No. 19-1838

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIRST CIRCUIT

MARIAN RYAN, in her official capacity as Middlesex County District
Attorney; RACHAEL ROLLINS, in her official capacity as Suffolk County
District Attorney; COMMITTEE FOR PUBLIC COUNSEL SERVICES;
CHELSEA COLLABORATIVE, INC.,
*Plaintiffs-Appellees,*

v.

U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; MATTEW T.
ALBENCE, in his official capacity as Acting Deputy Director of U.S.
Immigration and Customs Enforcement and Senior Official Performing the
Duties of the Director; TODD M. LYONS, in his official capacity as Acting
Field Office Director of U.S. Immigration and Customs Enforcement,
Enforcement and Removal Operations; U.S. DEPARTMENT OF HOMELAND
SECURITY; CHAD WOLF, in his official capacity as Acting Secretary of
United States Department of Homeland Security,
*Defendants-Appellants.*

On Appeal from the United States District Court for the District of
Massachusetts
Case No. 19-cv-11003; The Hon. Indira Talwani

**BRIEF OF *AMICI CURIAE* 19 FORMER MASSACHUSETTS JUDGES
IN SUPPORT OF PLAINTIFFS-APPELLEES AND AFFIRMANCE**

Douglas E. Keith
Alicia L. Bannon
Brennan Center for Justice
  at NYU School of Law
120 Broadway, Suite 1750
New York, NY 10271-0202
(646) 292-8310
keithd@brennan.law.nyu.edu
*Counsel for Amici Curiae*

# TABLE OF CONTENTS

TABLE OF CONTENTS ........................................................................... i

TABLE OF AUTHORITIES ..................................................................... ii

INTERESTS OF AMICI ...........................................................................1

SUMMARY OF ARGUMENT ................................................................2

ARGUMENT .............................................................................................5

  I.  ICE Courthouse Enforcement Deters Members of Immigrant Communities from Accessing State Courts and Chills Their Behavior. ...............................5

    A.  ICE Arrests in State Courts Have Had a Broad Chilling Effect on Courthouse Access. ...................................................................6

    B.  Even When the Parties to a Case Appear in Court, the Presence of ICE Deters Witnesses from Appearing and Affects Case Outcomes. .............12

  II.  ICE Courthouse Enforcement Prevents State Judiciaries from Administering the Justice System in an Orderly Fashion.......................................................14

    A.  ICE Arrests Have Disrupted and Delayed Court Proceedings.................16

    B.  ICE Enforcement Interferes with State Judicial Administration by Pulling State Court and Court-Adjacent Employees into Enforcement Actions..18

    C.  ICE's Presence Has Led to a Generally Chaotic, at Times Violent, Atmosphere Inside Courthouses, Undermining Safety and Interfering with Judicial Administration. ...................................................................20

  III.  ICE Courthouse Enforcement Threatens the Public Trust Courts Depend on to Ensure Access to Justice...........................................................................23

CONCLUSION .......................................................................................27

APPENDIX: LIST OF AMICI ...............................................................29

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

## Cases

*Christopher v. Harbury*,
  536 U.S. 403 (2002)......................................................................................4

*Commonwealth v. Young*,
  73 Mass. App. Ct. 479, 899 N.E.2d 838 (2009) ...................................12

*Cox v. Louisiana*,
  379 U.S. 559 (1965).......................................................................................6

*Lamb v. Schmitt*,
  285 U.S. 222 (1932).......................................................................................4

*New York v. U.S. Immigration and Customs Enforcement*,
  No. 19-cv-8876, 2019 WL 6906274 (S.D.N.Y. Dec. 19, 2019)......................4, 12

*Richmond Newspapers, Inc. v. Virginia*,
  448 U.S. 555 (1980).....................................................................................24

*United States v. Kravetz*,
  706 F.3d 47 (1st Cir. 2013).........................................................................24

*Waller v. Georgia*,
  467 U.S. 39 (1984).......................................................................................12

*Williams-Yulee v. Florida Bar*,
  575 U.S. 433 (2015).....................................................................................24

## Other Authorities

American Civil Liberties Union, *Freezing Out Justice* (2018) ...............................16

Amicus Letter of Massachusetts Legal Aid Organizations filed in Support of
  Petition for Writ of Protection, Mar. 23, 2018 ..................................... 8, 9, 10, 14

Andrew Selsky, *Oregon Panel Recommends Barring ICE From Courthouse
  Arrests*, Associated Press (Oct. 18, 2019) ...........................................................22

Angela Irvine, Ph. D. et al., *The Chilling Effect of ICE Courthouse Arrests: How
  Immigration and Customs Enforcement (ICE) Raids Deter Immigrants from
  Attending Child Welfare, Domestic Violence, Adult Criminal, and Youth Court
  Hearings*, Ceres Policy Research (2019)...............................................................26

Annual Report on the State of the Massachusetts Court System, Fiscal Year 2019 ......................................................................................................... 15, 25

Cameron Knight, *Ohio Judge Uses a Hunch to Call ICE on Undocumented Defendants: 'Haven't Got One Wrong Yet'*, USA Today (Jan. 26, 2020) ...........26

Chantal Da Silva, *Pennsylvania Judge Calls ICE to Arrest Couples On Their Wedding Days*, Newsweek (Apr. 20, 2018) ........................................................26

Chief Justice of the California Supreme Court Tani G. Cantil-Sakauye, opinion, *California Chief Justice: The Courthouse Is Not the Place for Immigration Enforcement*, Wash. Post (Apr. 19, 2017) ...........................................................25

Chris Henry, *Man Arrested By ICE Outside Kitsap Courthouse Free on Bail*, Kitsap Sun (Dec. 7, 2019)......................................................................................11

Cora Engelbrecht, *Few Immigrants Are Reporting Domestic Abuse. Police Blame Fear of Deportation.*, N.Y. Times (June 3, 2018) ...................................................8

Edmund H. Mahony, *Marshal Fired After Standoff Between Activists and ICE Agents at Derby Courthouse*, Hartford Courant (Jan. 27, 2020)..........................21

E-mail from Chief Criminal Judge Andrew R. Erwin to WSH-Judges, et al. (June 1, 2018) ................................................................................................... 19, 23

Evangeline M. Chan, opinion, *Government Immigration Policies Are Harming Trafficking Survivors*, The Hill (Jan. 20, 2020).....................................................7

Gustavo Solis, *Fewer Immigrants Apply for Special Visa Reserved for Crime Victims*, San Diego Union-Tribune (Sept. 1, 2019)................................................9

ICE Directive No. 11072.1, "Civil Immigration Actions Inside Courthouses," Jan. 10, 2018................................................................................................... 11, 20

ICE Out of Courts Coalition, *Safeguarding the Integrity of Our Courts: The Impact of ICE Courthouse Operations in New York State* (2019)........................ 8, 14, 17

Immigrant Defense Project, *Denied, Disappeared, and Deported: The Toll of ICE Operations at New York's Courts in 2019* (2020)...................................................2

