# United States Court of Appeals for the First Circuit

MARIAN RYAN, in her official capacity as Middlesex County District Attorney; RACHAEL ROLLINS, in her official capacity as Suffolk County District Attorney; COMMITTEE FOR PUBLIC COUNSEL SERVICES; CHELSEA COLLABORATIVE, INC.,

*Plaintiffs-Appellees,*

v.

U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; MATTHEW T. ALBENCE, in his official capacity as Acting Deputy Director of U.S. Immigration and Customs Enforcement and Senior Official Performing the Duties of the Director; TODD M. LYONS, in his official capacity as Acting Field Office Director of U.S. Immigration and Customs Enforcement, Enforcement and Removal Operations; U.S. DEPARTMENT OF HOMELAND SECURITY; CHAD WOLF, in his official capacity as Acting Secretary of United States Department of Homeland Security,

*Defendants-Appellants.*

On Appeal from the United States District Court
for the District of Massachusetts, Boston

---

**BRIEF FOR AMICI CURIAE STATES OF NEW YORK, CONNECTICUT, ILLINOIS, MARYLAND, MINNESOTA, NEW JERSEY, NEW MEXICO, OREGON, PENNSYLVANIA, RHODE ISLAND, VERMONT, VIRGINIA, WASHINGTON, AND THE DISTRICT OF COLUMBIA IN SUPPORT OF APPELLEES AND AFFIRMING THE JUDGMENT**

---

BARBARA D. UNDERWOOD
  *Solicitor General*
STEVEN C. WU
  *Deputy Solicitor General*
ARI J. SAVITZKY
  *Assistant Solicitor General*
    *of Counsel*

*(Counsel listing continues on signature pages.)*

LETITIA JAMES
  *Attorney General*
  *State of New York*
28 Liberty Street
New York, New York 10005
(212) 416-6073

Dated: May 22, 2020

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ........................................................................ii

INTEREST OF AMICI CURIAE AND PRELIMINARY
    STATEMENT ................................................................................. 1

ARGUMENT ............................................................................................. 3

POINT I

ICE's Policy Significantly Impairs Amici States' Ability to
Dispense Justice Through Their Courts ........................................ 3

    A.   Civil Immigration Arrests Pursuant to ICE's Policy
        Have Seriously Disrupted State Judicial Proceedings ............. 5

    B.   ICE's Policy Has Impeded Prosecutions and Deterred
        Crime Victims and Others from Accessing State Courts....... 15

    C.   ICE Has Disregarded Amici States' Good-Faith Efforts
        to Cooperate to Avoid Undue Federal Interference. .............. 20

POINT II

ICE's Policy Contravenes a Long-Established Nationwide
Consensus Against Disrupting Courthouses with Civil
Arrests .......................................................................................... 25

CONCLUSION ....................................................................................... 33

# TABLE OF AUTHORITIES

| Cases | Page(s) |
|---|---|

*Arizona v. United States,*
567 U.S. 387 (2012) ............................................................ 32

*Atlantic Coast Line R.R. v. Brotherhood. of Locomotive Eng'rs,*
398 U.S. 281 (1970) .............................................................. 3

*Bishop v. Vose,*
27 Conn. 1 (1858) .............................................................. 28

*Bolgiano v. Gilbert Lock Co.,*
73 Md. 132, 20 A. 788 (1890) ............................................ 29

*Chick Kam Choo v. Exxon Corp.,*
486 U.S. 140 (1988) .............................................................. 4

*Diamond v. Earle,*
217 Mass. 499, 105 N.E. 363 (1914) ................................. 30

*Greer v. Young,*
120 Ill. 184, 11 N.E. 167 (1887) ........................................ 29

*Gregory v. Ashcroft,*
501 U.S. 452 (1991) ........................................................ 4, 32

*Halsey v. Stewart,*
4 N.J.L. 366 (N.J. 1817) .................................................... 28

*Hayes v. Shields,*
2 Yeates 222 (Pa. 1797) .................................................... 30

*Heath v. Alabama,*
474 U.S. 82 (1985) ............................................................... 4

*In re Healey,*
53 Vt. 694 (1881) .............................................................. 30

**Cases**                                                                       **Page(s)**

*Larned v. Griffin,*
12 F. 590 (C.C.D. Mass 1882) ............................................................ 29

*Lester v. Bennett,*
1 Va. App. 47, 333 S.E.2d 366 (Ct. App. 1985) .................................. 30

*Michaelson v. Goldfarb,*
94 N.J.L. 352, 110 A. 710 (N.J. 1920) ................................................ 28

*Murphy Bros. v. Michetti Pipe Stringing, Inc.,*
526 U.S. 344 (1999) ......................................................................... 31-32

*New York v. ICE,*
No. 19-cv-8876, --- F. Supp. 3d ----, 2019 WL 6906274
(S.D.N.Y. Dec. 19, 2019) ........................................................... passim

*New York v. United States,*
505 U.S. 144 (1992) .............................................................................. 3

*Parker v. Marco,*
136 N.Y. 585 (1893) ............................................................................ 27

*Pasquantino v. United States,*
544 U.S. 349 (2005) ............................................................................ 32

*Person v. Grier,*
66 N.Y. 124 (1876) .............................................................................. 26

*Stewart v. Ramsey,*
242 U.S. 128 (1916) ............................................................................ 28

*United States v. Craft,*
535 U.S. 274 (2002) ............................................................................ 32

*United States v. Green,*
305 F. Supp. 125 (S.D.N.Y. 1969) ...................................................... 31

*United States v. Texas,*
507 U.S. 529 (1993) ............................................................................ 32

**Cases**                                                     **Page(s)**

*Walpole v. Alexander*,
   (1782) 99 Eng. Rep. 530 .................................................... 25

*Wemme v. Hurlburt*,
   133 Or. 460, 289 P. 372 (1930) ......................................... 29

**Laws**

Cal. Civ. Code § 43.54 ............................................................. 24

N.Y. Exec. Order No. 170.1, 9 N.Y.C.R.R. § 8.170.1 (2018) ................... 22

**Miscellaneous Authorities**

Brian Hickey, *ICE Arrests at Montgomery County courts spark
   fears of chilling effect on crime victims, witnesses*, Philly Voice
   (Mar. 15, 2018), *at* https://www.phillyvoice.com/ice-arrests-
   montco-courthouses-said-have-chilling-effect-crime-victims-
   witnesses ............................................................................ 14

Chief Justice Lloyd A. Karmeier, *ICE Arrests Threaten to Chill
   Access to Justice*, Illinois Courts Connect (Aug. 28, 2017), *at*
   http://www.illinoiscourts.gov/Media/enews/2017/082517_chief
   _justice.asp ........................................................................ 11

Christopher N. Lasch, *A Common-Law Privilege to Protect
   State and Local Courts During the Crimmigration Crisis*,
   127 Yale L.J. Forum 410 (2017) ......................................... 25