Immigrant Defense Project, *The Courthouse Trap: How ICE Operations Impacted New York's Courts in 2018* (2019) .....................................................................22

James Queally, *Fearing Deportation, Many Domestic Violence Victims Are Steering Clear of Police and Courts*, L.A. Times (Oct. 9, 2017)...........................8

Judicial Branch of California, *Fear of Immigration Crackdown May Keep Court Users Away*, Mar. 30, 2017.................................................................21

Katie Shepherd, *An ICE Agent Shoved a Lawyer While Making an Arrest at the Multnomah County Courthouse*, Williamette Week (Apr. 26, 2019) .................22

Larry Celona et al., *Why Illegal-Immigrant Criminals Are Begging to Go to Rikers Island*, N.Y. Post (Mar. 24, 2017) .......................................................14

Lawyers' Committee for Civil Rights and Economic Justice, *Immigration Enforcement At Massachusetts Courthouses: A Fact Sheet* (2017) .......................3

Leonard Greene, *ICE Ignoring Courthouse Guidelines to Make Arrests: Report*, N.Y. Daily News (Jan. 14, 2020).......................................................11

Letter from Former Judges to Ronald D. Vitiello, Acting Director, U.S. Immigration & Customs Enforcement, Dec. 12, 2018 ............................... 3, 6, 15

Letter from Innovation Law Lab to Chief Justice Martha L. Walters, Oregon Supreme Court, Dec. 4. 2018.................................................................16

Letter from Innovation Law Lab, ACLU of Oregon, and Stoll Berne to Bruce Miller, Oregon Uniform Trial Court Rules Reporter, Sept. 3, 2019 ...............7, 13

Letter from Martha L. Walters, Chief Justice of the State of Oregon, to Bryan S. Wilcox, Acting Field Office Director for ICE Enforcement & Removal Operations, June 17, 2019.................................................... 9, 21, 22

Letter from Massachusetts Supreme Judicial Court Chief Justice Ralph D. Gants and Trial Court Chief Justice Paula M. Carey to Acting Field Office Director Marcos Charles, Oct. 23, 2019 .......................................................18

Letter from Members of Congress to Hon. Jeh Johnson, Secretary of the U.S. Dep't of Homeland Security, May 28, 2014.................................................27

Letter from Paula M. Carey, Chief Justice of the Trial Court, Commonwealth of Massachusetts, to Matthew Etre, ICE Special Agent in Charge, Feb. 23, 2017, *Ryan v. U.S. Immigration and Customs Enforcement*, No. 1:19-cv-11003-IT, ECF No. 1 Ex. G (D. Mass. Apr. 29, 2019).................................... 10, 25

Letter from Thomas A. Balmer, Chief Justice of the State of Oregon, to U.S. Attorney General Jeff Sessions and Hon. John F. Kelly, Apr. 6, 2017 ...............16

Michael L. Buenger, *The Challenge of Funding State Courts in Tough Fiscal Times*, 41 Court Review 14, 17 (2004).................................................15

Northeastern University School of Law, Immigrant Justice Clinic, *Blocking the Courthouse Doors: ICE Enforcement at Massachusetts Courthouses and Its Effects on the Judicial Process* (2018) .......................................................... 17, 18

Sarah Plake, *ICE Arrests KC Mom Outside of Child Custody Hearing*, 41 KSHB Kansas City (Feb. 18, 2019) ...............................................................................11

Scott Weiner and George Gascon, opinion, *Now Immigrants Are Being Harassed on the Witness Stand in California Courtrooms*, Sacramento Bee (May 7, 2018) .................................................................................................................13

Sheller Center for Social Justice at Temple University Beasley School of Law, *Obstructing Justice: The Chilling Effect of ICE's Arrests of Immigrants at Pennsylvania's Courthouses* (2019) .................................................. 6, 7, 9, 13, 17

Stephen Rex Brown, *ICE Arrests of Undocumented Immigrants at NYC Courthouses Increase Again in 2018: Report*, N.Y. Daily News (Jan. 27, 2019) .................................................................................................................23

University of Washington Center for Human Rights, *Justice Compromised: Immigration Arrests at Washington State Courthouses* (Oct. 16, 2019)..............27

**<u>INTERESTS OF AMICI</u>[1]**

We are 19 former state judges and justices from Massachusetts, with more than 350 years of combined experience on the state's trial and appellate courts. We have served on the Massachusetts Supreme Judicial Court, the Appeals Court, Superior Court, District Court, Juvenile Court, and Boston Municipal Court. In these roles we have seen and taken on the judicial branch's challenging task of administering the state's justice system daily, and we have sought to foster and expand access to justice in carrying out those responsibilities. Some of us have also served on the Massachusetts Access to Justice Commission, a body tasked with understanding and reducing the barriers faced by members of Massachusetts' communities in accessing justice in our courts. A full list of amici is provided in the Appendix.

As former judges and justices, we know first-hand how the presence and actions of Immigration and Customs Enforcement (ICE) are likely to affect Massachusetts' judges and the day-to-day operations of its courthouses. Based on our experience, informed by how courthouse enforcement has manifested across

_____

[1] Pursuant to Fed. R. App. P. 29(a)(4), counsel for amici certify that amici and their counsel authored this brief in its entirety and that no party or its counsel, nor any other person or entity other than amici or their counsel, made a monetary contribution to this brief's preparation or submission. All parties consented to the filing of this brief. This brief does not purport to convey the position of NYU School of Law.

the country, we write to detail how courthouse arrests by ICE are incompatible with the judiciary's responsibility to ensure courthouse access, maintain orderly and efficient dockets and courthouses, and safeguard the public's trust in its courts.

## **SUMMARY OF ARGUMENT**

For courts to fully serve their communities, broad access to justice is vital. One essential element of access is that anyone who walks through the courthouse doors to seek relief, protection, or to defend themselves will feel safe doing so. Beginning in 2017, however, there has been a substantial increase in ICE officers making civil immigration arrests of persons appearing in state courts. Reports suggest that there has been more than a ten-fold increase in the frequency of these arrests in some jurisdictions.[2] In 2017 alone, federal immigration officers conducted immigration enforcement in or near at least 24 state courthouses in

---

[2] Immigrant Defense Project, *Denied, Disappeared, and Deported: The Toll of ICE Operations at New York's Courts in 2019*, at 6 (2020), https://www.immigrantdefenseproject.org/wp-content/uploads/Denied-Disappeared-Deported-FINAL.pdf.

Massachusetts.[3] Nationally, ICE officers have made civil immigration arrests at courts in more than twenty states.[4]

The examples in this brief, drawn from within Massachusetts and across the country, are illustrative of the intolerable harm courthouse immigration arrests pose to the Massachusetts justice system. First, courthouse immigration enforcement has made courthouses places to fear for many members of immigrant communities, leading many individuals to avoid courthouses altogether or limit their interaction with courts. This chilling effect harms both the individuals who have lost opportunities to seek justice and protection in the courts, as well as the justice system as a whole, which faces the challenge of delivering justice and ensuring public safety without the full participation of the communities it serves.