Elise Kaplan, *Migrant advocates say ICE arrests continue at
   court*, Albuquerque Journal (May 21, 2019), *at*
   https://www.abqjournal.com/1318815/advocates-protest-
   continued-ice-arrests-at-metro-court.html ......................... 11

Eugene Driscoll & Thomas Breen, *ICE Folds in Immigrant
   Standoff*, New Haven Independent (Oct. 31, 2019), *at*
   https://www.newhavenindependent.org/index.php/archive
   s/entry/derby_courthouse ................................................. 10

**Miscellaneous Authorities**                                    **Page(s)**

Immigrant Defense Project, *The Courthouse Trap* (Jan. 2019),
   *at* https://www.immigrantdefenseproject.org/wp-
   content/uploads/TheCourthouseTrap.pdf ............................................... 5

Immigrant Defense Project, *Safeguarding the Integrity of Our
   Courts: The Impact of ICE Courthouse Operations on New York
   State* (2019), *at* https://www.immigrantdefenseproject.org/wp-
   content/uploads/Safeguarding-the-Integrity-of-Our-Courts-
   Final-Report.pdf ............................................................................. 16, 21

Jason Nguyen, *Monday morning vigil aims to bring
   transparency to ICE arrests*, KATU (Sept. 18, 2017), *at*
   https://katu.com/news/local/monday-morning-vigil-aims-
   to-bring-transparency-to-ice-arrests .................................................... 13

Kathleen Masterson, *ICE Arrests Dairy Worker En Route To
   Burlington Courthouse*, Vt. Public Radio (Mar. 16, 2017),
   *at* https://www.vpr.org/post/ice-agents-arrest-dairy-
   worker-en-route-burlington-courthouse#stream/0 ............................ 15

Katy Barnitz, *ACLU seeks video of ICE arrest at courthouse*,
   Albuquerque Journal (Aug. 14, 2019), *at*
   https://www.abqjournal.com/1353537/aclu-seeks-video-of-ice-
   arrest-at-courthouse-lawsuit-argues-courts-refusal-to-release-
   footage-is-improper.html ..................................................................... 11

Kymelya Sari, *Migrant LGBTQ leader faces deportation after
   ICE arrest at courthouse*, Seven Days (Jan. 24, 2019), *at*
   https://www.sevendaysvt.com/OffMessage/archives/2019/0
   1/24/migrant-lgbtq-leader-faces-deportation-after-ice-
   arrest-at-courthouse ........................................................................... 15

Letter from Att'y General Barr and Acting DHS Sec'y Chad Wolf to
   the Chief Justices of Oregon and Washington (Nov. 21, 2019), *at*
   https://www.justice.gov/ag/page/file/1219556/download ....................... 24

Letter from Chief Criminal Judge Andrew R. Erwin to WSH-
   Judges, Bob Herman, Kevin Barton, Pat Garrett (June 1, 2018) ..... 13

Letter from Chief Justice of Cal. Tani G. Cantil-Sakauye to
   Att'y General Jeff Sessions and Sec'y of Homeland Sec. John
   F. Kelly (Mar. 16, 2017), *at* https://newsroom.courts.ca.gov/
   news/chief-justice-cantil-sakauye-objects-to-immigration-
   enforcement-tactics-at-california-courthouses .................................. 21

Make the Road New Jersey, *ICE in the New Jersey Courts: The
   Impact of Immigration Enforcement on Access to Justice in
   the Garden State* (Dec. 2017), *at* https://d3n8a8pro7vhmx.
   cloudfront.net/maketheroadnj/pages/70/attachments/origina
   l/1513001085/ICE_in_the_Courts_Data_-
   _final_Dec_10__2017.pdf ............................................................ 12, 19

Mem. from Chief Justice Stuart Rabner to Assignment Judges,
   et al. (May 23, 2019), *at* https://www.njcourts.gov/notices/
   2019/n190523a.pdf ................................................................................ 23

New Mexico Judicial Branch, *Courthouse Access Policy*,
   SJDC Policy No. 2017-SJDC-010 (Nov. 9, 2017), *at*
   https://seconddistrictcourt.nmcourts.gov/uploads/files/New
   s/SJDCCourthouseAccessPolicy20171120.pdf .................................... 23

New York State Unified Court System, *2018 Annual Report* (2018), *at*
   https://www.nycourts.gov/legacypdfs/18_UCS-Annual_Report.pdf ........ 5

Office of the Chief Admin. Judge, N.Y. State Unified Court
   Sys. Directive No. 1-2019: *Protocol Governing Activities in
   Courthouses by Law Enforcement Agencies* (Apr. 17,
   2019), *at* https://www.immigrantdefenseproject.org/wp-
   content/uploads/OCA-ICE-Directive.pdf............................................ 22

Office of the Chief Admin. Judge, N.Y. State Unified Court Sys.,
   *Policy and Protocol Governing Activities in Courthouses by
   Law Enforcement Agencies* (Apr. 26, 2017), *at*
   https://www.ncsc.org/~/media/Files/PDF/Topics/ICE/NYS%20
   Courthouse%20Activity%20by%20LEAs.ashx .................................... 21

**Miscellaneous Authorities**                                          **Page(s)**

Patrick Gordon, Kelley Grady, & Shaqueil Stephenson,
    *Obstructing Justice: The Chilling Effect of ICE's Arrests of*
    *Immigrants at Pennsylvania Courthouses* (Stephen and
    Sandra Sheller Center for Social Justice, Temple
    University Beasley School of Law) (Jan. 30, 2019) ........................... 14

Paul Bass & Sam Gurwitt, *Another ICE Courthouse Arrest
    Interrupted*, New Haven Independent (Dec. 19, 2019), *at*
    https://www.newhavenindependent.org/index.php/archive
    s/entry/ice_courthouse_arrest_thwarted .......................................... 10

Press Release, Oregon Judicial Dep't, *Oregon Chief Justice
    Issues Rule Limiting Courthouse Arrests* (Nov. 14, 2019), *at*
    https://www.courts.oregon.gov/news/Lists/ArticleNews/Attac
    hments/1213/acd3fb79befadf4982b20ceba127ffd0-Media-
    Release-New-UTCR-Limiting-Civil-Arrests-in-Court-
    Facilities-effective-2019-11-14.pdf ..................................................... 24

*Proclamation by the President of the Board of Commissioners Cook
    County, Illinois,* (Feb. 7, 2018), *at* https://www.cookcountyil.gov/
    sites/default/files/2.7.18_proclamation_ice_county_courts.pdf ............ 22

William Blackstone, *Commentaries on the Laws of England*,
    vol. 3 (1768) ....................................................................................... 25

Zephaniah Swift, *A Digest of the Laws of the State of
    Connecticut*, vol. 1 (1822) ................................................................... 27

## INTEREST OF AMICI CURIAE AND
## PRELIMINARY STATEMENT

Amici States—New York, together with Connecticut, Illinois, Maryland, Minnesota, New Jersey, New Mexico, Oregon, Pennsylvania, Rhode Island, Vermont, Virginia, Washington, and the District of Columbia—have a compelling interest in providing access to justice for all our residents and ensuring the orderly operation of our court systems. An effective court system is a critical aspect of state sovereignty—one that is essential to ensuring that crimes are prosecuted, victims receive relief, and justice is done on behalf of the States' residents.