The manner in which ICE officers have conducted courthouse arrests has also at times created an atmosphere of chaos and confusion in courthouses. By removing individuals immediately prior to, or in the middle of, proceedings, and

_____

[3] Lawyers' Committee for Civil Rights and Economic Justice, *Immigration Enforcement At Massachusetts Courthouses: A Fact Sheet* 3 (2017), http://lawyersforcivilrights.org/wp-content/uploads/2017/11/Immigration-Enforcement-at-Massachusetts-Courthouses-FINAL-FOR-PUBLIC-RELEASE.pdf.
[4] Letter from Former Judges to Ronald D. Vitiello, Acting Director, U.S. Immigration & Customs Enforcement, Dec. 12, 2018, at 1, https://www.scribd.com/document/395488473/Letter-From-Former-Judges-Courthouse-Immigration-Arrests ("Former Judges' Letter").

engaging in physical altercations while court is in session, ICE officers have disrupted the order and compromised the safety essential to effectively and efficiently conduct the business of state courts.

Finally, ICE's use of state judicial branch resources to further federal immigration enforcement undermines the public's trust in the judicial branch. The judiciary depends on this trust to encourage public participation in the justice system as victims, defendants, witnesses, and jurors. This trust is essential to encouraging participation in programs designed to expand access to, and improve the quality of, the justice the judicial branch delivers.

Appellees' claims under the Administrative Procedure Act and the United States Constitution are grounded in longstanding legal principles ensuring courthouse access so that the public may have "an opportunity to seek justice," so that courts may "function properly," and so that states may administer their own judicial systems. *See New York v. U.S. Immigration and Customs Enforcement*, No. 19-cv-8876, 2019 WL 6906274, at *10, *12 (S.D.N.Y. Dec. 19, 2019).[5] For the

---

[5] *See also Christopher v. Harbury*, 536 U.S. 403, 412-15 (2002) (discussing the several constitutional provisions on which courthouse access claims rest, and concluding that courts have viewed the right to courthouse access as a necessary corollary of the underlying right plaintiffs seek to enforce); *Lamb v. Schmitt*, 285 U.S. 222, 225 (1932) ("The general rule that witnesses, suitors, and their attorneys, while in attendance in connection with the conduct of one suit, are immune from service of process in another, is founded, not upon the convenience of the individuals, but of the court itself…, it proceeds upon the ground that the due

above reasons, civil immigration arrests of persons appearing in court violate these principles, and this Court should uphold the preliminary injunction granted by the district court.

## **ARGUMENT**

### I. **ICE Courthouse Enforcement Deters Members of Immigrant Communities from Accessing State Courts and Chills Their Behavior.**

Courts are supposed to be places where individuals feel safe accessing the justice system. Without this sense of safety, the public will be reluctant to access courts, courts will be unable to provide the protection and services on which communities and individuals depend, and justice will remain out of reach for many. The experiences of jurisdictions across the country, however, make clear that ICE arrests of persons attending court on official business have made courthouses places to fear for many members of immigrant communities. As a result, individuals crucial to the proper functioning of the criminal and civil justice systems – including defendants, plaintiffs, victims, and witnesses – are avoiding courthouses and withdrawing from the justice system. "Judges simply cannot do

---

administration of justice requires that a court shall not permit interference with the progress of a cause pending before it,…which would prevent, or the fear of which might tend to discourage, the voluntary attendance of those whose presence is necessary or convenient to the judicial administration in the pending litigation.") (internal citations omitted).

their jobs – and our justice system cannot function effectively – if victims, defendants, witnesses, and family members do not feel secure in accessing the courthouse."[6] The chilling effect of ICE's presence undermines the judicial branch's ability to provide justice to the communities it is supposed to serve.

### A. ICE Arrests in State Courts Have Had a Broad Chilling Effect on Courthouse Access.

We understand intimately that the primary responsibility of state judges is to serve their communities and ensure that the state's justice system both appears to be, and is in fact, open to all. More broadly, we recognize that "the unhindered and untrammeled functioning of our courts is part of the very foundation of our constitutional democracy." *Cox v. Louisiana*, 379 U.S. 559, 562 (1965).

Yet, across the country, including in Massachusetts, individuals from immigrant communities, including victims of violence, have told their lawyers they are afraid of appearing in court due to the presence of ICE. Numerous surveys of lawyers and non-attorney advocates conducted over the last three years confirm the persistence of these fears. Three-quarters of lawyers and community service providers surveyed in Pennsylvania reported that clients have expressed fear of going to court, or declined to pursue a case, because of fear of ICE contact.[7] In a

---

[6] Former Judges' Letter, *supra* note 4.
[7] Sheller Center for Social Justice at Temple University Beasley School of Law, *Obstructing Justice: The Chilling Effect of ICE's Arrests of Immigrants at*

2019 survey of Oregon legal service providers, every attorney surveyed reported hearing such fears directly from clients.[8]

Alleged perpetrators of violence have at times deliberately used ICE's presence in courthouses as a threat to dissuade their victims from seeking the protection of a court. When one survivor of human trafficking was evicted by her trafficker, her trafficker's attorney told her that if she went to court to fight the eviction, ICE would be there to deport her.[9] A domestic violence services agency has also reported instances of intimate partners telling survivors of violence that they will be deported if they go to court to pursue an order of protection.[10] The resulting fear has translated into the filing of fewer cases on behalf of these survivors of violence. In Massachusetts, for example, "[a]dvocates have reported

---

*Pennsylvania's Courthouses* 9 (2019), https://www2.law.temple.edu/csj/publication/obstructing-justice-the-chilling-effect-of-ices-arrests-of-immigrants-at-pennsylvanias-courthouses/ ("Obstructing Justice").

[8] Letter from Innovation Law Lab, ACLU of Oregon, and Stoll Berne to Bruce Miller, Oregon Uniform Trial Court Rules Reporter, Sept. 3, 2019, at 6, https://aclu-or.org/sites/default/files/field_documents/utcr_proposal_re_ice_courthouses.pdf.

[9] Evangeline M. Chan, opinion, *Government Immigration Policies Are Harming Trafficking Survivors*, The Hill (Jan. 20, 2020), https://thehill.com/opinion/immigration/479034-government-immigration-policies-are-harming-trafficking-survivors.

[10] Obstructing Justice, *supra* note 7, at 10.

immigrant clients…are so afraid of encountering ICE that they choose to let [209A Abuse Prevention Orders] expire, or forego seeking a 209A order entirely."[11]

Fears stemming from ICE's presence have measurably harmed the ability of our courts to serve immigrant communities. Numerous metrics indicate that, across the country, members of immigrant communities are avoiding courts. Court systems and law enforcement agencies have reported declines in reports of domestic violence and requests for protective orders among immigrant communities.[12] New York's court system also reported a decline in participation in problem-solving courts, with 10 percent fewer foreign-born clients seeking assistance in the state's Family Justice Centers in 2017 as compared to 2016.[13] Use

---

[11] Amicus Letter of Massachusetts Legal Aid Organizations filed in Support of Petition for Writ of Protection, Mar. 23, 2018, at 10 ("Mass. Legal Aid Amicus Letter"), https://dovema.org/wp-content/uploads/2018/03/Final-Amicus-Letter-SIGNED-3-23-2018.pdf.