In 2017, Defendants, including U.S. Immigration and Customs Enforcement (ICE),[1] began implementing a policy that threatens those sovereign interests. ICE's new policy authorizes federal immigration agents and officers to conduct civil immigration arrests in and around state courthouses, without the significant limitations that ICE had previously found necessary to respect the States' basic right to maintain the integrity of their judicial proceedings. As a result of that new policy,

---

[1] For simplicity, Amici refer to all defendants here as ICE throughout this brief.

the number of arrests at or near Amici States' courthouses has soared in the last few years. The practical effect has been to disrupt the effective functioning of our state courts and hinder both criminal and civil proceedings. Due both to the arrests and detentions themselves and to their terrorizing effect, witnesses and parties miss court appearances, victims are afraid to seek judicial relief or cooperate with prosecutors and police, and prosecutors are unable to obtain justice for the people whom they serve.

Besides the district court here, two other district courts (in New York and Washington State) have reviewed ICE's disruptive policy of courthouse civil arrests and found it highly suspect under both the Administrative Procedure Act and the Tenth Amendment. As relevant here, both courts concluded that ICE's courthouse civil arrests may be contrary to law because Congress did not authorize federal immigration agents and officers to conduct such arrests. Rather, the Immigration and Nationality Act (INA) incorporates the longstanding common law privilege against civil arrests at or near courthouses. The district court here reached that same conclusion, and accordingly issued a preliminary injunction against ICE's courthouse civil arrest policy.

Amici urge this Court to affirm. As in Massachusetts, Amici States have experienced direct interference with their judicial proceedings and criminal prosecutions as a result of ICE's courthouse arrest policy. And as in Massachusetts, Amici States have long recognized the common-law privilege against courthouse civil arrests. Congress cannot be presumed to have silently overruled the longstanding, nationwide consensus, reflected in the common law, regarding the unique importance of preserving the dignity and security of state courts.

## ARGUMENT

## POINT I

### ICE's Policy Significantly Impairs Amici States' Ability to Dispense Justice Through Their Courts

In our system of federalism, as reflected in part by the Constitution's Tenth Amendment, the States "retain a significant measure of sovereign authority." *New York v. United States*, 505 U.S. 144, 156 (1992) (alteration and quotation marks omitted). Among the powers reserved to the States is "the maintenance of state judicial systems for the decision of legal controversies." *Atlantic Coast Line R.R. v. Brotherhood. of Locomotive Eng'rs*, 398 U.S. 281, 285 (1970); *see also, e.g.*,

*Heath v. Alabama*, 474 U.S. 82, 93 (1985). Maintaining a judicial system is "essential to [a State's] separate and independent existence." *Gregory v. Ashcroft*, 501 U.S. 452, 457 (1991) (quotation marks omitted). Federal interference with that prerogative thus threatens "the fundamental constitutional independence of the States." *Chick Kam Choo v. Exxon Corp.*, 486 U.S. 140, 146 (1988).

Since 2017, however, civil immigration arrests by ICE agents in and around state courthouses have interfered with Amici States' operation of state judicial proceedings and their ability to pursue criminal prosecutions, injuring the States' core sovereign interests. Arrests have forced courts to adjourn or postpone hearings, administer trials without witnesses, and delay or dismiss cases. Investigating and prosecuting crimes and other legal violations has become increasingly difficult as victims and witnesses from immigrant communities have either been directly detained by ICE, or become afraid to report crimes, testify in court, or cooperate with law enforcement or prosecutors. ICE's courthouse civil arrests have made it harder, and sometimes impossible, for Amici States to maintain the open, safe, and fair courts that are necessary for the orderly administration of justice and the preservation of public safety.

## A.    Civil Immigration Arrests Pursuant to ICE's Policy Have Seriously Disrupted State Judicial Proceedings.

State courts are essential for Amici States to protect the rights of their residents and visitors. Amici States' court systems include trial courts, appellate courts, and courts of last resort, and also specialized courts and alternative justice programs. Together, these systems adjudicate millions of disputes each year that touch on a wide range of matters critical to the health and safety of state residents—including crime, child custody, domestic violence, housing, wills and estates, health care, and human trafficking.[2] As in Massachusetts, immigration arrests at or near state courthouses in Amici States have prevented those in need from getting timely judicial relief.

In New York, ICE agents have conducted hundreds of civil arrests at or near courthouses since 2017.[3] Often, these enforcement activities

---

[2] *See, e.g.,* New York State Unified Court System, *2018 Annual Report* 37–39 (2018) (internet). For authorities available on the internet, full URLs appear in the Table of Authorities.

[3] *See New York v. ICE*, No. 19-cv-8876, --- F. Supp. 3d ----, 2019 WL 6906274, at *1 (S.D.N.Y. Dec. 19, 2019) (discussing number of arrests in 2017 and 2018); *see also* Immigrant Defense Project, *The Courthouse Trap* 6 (Jan. 2019) (internet). Discovery in the *New York v. ICE* litigation has since confirmed the massive ramp-up in ICE arrests in and around

have been accompanied by aggressive tactics that threaten the safety of court officials and attendees. ICE agents have slammed arrestees to the ground, shoved them into unmarked cars, and in one case even broken a courthouse door in Yonkers while effecting a civil arrest of a noncitizen who was due in court for a scheduled appearance.[4] One courthouse observer described a civil arrest in broad daylight on the steps of the New York County Supreme Court as looking like a "rendition," with four ICE agents slamming a man to the ground and pushing him into an unmarked vehicle.[5] Such arrests occur as "scared and bewildered" members of the public look on, increasing their in terrorem effects.[6] Indeed, ICE's plainclothes agents have arrested New York residents in court in the middle of a conversation with an attorney—and even in front

---

courthouses in New York. *See* Pls.' Mem. of Law in Supp. of Mot. for Summ. J. at 13, *New York v. ICE*, ECF No. 94.

[4] *Id.* at 5-6; Pls.' R. 56.1 Stmt in Supp. of Mot. for Summ. J. ¶ 138, *New York v. ICE*, ECF No. 92

[5] Pls.' Mem., *New York v. ICE*, *supra*, at 6, 8.

[6] *Id.*

of their own children.[7] ICE agents have arrested New Yorkers in packed courtrooms with their families present, and followed them into courthouse bathrooms.[8] And notably, ICE's courthouse civil arrests sometimes target witnesses or litigants with no criminal record at all, and occur not just at criminal courts, but at the State's Family Courts, at special Human Trafficking Intervention Court in Queens County, and at local village and town courts across New York State.[9]

ICE's civil immigration arrests have also disrupted judicial proceedings in New York by preventing people from attending hearings or trials. ICE has arrested defendants and complaining witnesses in the middle of ongoing criminal cases.[10] New York residents, including crime victims, witnesses, defendants, and family members, are afraid to attend important proceedings like bond hearings or court dates in Family Court

---

[7] Decl. of Matthew Colangelo, Ex. 16 ¶ 7, *New York v. ICE,* ECF No. 91-16.