[12] *See, e.g.*, James Queally, *Fearing Deportation, Many Domestic Violence Victims Are Steering Clear of Police and Courts*, L.A. Times (Oct. 9, 2017), http://www.latimes.com/local/lanow/la-me-ln-undocumented-crime-reporting-20171009-story.html; Cora Engelbrecht, *Few Immigrants Are Reporting Domestic Abuse. Police Blame Fear of Deportation.*, N.Y. Times (June 3, 2018), https://www.nytimes.com/2018/06/03/us/immigrants-houston-domestic-violence.html; ICE Out of Courts Coalition, *Safeguarding the Integrity of Our Courts: The Impact of ICE Courthouse Operations in New York State* 22 (2019) ("Safeguarding Report"), https://www.immigrantdefenseproject.org/wp-content/uploads/Safeguarding-the-Integrity-of-Our-Courts-Final-Report.pdf (analyzing data from the New York State Unified Court System showing a general decline in the issuance of orders of protection against intimate partners and family members at the same time ICE increased its presence in New York courthouses).

[13] Safeguarding Report, *supra* note 12, at 23.

of the federal government's U-visa program, which provides visas to noncitizens who have been victims of crimes and cooperate in the investigation of those crimes, as certified by state or federal judges, law enforcement officers, or prosecutors, has also declined for the first time in its 10-year existence.[14]

ICE's courthouse presence has had a similar impact on individuals who otherwise would look to the justice system to vindicate rights related to housing, employment, and child custody.[15] For example, the Chief Justice of the Oregon Supreme Court informed ICE that its presence is "affecting community members' willingness to participate in judicial proceedings, including…responding to eviction notices."[16] In Pennsylvania, civil legal services attorneys surveyed reported a 35 percent decline in undocumented immigrants seeking assistance with wage theft cases.[17] The Chief Justice of the Trial Court in Massachusetts warned ICE in a 2017 letter that "individuals who currently come to our Courts to help

---

[14] Gustavo Solis, *Fewer Immigrants Apply for Special Visa Reserved for Crime Victims*, San Diego Union-Tribune (Sept. 1, 2019), https://www.sandiegouniontribune.com/news/immigration/story/2019-08-31/u-visa-decline-story.

[15] *See generally* Mass. Legal Aid Amicus Letter, *supra* note 11.

[16] Letter from Martha L. Walters, Chief Justice of the State of Oregon, to Bryan S. Wilcox, Acting Field Office Director for ICE Enforcement & Removal Operations, June 17, 2019 ("Walters Letter"), https://innovationlawlab.org/wp-content/uploads/2019/07/ICE-Letter-to-Wilcox.pdf.

[17] Obstructing Justice, *supra* note 7, at 10.

themselves or a loved one in obtaining a civil commitment for detox or treatment will be reluctant to come forward if they fear immigration consequences."[18]

The fear of encountering ICE in Massachusetts' courts is so powerful and widespread that the state's legal service providers have changed the way they serve their clients, incorporating new strategies aimed at avoiding court. For example, Appellee Chelsea Collaborative, a community-based service provider, reports that it has expended great time and resources establishing extra-judicial dispute resolution programs. Vega Decl. ¶¶ 15-21 (Joint Appendix ("JA") 165-67). These programs serve persons suffering from harms including consumer fraud and wage theft, but who refuse to appear in court despite being advised that they could seek court intervention. *Id*. Other service providers have avoided asking courts to waive fees for indigent clients "where the process of getting court fees waived requires a court appearance for a vulnerable client who fears exposure to ICE."[19]

In its January 2018 directive formalizing its policy regarding courthouse arrests, ICE said that its officers would "generally avoid" specialty courts and "areas within courthouses that are dedicated to non-criminal (e.g., family court,

---

[18] Letter from Paula M. Carey, Chief Justice of the Trial Court, Commonwealth of Massachusetts, to Matthew Etre, ICE Special Agent in Charge, Feb. 23, 2017, *Ryan v. U.S. Immigration and Customs Enforcement*, No. 1:19-cv-11003-IT, ECF No. 1 Ex. G (D. Mass. Apr. 29, 2019) ("Carey Letter").

[19] Mass. Legal Aid Amicus Letter, *supra* note 11, at 13.

small claims court) proceedings." ICE Directive No. 11072.1, "Civil Immigration Actions Inside Courthouses," Jan. 10, 2018 (JA 149-152). But there is no indication that this directive has allayed fears of coming to court and it may even have exacerbated them. Many courthouses conduct a variety of proceedings in close proximity – and a large portion of the public does not have a lawyer's nuanced understanding of the distinction between types of courts or types of cases that courts hear. To that population, the directive amounts to little more than a pledge by ICE to continue making arrests. In fact, ICE officers have continued to make arrests of persons appearing in court for things as routine as traffic violations and as sensitive as child custody hearings.[20]

Without judicial action, or a wholesale formal policy change by ICE that its officers will no longer arrest persons coming to court on official business, members of immigrant communities will continue to avoid courthouses, the very

---

[20] *See, e.g.*, Chris Henry, *Man Arrested By ICE Outside Kitsap Courthouse Free on Bail*, Kitsap Sun (Dec. 7, 2019), https://www.kitsapsun.com/story/news/local/2019/12/07/man-arrested-ice-outside-kitsap-courthouse-free-bail/2613128001/; Sarah Plake, *ICE Arrests KC Mom Outside of Child Custody Hearing*, 41 KSHB Kansas City (Feb. 18, 2019), https://www.kshb.com/news/local-news/ice-arrests-kc-mom-outside-of-child-custody-hearing-attorneys-say-its-suspicious; *see also* Leonard Greene, *ICE Ignoring Courthouse Guidelines to Make Arrests: Report*, N.Y. Daily News (Jan. 14, 2020), https://www.nydailynews.com/new-york/ny-ice-rally-courthouse-arrests-20200114-pck7bxjhmbdrfpefwerh53b3fm-story.html.

places that are tasked with serving them and ensuring the safety and rights of their communities.

### B. Even When the Parties to a Case Appear in Court, the Presence of ICE Deters Witnesses from Appearing and Affects Case Outcomes.