[8] Colangelo Decl., Ex. 6 ¶¶ 8-16 & Ex. 14 ¶¶ 7-8, *New York v. ICE*, ECF Nos. 91-6 & 91-14.

[9] Pls.' Mem., *New York v. ICE*, supra, at 5, 8.

[10] *Id.* at 10-11.

on child custody and other matters, to testify before a grand jury, or to appear for criminal proceedings.[11] A robust survey of Latinx adults in New York by an expert political scientist—part of the summary judgment record in New York's own litigation against ICE—confirms the consistent observation of courthouse lawyers from around New York State that ICE's policy chills participation in the legal process.[12]

Other States have experienced similar disruptions to the orderly administration of justice as a result of ICE's courthouse civil immigration arrests. In Washington State, ICE has made hundreds of arrests at or near courthouses since 2017.[13] Those arrests occur statewide, in the courtrooms, hallways, parking lots, sidewalks, courtyards, and on the front steps of local courthouses.[14] ICE's agents almost always wear plain clothes, do not identify themselves, and provide no warrant or

---

[11] *Id.*

[12] *Id.* at 10; *see generally* Colangelo Decl., Ex. 25, *New York v. ICE,* ECF No. 91-25.

[13] *See* Defs' Opp'n to Mot. for Prelim. Inj. at 7, *Washington v. DHS*, No. 19-cv-2043 (W.D. Wash. Jan. 23, 2020), ECF No. 95 (admitting to at least 216 arrests in Washington State from 2017 to 2019)

[14] Complaint ¶ 2, *Washington v. DHS*, ECF No. 1.

explanation for their conduct, making it difficult for bystanders, including judges, courthouse personnel, and local law enforcement officers, to understand what is happening.[15] Agents have chased, tackled, dragged, and used force against immigrants during courthouse arrests.[16] For example, in June 2019, several plainclothes agents forcibly arrested a man outside the Thurston County courthouse after he appeared for a court hearing. Several witnesses were shocked to see this struggle and the amount of force used.[17] The county's presiding judge noted that the arrest "ha[d] all the hallmarks of a kidnapping," and that violence easily could have resulted if a bystander or court staff had tried to intervene.[18]

---

[15] *Washington v. DHS* Compl., *supra*, ¶¶ 21, 50-51, 88; Mot. for Prelim. Inj. at 4, 20, *Washington v. DHS*, ECF No. 6.

[16] Decl. of Kenneth Chadwick ¶ 13, *Washington v. DHS*, ECF No. 18; Decl. of Brian Gwinn ¶¶ 9, 10, *Washington v. DHS*, ECF No. 26; Decl. of Sandy Restrepo ¶ 13, *Washington v. DHS*, ECF No. 38; Decl. of Jacinta Rodriguez ¶ 6, *Washington v. DHS*, ECF No. 39; Decl. of S.G. ¶¶ 5-6, *Washington v. DHS*, ECF No. 41; Decl. of Raul Salazar ¶¶ 4-5, *Washington v. DHS*, ECF No. 42.

[17] Decl. of Jon Tunheim ¶ 8, *Washington v. DHS*, ECF No. 47.

[18] Decl. of Presiding Judge Brett Buckley ¶ 6, *Washington v. DHS*, ECF No. 13.

In Connecticut, standoffs with ICE agents have disrupted entire days of proceedings at state courthouses. In December 2019, a recipient of Deferred Action for Childhood Arrivals (DACA) accompanied a friend to court in Milford to provide moral support.[19] In the courthouse lobby, the DACA recipient was confronted by ICE agents, cuffed, and threatened with arrest. After proving that she was lawfully present under DACA, she was released, but not before the incident had provoked a disruptive faceoff at the courthouse between ICE agents and immigration advocates. Similarly, in October 2019, ICE agents entered a courthouse in Derby, Connecticut, in search of a Jamaican citizen who had overstayed his tourist visa.[20] The man took shelter in the public defender's office, which refused to allow ICE agents to enter, and a daylong standoff ensued, disrupting the day's proceedings.

In Illinois, there have been dozens of arrests at Illinois courthouses since 2017, including inside courtrooms in Skokie, Cook, Champaign, and

---

[19] *See* Paul Bass & Sam Gurwitt, *Another ICE Courthouse Arrest Interrupted*, New Haven Independent (Dec. 19, 2019) (internet).

[20] Eugene Driscoll & Thomas Breen, *ICE Folds in Immigrant Standoff*, New Haven Independent (Oct. 31, 2019) (internet).

Kane counties. In one April 2017 incident, ICE agents arrested (and ultimately deported) a father who was at the courthouse attempting to finalize an adoption.[21]

In New Mexico, ICE agents detained a Ph.D. student at Bernalillo County's Metropolitan Court, where he was responding to a charge of driving under the influence. Despite directing the arresting agents to his student visa sponsor at the University of New Mexico, he was taken to a holding cell and told he would be deported before ultimately being released.[22] That same month, ICE agents arrested a woman while she was attending the same court in order to provide proof that she had completed classes following a speeding ticket.[23]

In New Jersey, at an Essex County courthouse, a defendant was arrested immediately following trial and deported prior to sentencing,

---

[21] Chief Justice Lloyd A. Karmeier, *ICE Arrests Threaten to Chill Access to Justice*, Illinois Courts Connect (Aug. 28, 2017) (internet).

[22] Katy Barnitz, *ACLU seeks video of ICE arrest at courthouse*, Albuquerque Journal (Aug. 14, 2019) (internet).

[23] Elise Kaplan, *Migrant advocates say ICE arrests continue at court*, Albuquerque Journal (May 21, 2019) (internet).

despite a request from the judge to complete the proceeding. In another case in Passaic, a parent seeking a child's return from foster care was arrested in the courtroom. After witnessing the arrest, several adults awaiting similar hearings left before their hearings could occur. [24]

In Oregon, too, civil immigration arrests at or near courthouse have raised serious risks to public safety. In June 2018, ICE arrested a man immediately following a hearing in his case just outside a Washington County courtroom. The arrest was so violent and chaotic that the judge sent a letter documenting the event to the Chief Justice of the Oregon Supreme Court. The judge described the arrest as creating "general melee," and explained,

> Many people were screaming, bodies were slamming against the walls, it was clear that some manner of fighting was going on, and it appeared that someone (a female) was in anguish or pain. But we had no idea what was happening or who was involved. . . .
>
> ICE agents . . . placed the security of this court, and those before it, in an untenable and unacceptable position. Their actions to lie in wait on the third floor of

---

[24] Make the Road New Jersey, *ICE in the New Jersey Courts: The Impact of Immigration Enforcement on Access to Justice in the Garden State* 3 (Dec. 2017) (internet).