For judges and juries to reach just outcomes in pending cases, it is essential that members of immigrant communities feel confident they can safely access courthouses. The public's full and willing participation in the justice system makes it more likely that judges and juries will hear from all relevant parties and witnesses and be able to assess the trustworthiness of that testimony. Moreover, the presence of family members and other observers in the courtroom is similarly crucial because their presence keeps "triers keenly alive to a sense of their responsibility and to the importance of their functions," and "encourages witnesses to come forward and discourages perjury." *See Waller v. Georgia*, 467 U.S. 39, 46 (1984) (citations omitted). Put simply, "Courts cannot be expected to function properly if third parties (not least the executive branch of the government) feel free to disrupt the proceedings and intimidate the parties and witnesses by staging arrests for unrelated civil violations in the courthouse, on court property, or while the witnesses or parties are in transit to or from their court proceedings." *New York v. U.S. Immigration and Customs Enforcement*, No. 19-cv-8876, 2019 WL 6906274, at *1 (S.D.N.Y. Dec. 19, 2019); *see also Commonwealth v. Young*, 73

Mass. App. Ct. 479, 899 N.E.2d 838 (2009) (recognizing judicial "authority to exclude spectators whose presence intimidates the witnesses").

The presence of ICE in courthouses and courtrooms has made persons crucial to pending cases less willing to testify in court. There are numerous reports by advocates and prosecutors of witnesses refusing to testify out of fear of appearing in court, including eyewitnesses with exculpatory evidence, gravely undermining the search for truth in those cases.[21] In one incident in California, for example, the mother of a survivor of domestic violence declined to testify in the retrial of her daughter's alleged abuser because the mother's immigration status had been revealed during her testimony in the initial trial.[22] The presence of ICE officers in courtrooms during hearings may also deter witnesses who do appear in court from forthrightly sharing information that may confirm their own immigration status, or that of others.[23]

In many instances these fears are impacting judicial outcomes. Legal services attorneys in Massachusetts report, for example, that "ICE presence in the

---

[21] *See, e.g.*, Letter from Innovation Law Lab, ACLU of Oregon, and Stoll Berne to Bruce Miller, Oregon Uniform Trial Court Rules Reporter, Sept. 3, 2019, at APP-27, https://aclu-or.org/sites/default/files/field_documents/appendix_to_utcr_proposal.pdf.
[22] Scott Weiner and George Gascon, opinion, *Now Immigrants Are Being Harassed on the Witness Stand in California Courtrooms*, Sacramento Bee (May 7, 2018), https://www.sacbee.com/opinion/california-forum/article210594384.html.
[23] *See* Obstructing Justice, *supra* note 7, at 6.

courthouses of the Commonwealth…has already chilled access to civil legal remedies," leading to civil matters related to housing, employment, and family law ending prematurely or with different substantive outcomes than they otherwise would have.[24] In the criminal context, fear of ICE has led defendants to take pleas, or request to be detained in circumstances under which their attorneys normally would have requested their release without bail.[25] Tenants in housing court have similarly been more willing to settle on unfavorable terms, as they "feel pressured to resolve a housing court case as quickly as possible and not ask for a new court date to seek advice of counsel" out of fear that ICE will have more time to learn of their presence in court, leading to tenants "unknowingly waiving defenses and counterclaims, and signing judgment agreements with unjust terms."[26]

## II. ICE Courthouse Enforcement Prevents State Judiciaries from Administering the Justice System in an Orderly Fashion.

Across the country, immigration enforcement in and around state courthouses has interfered with judges' ability to maintain the order and safety

---

[24] *See generally* Mass. Legal Aid Amicus Letter, *supra* note 11.
[25] *See* Larry Celona et al., *Why Illegal-Immigrant Criminals Are Begging to Go to Rikers Island*, N.Y. Post (Mar. 24, 2017), https://nypost.com/2017/03/24/why-illegal-immigrant-criminals-are-begging-to-go-to-rikers-island/; Safeguarding Report, *supra* note 12, at 40-42 (finding that "Over half of the [public defender organization] attorneys who responded to an internal survey stated that their clients have taken less favorable pleas to avoid having to return to court for fear of ICE.").
[26] Safeguarding Report, *supra* note 12, at 57-58.

necessary to effectively administer the justice system. "ICE's courthouse activities have led to physical altercations involving court employees, court staff burdened by ICE requests to facilitate arrests, and disputes between court administration and legal service providers."[27] As a result, ICE's presence has distracted court officials from their day-to-day responsibilities, disrupted court calendars, and consumed court resources. "The environment created by these incidents, in addition to the delays and rescheduling that result when fear prevents parties from appearing in court, only makes it more difficult for judges and court staff to do their jobs."[28]

All judges, and state judges in particular, have extensive administrative responsibilities.[29] In FY 2019, Massachusetts' courts received more than 800,000 new case filings and scheduled more than 50 million individual case events on court calendars.[30] As judges, we know how the disruptions caused by ICE arrests can impair the efficient administration of justice necessary to sustain a justice system of this size.

---

[27] Former Judges' Letter, *supra* note 4.

[28] *Id.*

[29] *See* Michael L. Buenger, *The Challenge of Funding State Courts in Tough Fiscal Times*, 41 Court Review 14, 17 (2004) ("Unlike the federal Constitution and many early state constitutions, which anchored much of the judiciary's institutional structure in the legislature, modern state constitutions now generally place this responsibility directly in the judiciary or in extra-legislative bodies.").

[30] Annual Report on the State of the Massachusetts Court System, Fiscal Year 2019, at 38-39, https://www.mass.gov/doc/fy-2019-annual-report-for-the-court-system/download.

## A. ICE Arrests Have Disrupted and Delayed Court Proceedings.

ICE arrests have disrupted judicial proceedings in several ways. In some instances, the chilling effect of ICE's presence has deterred individuals from appearing in court. At other times, ICE officers have disrupted proceedings even more directly by detaining persons with matters pending before a court.

Disruptions due to fear of ICE's presence are common. Fifty-four percent of judges who responded to a 2017 survey about the impact of ICE's presence in courthouses reported that "court cases were interrupted due to an immigrant crime survivor's fear of coming to court."[31] Oregon Supreme Court Justice Thomas A. Balmer, then serving as Chief Justice, warned ICE that "trial courts report that even attendance at scheduled hearings has been adversely affected because parties or witnesses fear the presence of ICE agents."[32] According to one survey of legal service providers, 82 percent reported having clients who failed to appear for a court date due to fear of ICE's presence.[33]

---

[31] American Civil Liberties Union, *Freezing Out Justice* 2 (2018), https://www.aclu.org/report/freezing-out-justice.

[32] Letter from Thomas A. Balmer, Chief Justice of the State of Oregon, to U.S. Attorney General Jeff Sessions and Hon. John F. Kelly, Apr. 6, 2017, at 2, https://www.documentcloud.org/documents/3540528-Chief-Justice-Balmer-Letter-to-AG-Sessions-Secy.html.

[33] Letter from Innovation Law Lab to Chief Justice Martha L. Walters, Oregon Supreme Court, Dec. 4. 2018, at 8, https://innovationlawlab.org/wp-content/uploads/2019/04/Petition-for-Chief-Justice-Order-Preventing-ICE-Courthouse-Arrests.pdf.