> the courthouse and ambush a non-violent defendant during one of our busiest dockets directly jeopardized the safety of everyone involved. And, the disruption was significant.[25]

Yet ICE was not deterred. A couple months later, plainclothes ICE officers arrested a man *inside* the same Washington County judge's courtroom following a hearing.

Other cases in Oregon involved similar disruptions. For example, ICE arrested a father of three at the Washington County Courthouse who was attempting to pay a ticket for driving without a license. ICE also arrested, jailed, and deported a man who reported to pay a fine on a DUII conviction.[26]

In Pennsylvania, immigration arrests at courthouses have led to serious miscarriages of justice. In one 2018 incident, a man walked out of a Montgomery County courthouse during a break in his hearing only

---

[25] Letter from Chief Criminal Judge Andrew R. Erwin to WSH-Judges, Bob Herman, Kevin Barton, Pat Garrett (June 1, 2018) (a copy of the letter is on file with counsel).

[26] Jason Nguyen, *Monday morning vigil aims to bring transparency to ICE arrests*, KATU (Sept. 18, 2017) (internet).

to be arrested by ICE in the middle of the proceeding.[27] In another incident, ICE arrested a noncitizen even though the noncitizen did not match the police photo they possessed.[28] In another incident, ICE arrested a noncitizen making child support payments at the courthouse.[29] Lawyers and community advocates in Pennsylvania also report that ICE even makes arrests before a person can attend to his or her court business. For example, in Bucks County, one man was detained by ICE on his way into court to pay a ticket for driving without a license.[30] In these types of situations, judges will issue "bench warrants" for failure to appear, which are then held against a noncitizen during his or her hearing before an immigration judge.[31]

---

[27] Brian Hickey, *ICE Arrests at Montgomery County courts spark fears of chilling effect on crime victims, witnesses*, Philly Voice (Mar. 15, 2018) (internet).

[28] Patrick Gordon, Kelley Grady, & Shaqueil Stephenson*, Obstructing Justice: The Chilling Effect of ICE's Arrests of Immigrants at Pennsylvania Courthouses* 6 (Stephen and Sandra Sheller Center for Social Justice, Temple University Beasley School of Law) (Jan. 30, 2019).

[29] *Id.*

[30] *Id.*

[31] *Id.*

Similarly, in Vermont, ICE arrested a man outside a Burlington courthouse in 2017 as he was on his way to attend a preliminary hearing for a DUI charge. The prosecution dismissed the charge at the hearing.[32] The same year, another man was arrested as he entered a Windsor County courthouse to respond to a DUI charge. And on New Year's Eve 2018, a local activist was arrested inside a Middlebury courthouse immediately after he pleaded not guilty to a DUI charge.[33]

## B. ICE's Policy Has Impeded Prosecutions and Deterred Crime Victims and Others from Accessing State Courts.

Because of their disruptive and in terrorem effects, ICE's civil immigration arrests in or around state courthouses have also seriously interfered with the investigation and prosecution of crimes in Amici States and deterred residents from accessing state courts.

In New York, ICE has often arrested defendants and then failed to produce them for scheduled court appearances, even when requested to

---

[32] Kathleen Masterson, *ICE Arrests Dairy Worker En Route To Burlington Courthouse*, Vt. Public Radio (Mar. 16, 2017) (internet).

[33] Kymelya Sari, *Migrant LGBTQ leader faces deportation after ICE arrest at courthouse*, Seven Days (Jan. 24, 2019) (internet).

do so—preventing criminal trials from proceeding and justice from being served. For example, in one case, ICE arrested and deported a criminal defendant facing felony sexual and domestic violence charges minutes before he was due to plead guilty at the Kings County Criminal Court.[34] The defendant never stood trial, and his subsequent removal has permitted him to continue to harass the victim on social media, where he boasts about getting away with his past crimes.[35] Crime reporting in New York has also decreased, as a massive drop in the call rates to the Immigrant Affairs Unit (IAU) of state prosecutors' offices shows.[36] In addition, and as already discussed, victims and witnesses have been less willing to testify in court.

As Brooklyn's District Attorney has explained, ICE's courthouse arrests have undermined prosecutors' work, necessitated needless adjournments, and "caused complete chaos" for victims, defendants and

---

[34] Pls.' R. 56.1 Stmt., *New York v. ICE*, *supra*, ¶¶ 147-162.

[35] *Id.*

[36] *Id.* ¶¶ 207-213; *see also* Immigrant Defense Project, *Safeguarding the Integrity of Our Courts: The Impact of ICE Courthouse Operations on New York State* 13–14 & figs. 2-3 (2019) (internet).

other parties at the courthouse.[37]  Similar problems occur across New York State.[38]

ICE's policy has had similarly deleterious effects on the work of prosecutors and the criminal justice system in other States. In Washington, immigrants are now fearful to seek protective orders, file for divorce, seek parenting plans, and appear at child welfare hearings.[39] Victims and witnesses are fearful of reporting crimes or appearing in court.[40] And the delay caused by civil immigration arrests "negatively impacts [prosecutors'] ability to successfully prosecute our cases as witnesses move or disappear and their memory of events fades."[41] Moreover, the rights of criminal defendants are routinely impaired by

---

[37] Pls.' R. 56.1 Stmt., *New York v. ICE*, *supra*, ¶¶ 139-141.

[38] *Id.* ¶¶ 142-179, 186-215.

[39] *See* Pls.' Mot. for Prelim. Inj. at 5, *Washington v. DHS*, ECF No. 6; *see also, e.g.*, Decl. of Vanessa G. Gutierrez ¶ 8, *Washington v. DHS*, ECF No. 25.

[40] Pls.' Mot. for Prelim. Inj., *Washington v. DHS*, *supra*, at 5; *see also, e.g.*, Decl. of Lorena Ault ¶¶ 4-5, *Washington v. DHS*, ECF No. 10; Decl. of James Bamberger ¶ 13, *Washington v. DHS*, ECF No. 12; Decl. of Trish Gregory ¶¶ 7-10, *Washington v. DHS*, ECF No. 24.

[41] Tunheim Decl., *Washington v. DHS*, *supra*, at ¶ 18; *see* Pls.' Mot. for Prelim. Inj., *Washington v. DHS*, *supra*, at 20.

ICE's courthouse arrest policy, because when noncitizens are arrested before their criminal proceedings conclude, they are unable to contest the charges against them.[42]

In Illinois, there has been a 25% decrease in interpreter usage since 2015, potentially reflecting how litigants with limited English proficiency are coming to court with less frequency due to ICE's increased presence at Illinois courthouses.