When individuals do come to court, ICE officers have directly caused disruptions by detaining individuals before, or in the middle of, their hearings. Prosecutors and defense attorneys report that individuals have "disappeared" after arriving at court for a scheduled hearing because ICE will often make arrests without informing the court or the individual's attorney.[34] State law enforcement employees have also delayed pending proceedings to give ICE officers time to arrive at the court.[35] In one incident in a Massachusetts District Court, ICE interrupted an ongoing criminal proceeding, refusing to allow a competency evaluation of an individual with a history of mental illness to be completed before detaining them.[36]

A missed court appearance, whether because an individual was afraid to appear or because they have been detained, can have damaging ripple effects for both the individual and the court system's ability to serve the public. As the Chief Justices of Massachusetts' Supreme Judicial Court and the Trial Court both warned ICE, "[r]emoval of state criminal defendants pending trial severely, and often irreparably, interferes with the state criminal process…, it prevents victims from

---

[34] *See, e.g.*, Safeguarding Report, *supra* note 12, at 42-44.
[35] Obstructing Justice, *supra* note 7, at 7.
[36] Northeastern University School of Law, Immigrant Justice Clinic, *Blocking the Courthouse Doors: ICE Enforcement at Massachusetts Courthouses and Its Effects on the Judicial Process* 6 (2018) ("Blocking the Courthouse Doors"), https://www.northeastern.edu/law/pdfs/clinics/ijc/courthouse-report.pdf.

having their day in court, denies defendants the opportunity to be exonerated, and allows defendants who would otherwise be convicted to escape punishment."[37] Judges have also issued bench warrants and defaults against individuals who have failed to appear in court, adverse rulings which the federal government can use against these individuals in immigration proceedings.[38]

The detention of individuals with pending cases also consumes limited justice system resources. After ICE removed a defendant "without the knowledge of the court," Massachusetts defense attorneys and prosecutors expended "extraordinary resources…to extradite the defendant back to the United States…so that he could face trial."[39] To courts, these incidents delay cases that otherwise could be resolved, taking the courts' time that could be spent on other proceedings.

## B. ICE Enforcement Interferes with State Judicial Administration by Pulling State Court and Court-Adjacent Employees into Enforcement Actions.

In numerous instances court security, judges, probation officers, law enforcement, and attorneys have facilitated or been given no choice but to

---

[37] Letter from Massachusetts Supreme Judicial Court Chief Justice Ralph D. Gants and Trial Court Chief Justice Paula M. Carey to Acting Field Office Director Marcos Charles, Oct. 23, 2019, https://d279m997dpfwgl.cloudfront.net/wp/2020/02/Correspondence-from-Chief-Justice-Gants-and-Chief-Justice-Carey_2.20.20.pdf ("Gants Letter").
[38] *See id.*; *see also* Klein Decl. ¶¶ 5-15 (JA 171-175); Blocking the Courthouse Doors, *supra* note 36, at 6.
[39] Gants Letter, *supra* note 37.

intervene in an ICE courthouse enforcement action, drawing their attention away from their normal responsibilities. These incidents interfere with judicial administration both by disrupting proceedings and siphoning limited state judicial resources. The Chief Criminal Judge of the Washington County Circuit Court in Oregon described an illustrative incident that occurred outside his courtroom when multiple ICE officers struggled to arrest an out-of-custody defendant who had just consented to the prosecutor's request to postpone the day's proceedings due to a family illness:

> The court-security deputy assigned to my courtroom was in a clear Hobson's dilemma. In a packed courtroom he had to decide whether to confront the present violence and unknown danger, thereby abandoning the in-custody defendants, or stay at his post and accept the consequences [of] the violence being wrought. I finally ORDERED him to abandon the prisoners and secure the hall. Reluctantly he did so. ICE agents…placed the security of this court, and those before it, in an untenable and unacceptable position.[40]

Incidents in which ICE officers have involved court employees are not an aberration, they are by design. ICE's January 2018 directive instructs its officers that "enforcement actions inside courthouses should, to the extent practicable, continue to take place in non-public areas of the courthouse, be conducted in collaboration with court security staff, and utilize the court building's non-public

---

[40] E-mail from Chief Criminal Judge Andrew R. Erwin to WSH-Judges, et al. (June 1, 2018) ("Erwin Letter"), https://www.brennancenter.org/sites/default/files/2020-05/Ryan%20et%20al_Erwin%20email%206.1.18.pdf.

entrances and exits." ICE Directive 11072.1 at 2 (JA 150). The directive therefore expressly instructs officers conducting enforcement actions inside courthouses to use state judicial resources, both by collaborating with court security staff, and by gaining access to non-public areas of the courthouse. The directive, however, makes no suggestion that officers ask the judicial branch's permission before using these resources to make arrests, weigh the urgency of their arrest against the importance of the judicial proceedings it will impact, or consider the undesirability of drawing court staff away from their other pressing responsibilities. Rather, the directive assumes that ICE officers may interfere with state judicial proceedings and resources whenever they deem appropriate.

## C. ICE's Presence Has Led to a Generally Chaotic, at Times Violent, Atmosphere Inside Courthouses, Undermining Safety and Interfering with Judicial Administration.

Judges and others regularly present at courthouses have decried the chaos and confusion that ICE's courthouse tactics can and have led to. This environment deters courthouse access, hinders efficient administration, and leaves everyone in a courthouse less safe. Chief Justice Walters of Oregon explained:

> ICE arrests often create the type of public alarm that the directive seeks to avoid. For example, ICE agents are usually in plain clothes, do not always identify themselves during arrests, and have refused to produce a warrant or other document authorizing the detention, when requested.

An arrest made under those circumstances understandably leads to confusion and uncertainty.[41]

 In one incident that a judge in Los Angeles described as causing "near hysteria," the mere rumor that ICE was planning to carry out a raid led to individuals "fleeing the courthouse."[42] More recently, the Superior Court in Derby, Connecticut saw a day-long standoff between ICE officers and immigration advocates seeking to protect the individual the ICE officers had come to detain while he was appearing on an unrelated charge of misdemeanor assault.[43] The advocates and the officers remained in the court until closing, and the state ultimately fired a judicial marshal who the ICE officers complained initially prevented them from entering the courthouse.

Contributing to this chaos, even when ICE officers come to courthouses to arrest a particular individual, they often do not know what that person looks like and ultimately involve many bystanders in their investigations. Chief Justice Walters further described an incident in which "One court employee observed ICE agents stopping numerous people leaving a courtroom where a targeted individual

---

[41] Walters Letter, *supra* note 16.

[42] Judicial Branch of California, *Fear of Immigration Crackdown May Keep Court Users Away*, Mar. 30, 2017, https://newsroom.courts.ca.gov/news/fear-of-immigration-crackdown-may-keep-court-users-away.