In New Jersey**,** too, fear of immigration arrests has had significant impacts on crime reporting and participation in the justice system. In one case in Gloucester County, undocumented immigrants who were robbery victims and eyewitnesses in a 2019 homicide case relocated to Tennessee and refused to return to give testimony at the trial due to their fear of civil arrest by ICE. Legal and social service providers in New Jersey also report a decrease in noncitizens seeking assistance for domestic violence

---

[42] Buckley Decl., *Washington v. DHS*, *supra*, ¶ 5; Cassel Decl., *Washington v. DHS*, *supra*, ¶ 21; Decl. of Christie Hedman ¶ 14, *Washington v. DHS*, ECF No. 27; Decl. of Maxwell Lee ¶ 17, *Washington v. DHS*, ECF No. 30.

or family issues.[43] Of 59 surveyed service providers, 78% had noncitizen clients who were scared to attend criminal court, 62% had noncitizen clients withdraw or fail to pursue orders of protection, 56% had noncitizen clients refuse to attend municipal court, 55% had noncitizen clients fail to appear in municipal or criminal court, and 55% had noncitizen clients fail to file petitions or complaints—all due to fear of ICE presence at courthouses.[44]

ICE's activities have also had profound consequences on the pursuit of justice in Oregon. Attorneys from Oregon report that key witnesses have refused to testify for fear of being arrested by ICE, that clients have declined to report sexual assault to the authorities for fear of being deported, and that other clients have declined to fully pursue their rights so they could avoid stepping foot in a courthouse. Community advocates have reported that individuals they work with have chosen to endure domestic violence rather than report it or seek a restraining order for fear of arrest and deportation.

---

[43] Make the Road New Jersey, *ICE in the New Jersey Courts*, *supra*, at 2–3.

[44] *Id.*

## C. ICE Has Disregarded Amici States' Good-Faith Efforts to Cooperate to Avoid Undue Federal Interference.

The judicial systems and prosecutors in Amici States are well-accustomed to working cooperatively with federal law enforcement, including the criminal work of the FBI and United States Attorneys' Offices. In that spirit, several Amici States made good-faith efforts to reach out to ICE to flag serious concerns about how civil immigration arrests at or near state courthouses have interfered with state judicial proceedings. Some Amici States also proposed solutions to resolve these problems. But ICE effectively disregarded Amici States' overtures.

The States' efforts began as early as March 2017, when the Chief Justice of California sent a letter to the federal Departments of Justice and Homeland Security explaining that state courthouses are "a vital forum for ensuring access to justice and protecting public safety," and that these important sovereign functions would be undermined "if the public feels that our state institutions are being used to facilitate other

goals and objectives, no matter how expedient they may be."[45] The Chief

Justice requested that ICE refrain from "stalking courthouses" in order

to ensure the state "judiciary's ability to provide equal access to justice."[46]

The Chief Justice's letter was soon followed by similar letters from the

Chief Justices or Attorneys General of Connecticut, Maryland,

Massachusetts, New Jersey, Washington, and Oregon.[47]

When those pleas fell on deaf ears, many Amici States took legal

and administrative steps to preserve and protect their judicial systems.

For example, in New York, the Office of Court Administration (OCA)

initially issued a policy in 2017 requiring all law enforcement agents,

including ICE, to identify themselves and notify a judge if they intended

to arrest a party or participant in that judge's case.[48] The policy also

---

[45] Letter from Chief Justice of Cal. Tani G. Cantil-Sakauye to Att'y General Jeff Sessions and Sec'y of Homeland Sec. John F. Kelly (Mar. 16, 2017) (internet).

[46] *Id.*

[47] Immigrant Defense Project, *Safeguarding the Integrity of Our Courts*, *supra*, at 69 & nn.304–05 (collecting letters).

[48] Office of the Chief Admin. Judge, N.Y. State Unified Court Sys., *Policy and Protocol Governing Activities in Courthouses by Law Enforcement Agencies* (Apr. 26, 2017) (internet).

prohibited courtroom arrests absent an emergency and required court security personnel to file "Unusual Occurrence Reports" for each arrest.

Next, in April 2018, the Governor of New York issued Executive Order No. 170.1 to further guide immigration arrests in state facilities.[49] The order required that ICE obtain a judicial warrant or order to make an arrest on state facilities, "unless the civil arrest is related to a proceeding within such facility."[50] In April 2019, OCA updated its policy to include the same judicial-warrant requirement for arrests conducted in state courthouses.[51]

Other Amici States have taken similar steps. In Illinois, Cook County has directed ICE to refrain from enforcement activities within county courthouses.[52] In New Mexico, the state's busiest court adopted a "Courthouse Access Policy" mandating that law enforcement officers

---

[49] N.Y. Exec. Order No. 170.1, 9 N.Y.C.R.R. § 8.170.1 (2018).

[50] *Id.*

[51] Office of the Chief Admin. Judge, N.Y. State Unified Court Sys. Directive No. 1-2019: *Protocol Governing Activities in Courthouses by Law Enforcement Agencies* (Apr. 17, 2019) (internet).

[52] *Proclamation by the President of the Board of Commissioners Cook County, Illinois*, (Feb. 7, 2018) (internet).

"should not hinder or impede individuals in the courthouse conducting court business" without a lawful arrest warrant.[53] Reasoning that arrests, interrogations, or other restrictions on freedom "create[] an environment of fear, confusion and mistrust among courthouse participants," the policy requires law enforcement officers to present appropriate credentials upon entering the courthouse and prohibits interrogations unless necessary for public safety or to execute an arrest warrant.[54]

In New Jersey, the Chief Justice also issued a directive imposing new requirements on ICE agents attempting to make arrests at state courthouses.[55] That directive requires ICE agents to identify themselves, state the purpose of their visit, and notify court security personnel, among other requirements. Oregon issued a similar directive in 2019 "to

---

[53] New Mexico Judicial Branch, *Courthouse Access Policy* 3, SJDC Policy No. 2017-SJDC-010 (Nov. 9, 2017) (internet).

[54] *Id.*

[55] Mem. from Chief Justice Stuart Rabner to Assignment Judges, et al. (May 23, 2019) (internet).

maintain the integrity of our courts and provide access to justice."[56] And in October 2019, California enacted new legislation prohibiting civil arrests in courthouses unless pursuant to a judicial warrant. Cal. Civ. Code § 43.54(a).

ICE's stark response to these overtures has been to declare that "ICE and CBP officers are not subject to state rules that purport to restrict ICE and CBP from making administrative arrests on property that is otherwise open to the public and other law enforcement officers."[57] Consistent with that view, ICE agents have often failed to follow court rules and directives and refused to produce a judicial warrant or even to identify themselves. In New York, for example, ICE agents have continued to make arrests in or near courthouses without judicial warrants as required by the State's courts.[58]

---

[56] Press Release, Oregon Judicial Dep't, *Oregon Chief Justice Issues Rule Limiting Courthouse Arrests* (Nov. 14, 2019) (internet).

[57] *See* Letter from Att'y General Barr and Acting DHS Sec'y Chad Wolf to the Chief Justices of Oregon and Washington (Nov. 21, 2019) (internet); *see also* R. 56.1 Stmt, *New York v. ICE*, *supra*, ¶ 112.