[43] Edmund H. Mahony, *Marshal Fired After Standoff Between Activists and ICE Agents at Derby Courthouse*, Hartford Courant (Jan. 27, 2020), https://www.courant.com/news/connecticut/hc-news-marhall-immigration-agents-20200127-20200127-bqabiztyrrhenaqaxk3u2wlacy-story.html.

was expected," and another in which "ICE agents mistakenly accused the wrong person of being the targeted individual and aggressively questioned that person."[44] "In those cases," Chief Justice Walters wrote, "even though ICE agents were looking for a targeted individual, they exposed numerous people – based on their race and ethnicity – to tactics that aroused their fear."[45]

At the worst moments, ICE enforcement actions have led to incidents of violence in and around courthouses. There have been several instances of physical altercations between ICE officers and the individuals they are seeking to arrest, as well as their family members and attorneys. Court officers at the Somerville District Court had to intervene when one arrest escalated to the point that onlookers believed they were witnessing a civilian fist fight. Compl. ¶ 58 (JA 40). In one incident captured on videotape, "ICE agents pepper-sprayed family members of a person they were trying to arrest" in a courthouse in Astoria, Oregon.[46] In others, officers shoved attorneys or the targets of their arrests.[47] On

---

[44] Walters Letter, *supra* note 16.

[45] *Id.*

[46] Andrew Selsky, *Oregon Panel Recommends Barring ICE From Courthouse Arrests*, Associated Press (Oct. 18, 2019), https://apnews.com/95e068fcb3b0406aa4da1c5af9a24f81.

[47] *See, e.g.*, Katie Shepherd, *An ICE Agent Shoved a Lawyer While Making an Arrest at the Multnomah County Courthouse*, Williamette Week (Apr. 26, 2019), https://www.wweek.com/news/courts/2019/04/26/an-ice-agent-shoved-a-lawyer-while-making-an-arrest-at-the-multnomah-county-courthouse/; Immigrant Defense Project, *The Courthouse Trap: How ICE Operations Impacted New York's Courts*

more than one occasion in New York, the violence involved in the arrests, combined with the fact that ICE officers were wearing plain clothes, led onlookers to believe they had witnessed a kidnapping, not a law enforcement action.[48]

Judge Erwin's account of the incident outside his Oregon courtroom again provides a vivid illustration of the chaos that can result from ICE courthouse arrests:

> [ICE agents] rushed the defendant, who attempted to flee, and a general melee ensued. Many people were screaming, bodies were slamming against the walls, it was clear that some manner of fighting was going on, and it appeared that someone…was in anguish or pain. But we had no idea what was happening or who was involved.[49]

The chaos and confusion that flow from ICE's courthouse enforcement contributes to individuals' fear of coming to court, disrupts and delays proceedings, and makes everyone in court less safe.

### III.   ICE Courthouse Enforcement Threatens the Public Trust Courts Depend on to Ensure Access to Justice.

ICE's courthouse enforcement activities also threaten the public's trust in state courts. The perception and reality that some judges are participating in ICE

---

in 2018, at 8-9 (2019), https://www.immigrantdefenseproject.org/wp-content/uploads/TheCourthouseTrap.pdf.

[48] Stephen Rex Brown, *ICE Arrests of Undocumented Immigrants at NYC Courthouses Increase Again in 2018: Report*, N.Y. Daily News (Jan. 27, 2019), https://www.nydailynews.com/new-york/ny-metro-ice-arrests-nyc-courthouses-20190125-story.html.

[49] Erwin Letter, *supra* note 40.

enforcement will necessarily undermine confidence among immigrant communities that state courts are venues for delivering justice and steadfastly independent from the other branches of government. By chilling access to courts by family members, witnesses, and other observers, ICE's presence also undermines the trust that flows from the public's ability to "monitor the functioning of our courts." *See United States v. Kravetz,* 706 F.3d 47, 56-57 (1st Cir. 2013) (citation omitted).

In our democracy, the judicial branch depends chiefly on the public's confidence for its authority and on the public's willingness to participate in judicial proceedings for its effectiveness. *See Williams-Yulee v. Florida Bar*, 575 U.S. 433, 445-46 (2015) ("The judiciary's authority therefore depends in large measure on the public's willingness to respect and follow its decisions."); *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 571-72 (1980) ("[t]o work effectively, it is important that society's criminal process satisfy the appearance of justice") (internal quotation marks and citations omitted).

Particularly as state judiciaries implement programs aimed at improving the access to and quality of justice in their states, courts depend on the public's trust for those programs to be successful. As the Chief Justice of the Trial Court for Massachusetts explained to ICE, *"*Encouraging individuals who are concerned for their safety or the safety of another to explore the options and protections available

to them from the Trial Court has been an essential part of providing justice, preventing crime, and promoting public safety."[50] The Chief Justice of California has also noted that a specialized court, in particular a court that connects the justice system with social service agencies, "only works if it has the trust, confidence and cooperation of all of the participants."[51] In furtherance of its goal to serve the entirety of its community, the Massachusetts court system has itself established or partnered with community organizations on numerous access to justice initiatives.[52] The court system also includes 53 specialty courts, including drug courts, mental health courts, veteran treatment courts, and family resolutions court.[53] These programs also include numerous clinics which depend on community members' willingness to bring themselves to court facilities, including Massachusetts' Court Service Centers which served 60,000 people in FY 2019.[54]

---

[50] Carey Letter, *supra* note 18.

[51] Chief Justice of the California Supreme Court Tani G. Cantil-Sakauye, opinion, *California Chief Justice: The Courthouse Is Not the Place for Immigration Enforcement*, Wash. Post (Apr. 19, 2017), https://www.washingtonpost.com/opinions/california-chief-justice-the-courthouse-is-not-the-place-for-immigration-enforcement/2017/04/19/b35d5320-2054-11e7-be2a-3a1fb24d4671_story.html.

[52] Annual Report on the State of the Massachusetts Court System, *supra* note 30, at 9-11.

[53] *Id.* at 27-28.

[54] *Id.* at 14, 20, 22.

ICE's presence in courthouses undermines this essential trust. Regardless of how widely it occurs, a large segment of the population believes that judges *are* participating in ICE's courthouse enforcement activities. A 2019 nationwide survey of 1,000 people in mixed immigration status families found that a third of all respondents believed judges are helping ICE make arrests in courthouses and half of all court-involved respondents believed the same.[55] There are at least some incidents that support this perception. Last year, an Ohio Court of Common Pleas judge acknowledged tipping off ICE "about a dozen times a year" when he suspects someone appearing before him is undocumented.[56] In 2018, a Pennsylvania judge called ICE to report a man who appeared before her to be married, incorrectly suspecting that he was undocumented.[57]

---

[55] Angela Irvine, Ph. D. et al., *The Chilling Effect of ICE Courthouse Arrests: How Immigration and Customs Enforcement (ICE) Raids Deter Immigrants from Attending Child Welfare, Domestic Violence, Adult Criminal, and Youth Court Hearings*, Ceres Policy Research, 10 (2019), https://static1.squarespace.com/static/58ba8c479f7456dff8fb4e29/t/5dae6ba65642e a5d1cef9705/1571711914510/ice.report.final.21oct2019.pdf.

[56] Cameron Knight, *Ohio Judge Uses a Hunch to Call ICE on Undocumented Defendants: 'Haven't Got One Wrong Yet'*, USA Today (Jan. 26, 2020), https://www.usatoday.com/story/news/nation/2020/01/26/ice-ohio-judge-illegal-undocumented-immigrants-in-court/4581462002/.