[58] *E.g.*, Colangelo Decl., Ex. 38 at 263-264, *New York v. ICE,* ECF No. 91-38.

## POINT II

**ICE's Policy Contravenes a Long-Established Nationwide Consensus Against Disrupting Courthouses with Civil Arrests**

As the district court here correctly recognized, a longstanding common-law privilege against civil arrests at or near courthouses has protected the integrity and authority of state courts since the Founding Era, and formed part of the essential backdrop against which Congress enacted the INA. That longstanding consensus rule remains vital today.

The common-law privilege originated in fifteenth century England, at a time when civil litigation was initiated by arrest.[59] In light of that practice, civil litigants (and sheriffs acting for them) would stake out courthouses to catch opposing parties on unrelated court business. *See, e.g.*, *Walpole v. Alexander* (1782) 99 Eng. Rep. 530. The privilege developed in response, to protect parties and witnesses while they were coming to, remaining in, or returning from court. *See* 3 William Blackstone, *Commentaries on the Laws of England* 289 (1768) (prohibiting the arrest

---

[59] *See* Christopher N. Lasch, *A Common-Law Privilege to Protect State and Local Courts During the Crimmigration Crisis*, 127 Yale L.J. Forum 410 (2017).

of "[s]uitors, witnesses, and other persons" while attending court, "which include[d] their necessary coming and returning").

"This ancient privilege" was then "incorporated into American law in the early years of our republic by virtually all state and federal courts." *New York v. ICE*, No. 19-cv-8876, --- F. Supp. 3d. ----, 2019 WL 6906274, at *1 (S.D.N.Y. Dec. 19, 2019); *see also id.* *9-10 (collecting and discussing cases). Indeed, by the early twentieth century, the Supreme Court had "recognized this privilege as a matter of federal common law as well, and did so in part because of its ubiquity among the common laws of the states." *Id.* at *9 n.9 (discussing *Stewart v. Ramsey*, 242 U.S. 128 (1916)). A closer examination of state common law shows not only that the privilege was nearly universally adopted, but also that the privilege has always served the same core purposes—protecting the parties and witnesses and protecting the dignity and integrity of the courts by "enabl[ing] courts to function properly," *id.* at *8.

In New York, the state's highest court has long held that "[i]t is the policy of the law to protect suitors and witnesses from arrests upon civil process while coming to and attending the court and while returning home." *Person v. Grier*, 66 N.Y. 124, 125 (1876). That recognized privilege

continued to apply against civil arrests even after service of process began to replace arrest as the dominant means of initiating a civil action. *Parker v. Marco*, 136 N.Y. 585, 589 (1893). As in Massachusetts, courts in New York recognized that the privilege was "necessary for the maintenance of [the courts'] authority and dignity and in order to promote the due and efficient administration of justice." *Id.*

Similar principles have been deeply embedded in the laws of other Amici States for centuries. In 1822, Zephaniah Swift, the Chief Judge of Connecticut's Superior Court, explained the Founding-era protection against arrest for litigants and witnesses: "Parties and witnesses in cases pending before a court of justice, are privileged from arrests, *adeundo, morando, et redeundo*." 1 Zephaniah Swift, *A Digest of the Laws of the State of Connecticut* 497 (1822). As in Massachusetts and New York, Connecticut's privilege "is considered the privilege of the court, and not of the party attending the court; and it is discretionary with the court to allow it or not." *Id.* The leading Connecticut Supreme Court case on the issue states the rule in clear and broad terms: "[T]here can be no doubt that in all such cases of parties or witnesses, they can not be arrested or

detained, and will be discharged at once on motion to the court." *Bishop v. Vose*, 27 Conn. 1, 12 (1858).

Like Connecticut, New Jersey has long accepted the privilege. "A leading authority in the state courts," *Stewart*, 242 U.S. at 129, the New Jersey Supreme Court's 1817 decision in *Halsey v. Stewart* reasoned that "[c]ourts of justice ought, everywhere, to be open, accessible, free from interruption, and to cast a perfect protection around every man who necessarily approaches them," 4 N.J.L. 366, 367 (N.J. 1817). The court recognized that, as such, the privilege belonged not only to "parties and witnesses," but to "the court and the citizen" to "protect[] the court from interruption and delay." *Id.* at 368–69. By 1920, it was a "thoroughly settled" part of New Jersey common law "that a party to a suit, while necessarily going to, staying at, or returning from the court, is equally privileged from the service of a summons or of a capias [writ of arrest] in a civil action." *Michaelson v. Goldfarb*, 94 N.J.L. 352, 352, 110 A. 710, 710 (N.J. 1920). Even as new methods of initiating a civil action developed, the New Jersey Supreme Court, like others, maintained that the privilege against courthouse civil arrest had "never been relaxed or modified in this state." *Id.* at 353, 110 A. at 710.

Most other jurisdictions reached that same conclusion. By the late 1800s, courts not only in Massachusetts and the other States mentioned, but also in Illinois, Maryland, Oregon, Pennsylvania, Vermont, and Virginia agreed "that parties and witnesses attending in good faith any legal tribunal, with or without a writ of protection, are privileged from arrest on civil process during their attendance, and for a reasonable time in going and returning." *Larned v. Griffin*, 12 F. 590, 590 (C.C.D. Mass 1882); *see also Greer v. Young*, 120 Ill. 184, 187–88, 11 N.E. 167, 168 (1887) (recognizing the "almost unbroken current of authority" asserting "the privilege or immunity which the common law has, from a very early period, extended to parties and witnesses in a lawsuit while attending court, including going and coming" in "cases of *arrest* on civil process"); *Bolgiano v. Gilbert Lock Co.*, 73 Md. 132, 132, 20 A. 788, 788 (1890) ("A witness is protected from arrest on any civil process while going to the place of trial, while attending there for the purpose of the cause, and while returning home; *eundo, morando, et redeundo*; and it matters not whether he attends voluntarily or by compulsion."); *Wemme v. Hurlburt*, 133 Or. 460, 462, 289 P. 372, 373 (1930) ("Parties and witnesses are exempt from arrest while going to, in attendance on, and returning from,

court. This . . . is a part of the common law and is a power inherent in courts for the purpose of preventing delay, hindrance, or interference with the orderly administration of justice in the courts."); *Hayes v. Shields*, 2 Yeates 222, 222 (Pa. 1797) (recognizing "the privilege of the court" to protect court attendees from process and arrest); *In re Healey*, 53 Vt. 694, 695 (1881) ("[A]ll persons who have any relation to a cause which calls for their attendance in court, and who attend in the course of that cause, though not compelled by process, are for the sake of public justice protected from arrest in coming to, attending upon and returning from the court."); *Lester v. Bennett*, 1 Va. App. 47, 50, 333 S.E.2d 366, 368 (Ct. App. 1985) ("Several early Virginia cases state that exemption from arrest and service of process on a person attending court is a common law privilege.").