[57] Chantal Da Silva, *Pennsylvania Judge Calls ICE to Arrest Couples On Their Wedding Days*, Newsweek (Apr. 20, 2018), https://www.newsweek.com/judge-calls-ice-arrest-couples-their-wedding-days-895116.

Even when judges themselves are not facilitating immigration enforcement at courthouses, the involvement of other officials in the state's justice system likely contributes to the perception that courts are willing participants. In Washington State, for example, some local prosecutors have an informal agreement with federal immigration officers to share the court's docket, including identifying information and hearing schedules.[58] In other states, ICE personnel have appeared at courthouses on the limited days when Spanish interpreters were available, "question[ing] and detain[ing] people in court who do not speak English or look Latino."[59]

Under these circumstances, public confidence in the judiciary as a fair and independent branch of government that provides justice to all communities is under threat.

## CONCLUSION

For the foregoing reasons, Amici join in asking this Court to affirm the district court's grant of a preliminary injunction barring the Defendants-Appellants

---

[58] University of Washington Center for Human Rights, *Justice Compromised: Immigration Arrests at Washington State Courthouses* (Oct. 16, 2019), https://jsis.washington.edu/humanrights/2019/10/16/ice-cbp-courthouse-arrests/.
[59] Letter from Members of Congress to Hon. Jeh Johnson, Secretary of the U.S. Dep't of Homeland Security, May 28, 2014, https://gwenmoore.house.gov/uploads/letter%20to%20secretary%20jeh%20johnson%20immigrant%20courthouse%20targeting%205.28.14.pdf.

from conducting civil immigration arrests of persons going to, attending, or leaving

Massachusetts courthouses on official business.

Dated: May 21, 2020

Respectfully submitted,

By: */s/ Douglas E. Keith*
    Douglas E. Keith
      Bar No. 1192712
    Alicia L. Bannon
    Brennan Center for Justice
      at NYU School of Law
    120 Broadway, Suite 1750
    New York, NY 10271-0202
    (646) 292-8310
    keithd@brennan.law.nyu.edu

## APPENDIX: LIST OF AMICI

**Hon. Roderick L. Ireland**: Former Chief Justice, Massachusetts Supreme Judicial Court; former Associate Justice, Massachusetts Supreme Judicial Court; former Associate Justice, Massachusetts Appeals Court; former Judge, Boston Juvenile Court

**Hon. Margot G. Botsford**: Former Associate Justice, Massachusetts Supreme Judicial Court; former Associate Justice, Massachusetts Superior Court

**Hon. Fernande R.V. Duffly**: Former Associate Justice, Massachusetts Supreme Judicial Court; former Associate Justice, Massachusetts Appeals Court; former Associate Justice, Massachusetts Probate and Family Court

**Hon. Geraldine S. Hines**: Former Associate Justice, Massachusetts Supreme Judicial Court; former Associate Justice, Massachusetts Appeals Court; former Associate Justice, Massachusetts Superior Court

**Hon. Barbara A. Dortch-Okara:** Former Chief Justice for Administration and Management of the Massachusetts Trial Court; Former Associate Justice, Massachusetts Superior Court; Former Judge, Boston Municipal Court

**Hon. Suzanne V. DelVecchio**: Former Chief Justice, Massachusetts Superior Court

**Hon. Carol S. Ball**: Former Associate Justice, Massachusetts Superior Court

**Hon. Thomas P. Billings**: Former Associate Justice, Massachusetts Superior Court

**Hon. Nonnie S. Burnes**: Former Associate Justice, Massachusetts Superior Court

**Hon. Paul A. Chernoff**: Former Associate Justice, Massachusetts Superior Court

**Hon. John C. Cratsley**: Former Associate Justice, Massachusetts Superior Court

**Hon. Leslie E. Harris**: Former Associate Justice, Suffolk Juvenile Court

**Hon. Bertha D. Josephson**: Former Associate Justice, Massachusetts Superior Court; former Judge, Chicopee District Court

**Hon. Christopher J. Muse**: Former Associate Justice, Massachusetts Superior Court

**Hon. Regina L. Quinlan Doherty**: Former Associate Justice, Massachusetts Superior Court

**Hon. Ernest L. Sarason, Jr.**: Former Associate Justice, Massachusetts District Court; former Associate Justice, Boston Municipal Court

**Hon. Charles T. Spurlock**: Former Associate Justice, Massachusetts Superior Court; former Associate Justice, Massachusetts District Court

**Hon. Paul E. Troy**: Former Associate Justice, Massachusetts Superior Court

**Hon. Margaret A. Zaleski**: Former Associate Justice, Massachusetts District Court

## CERTIFICATE OF COMPLIANCE

The undersigned counsel certifies compliance of the foregoing amicus brief with the following requirements of the Federal Rules of Appellate Procedure and the Local Rules of this Court.

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) and 29(a)(5), because this brief contains 6,326 words, including footnotes and appendix, but excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in Times New Roman 14-point font.

Dated: May 21, 2020                         Respectfully submitted,

By: */s/ Douglas E. Keith*
    Douglas E. Keith
    Alicia L. Bannon
    Brennan Center for Justice
      at NYU School of Law
    120 Broadway, Suite 1750
    New York, NY 10271-0202
    (646) 292-8310
    keithd@brennan.law.nyu.edu

## CERTIFICATE OF SERVICE

I hereby certify that on May 21, 2020, I electronically filed the foregoing document with the Clerk of the United States Court of Appeals for the First Circuit by using the CM/ECF system. Counsel in the case are registered CM/ECF users and such service will be accomplished by the CM/ECF system.

Katherine M. Fahey
Christopher J.C. Herbert
Alicia Rubio
Daryl L. Wiesen
David Zimmer
Goodwin Procter LLP
100 Northern Avenue
Boston, MA 02210

Wendy S. Wayne
Committee for Public Counsel Services
21 McGrath Highway, 2nd Floor
Somerville, MA 02143

Oren Nimni
Lawyers' Committee for Civil Rights
61 Batterymarch Street, 5th Floor
Boston, MA 02110

Rayford A. Farquhar
Donald Campbell Lockhart
Eve A. Piemonte
Michael P. Sady
U.S. Attorney's Office
1 Courthouse Way, Suite 9200
Boston, MA 02210

Francesca Genova
Julian Kurz
U.S. Dept. of Justice
Civil Division, Office of Immigration Litigation
PO Box 868
Washington, DC 20044

Erez R. Reuveni
U.S. Dept. of Justice
450 5th Street, N.W.
Washington, DC 20530

Bradly Paul Bennion
Law Office of Brad P. Bennion
PO Box 890118
Weymouth, MA 02189

Ralph L. Casale
Christopher J. Hajec
Michael Meriwether Hethmon
Immigration Reform Law Institute
25 Massachusetts Avenue, N.W., Suite 335
Washington, DC 20001

By: */s/ Douglas E. Keith*
    Douglas E. Keith
    Counsel for Amici