State common law demonstrates that, as service of process replaced civil arrest as the dominant mode of initiating a civil action, the States *extended* the ancient privilege, to varying degrees, to protect against service of process in *addition* to civil arrest, but without disturbing the privilege's original function or purpose. *See*, *e.g.*, *Diamond v. Earle*, 217 Mass. 499, 500, 105 N.E. 363, 363 (1914); *see New York*, 2019 WL

6906274, at *8-*9. Those courts did not question the privilege's continued application to civil arrests as such.[60]

By the time Congress enacted the INA in 1952, then, the privilege had long been a well-settled part of state common law not only in Massachusetts, but across the United States. That longstanding consensus was the backdrop against which, in the mid-twentieth century, "new forms of civil arrest arose" as part of the growing federal administrative state, "the most common of which are arrests of allegedly undocumented aliens" pursuant to the INA. *New York*, 2019 WL 6906274, at *9 (citing *INS v. Lopez-Mendoza*, 468 U.S. 1032, 1039 (1984)). Like the *capias* writs that were used in an earlier era to initiate a civil suit, civil arrests by ICE are carried out "to secure the [arrestee's] appearance" at a civil proceeding, namely, a removal proceeding. *See Murphy Bros. v. Michetti*

---

[60] ICE's reliance in its opening brief (*e.g.*, at 27-28) on cases like *United States v. Green*, 305 F. Supp. 125, 128 (S.D.N.Y. 1969), which involved the application of the privilege to service of subpoenas *in a criminal case*, is unavailing. *New York*, 2019 WL 6906274, at *9 n.10 (considering and rejecting *Green*'s application to the issue). And more broadly, the cases ICE cites involving the limits on the privileges application *to service of process* only confirm "that this policy was so strong that, even in the brief period when civil arrests became rare, the privilege was extended to service of process." *Id.* at *8-*9.

*Pipe Stringing, Inc.*, 526 U.S. 344, 350 (1999); *see also see also Arizona v. United States*, 567 U.S. 387, 396 (2012) ("Removal is a civil, not criminal, matter."). Yet despite the longstanding prohibition in the common law against civil arrests at or near courthouses, the INA evidences no intent, much less an "unmistakably clear" intent, *Gregory*, 501 U.S. at 460 (quotation marks omitted), to displace the "long-established and familiar" privilege against such arrests, *United States v. Texas*, 507 U.S. 529, 534 (1993).[61]

---

[61] Cases like *Pasquantino v. United States*, 544 U.S. 349 (2005) and *United States v. Craft*, 535 U.S. 274 (2002), on which ICE relies in its brief (at 31-33) do not alter that basic principle. *Pasquantino* recognized that federal laws should be read to preserve "long-established and familiar" common law rules, but found this principle inapplicable where there was no conflict to begin with between the common-law tax rule invoked by the defendant and the later-enacted federal statute. 544 U.S. at 359-60 (quotation marks omitted). Here, by contrast, ICE's interpretation of the INA as *allowing* courthouse civil arrests would override the common law rule *against* courthouse civil arrests. And the "traditional rationales" for the ancient common law privilege, *id.* at 360, confirm that the privilege prohibits the precise activity that ICE argues is authorized under the INA, namely disrupting judicial proceedings and deterring defendants, witnesses and victims from attending court for fear of civil arrest. *New York*, 2019 WL 6906274, at \*10. Meanwhile, in *Craft*, the state common law rule at issue, regarding the imposition of liens on properties-by-the-entirety, was less clearly established, and in light of that "ambiguity" did not preclude the application of federal tax liens under the capacious terms of the federal tax lien statute. 535 U.S. at 287-88.

ICE's courthouse civil arrest policy contravenes the historic and near-universal consensus in the common law against such arrests, disregards the weight of history and precedent, and outstrips the agency's authority under the INA.

## CONCLUSION

The district court's order should be affirmed.

Dated:  New York, New York
       May 22, 2020

Respectfully submitted,

LETITIA JAMES
  *Attorney General*
  *State of New York*

By:  */s/ Ari J. Savitzky*

BARBARA D. UNDERWOOD
  *Solicitor General*
STEVEN C. WU
  *Deputy Solicitor General*
    *of Counsel*

ARI J. SAVITZKY
*Assistant Solicitor General*

28 Liberty Street
New York, NY  10005
(212) 416-6073

*(Counsel listing continues on next page.)*

---

Here, by contrast, the common law rule against civil arrests stretches back for centuries and has been adopted in courts across the Nation.

WILLIAM TONG
  *Attorney General*
  *State of Connecticut*
165 Capitol Avenue
Hartford, CT 06106

KARL A. RACINE
  *Attorney General*
  *District of Columbia*
441 4th Street, N.W.
Washington, DC 20001

KWAME RAOUL
  *Attorney General*
  *State of Illinois*
100 West Randolph Street
Chicago, IL 60601

BRIAN E. FROSH
  *Attorney General*
  *State of Maryland*
200 Saint Paul Place
Baltimore, MD 21202

KEITH ELLISON
  *Attorney General*
  *State of Minnesota*
102 State Capitol
75 Rev. Dr. Martin Luther
King Jr. Blvd.
St. Paul, MN 55155

GURBIR S. GREWAL
  *Attorney General*
  *State of New Jersey*
25 Market Street
Trenton, NJ 08625

HECTOR BALDERAS
  *Attorney General*
  *State of New Mexico*
408 Galisteo Street
Santa Fe, NM 87501

ELLEN F. ROSENBLUM
  *Attorney General*
  *State of Oregon*
1162 Court Street, N.E.
Salem, OR 97301

JOSH SHAPIRO
  *Attorney General*
  *Commonwealth of Pennsylvania*
1699 Arch Street
Philadelphia, PA 19103

PETER F. NERONHA
  *Attorney General*
  *State of Rhode Island*
150 South Main Street
Providence, RI 02903

(*Counsel listing continues on next page.*)

ROBERT W. FERGUSON
  *Attorney General*
  *State of Washington*
P.O. Box 40100
Olympia, WA 98504

THOMAS J. DONOVAN, JR.
  *Attorney General*
  *State of Vermont*
109 State Street
Montpelier, VT 05609

MARK R. HERRING
  *Attorney General*
  *Commonwealth of Virginia*
202 North 9th Street
Richmond, VA 23219

# CERTIFICATE OF COMPLIANCE

Pursuant to Rule 32(a) of the Federal Rules of Appellate Procedure, Megan Chu, an employee in the Office of the Attorney General of the State of New York, hereby certifies that according to the word count feature of the word processing program used to prepare this brief, the brief contains 6,470 words and complies with the typeface requirements and length limits of Rules 29 and 32(a)(5)-(7).

_/s/ Megan Chu_

**CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the accompanying Brief for Amici Curiae States of New York et al. by using the CM/ECF system on May 22, 2020.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

Dated:   May 22, 2020
         New York, NY


_/s/ Ari J. Savitzky_____