# 𝔘𝔫𝔦𝔱𝔢𝔡 𝔖𝔱𝔞𝔱𝔢𝔰 ℭ𝔬𝔲𝔯𝔱 𝔬𝔣 𝔄𝔭𝔭𝔢𝔞𝔩𝔰 𝔣𝔬𝔯 𝔱𝔥𝔢 𝔉𝔦𝔯𝔰𝔱 ℭ𝔦𝔯𝔠𝔲𝔦𝔱

---

MARIAN RYAN, in her official capacity as Middlesex County District Attorney;
RACHAEL ROLLINS, in her official capacity as Suffolk County District Attorney;
COMMITTEE FOR PUBLIC COUNSEL SERVICES;
CHELSEA COLLABORATIVE, INC.
Plaintiffs - Appellees

v.

U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT;
MATTHEW T. ALBENCE, in his official capacity as Acting Deputy Director of U.S.
Immigration and Customs Enforcement and Senior Official Performing the Duties of the
Director; TODD M. LYONS, in his official capacity as Acting Field Office Director of
U.S. Immigration and Customs Enforcement, Enforcement and Removal Operations;
U.S. DEPARTMENT OF HOMELAND SECURITY; CHAD WOLF, in his official
capacity as Acting Secretary of United States Department of Homeland Security
Defendants - Appellants

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

## MASSACHUSETTS BAR ASSOCIATION, BOSTON BAR ASSOCIATION, MASSACHUSETTS ACADEMY OF TRIAL ATTORNEYS, WOMEN'S BAR ASSOCIATION OF MASSACHUSETTS, AND SOUTH ASIAN BAR ASSOCIATION OF GREATER BOSTON *AMICUS CURIAE* BRIEF SUPPORTING THE PLAINTIFFS-APPELLEES AND URGING AFFIRMANCE OF THE PRELIMINARY INJUNCTION ISSUED BELOW

*Counsel for Amici Curiae*

Thomas J. Carey, Jr.
First Circuit Bar #1101849
1131 Main Street
Hingham, MA  02043
(781) 740-1234
thomas.carey.1@bc.edu

Dated: May 20, 2020

*— Additional counsel listed on the inside cover —*

Martin W. Healy
First Circuit Bar #19151
Chief Operating Officer and General Counsel,
Massachusetts Bar Association
20 West Street
Boston, MA  02111
(617) 338-0500
MHealy@massbar.org


*On the Brief*:

Christopher N. Lasch
Professor of Law
Co-director, Immigration Law and Policy Clinic
University of Denver Sturm College of Law
2255 East Evans Avenue
Denver, CO 80208
(303) 871-6368
clasch@law.du.edu

# CORPORATE DISCLOSURE STATEMENT

*Amici curiae*, the Massachusetts Bar Association, Boston Bar Association, Massachusetts Academy of Trial Attorneys, Women's Bar Association of Massachusetts, and South Asian Bar Association of Greater Boston, are non-profit corporations or organizations. None has a parent corporation and no publicly-owned corporation owns 10% or more of its stock.

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ..........................................................i

TABLE OF AUTHORITIES ...................................................................................iv

IDENTITIES AND INTEREST OF THE *AMICI CURIAE* .....................................1

STATEMENT OF *AMICI* UNDER RULE 29(A)(4)(E)...........................................4

SUMMARY OF ARGUMENT .................................................................................4

ARGUMENT ...........................................................................................................6

     I.     ICE'S INCREASED USE OF COURTHOUSE ARRESTS
           CONTINUES A RECENT PUSH BY THE EXECUTIVE
           BRANCH TO INVOLVE STATE AND LOCAL JUSTICE
           SYSTEMS IN IMMIGRATION ENFORCEMENT AND
           THREATENS THE FAIR ADMINISTRATION OF JUSTICE
           IN STATE COURTS ...........................................................................6

     II.    THE COMMON-LAW PRIVILEGE AGAINST CIVIL
           ARREST WHILE ATTENDING COURT PRESERVES THE
           SANCTITY, AUTHORITY, AND EFFECTIVENESS OF THE
           JUDICIAL BRANCH OF GOVERNMENT, PROTECTS
           INDIVIDUAL ACCESS TO JUSTICE, AND PRESERVES
           INDIVIDUAL RIGHTS....................................................................13

           A.    The Common-Law Privilege Prohibits Civil Arrests in
                 and Around Courthouses, Protecting the Sanctity of the
                 Courts as a Branch of Government and Signaling Equal
                 Access for All Who Come Seeking Justice ..............................15

           B.    The Common-Law Privilege Prohibits Civil Arrests of
                 Those on Their Way to, or Returning from, Court
                 Proceedings, thus Protecting Individual Access to the
                 Courts and Preserving Individual Rights ..................................19

      C.     There Is No Merit to the Government's Arguments
                 Against the Existence and Application of the Common-
                 Law Privilege Against Civil Arrest .......................................... 25

CONCLUSION ..................................................................................... 27

CERTIFICATE OF COMPLIANCE ....................................................... 30

CERTIFICATE OF SERVICE .............................................................. 31

# TABLE OF AUTHORITIES

## Cases

### Federal Cases

*Arizona v. United States*, 567 U.S. 387 (2012) ........................................................10

*Blight v. Fisher,* 3 F. Cas. 704 (C.C.D.N.J. 1809) (No. 1542) ................................17

*Bramwell v. Owen,* 276 F. 36 (D. Or. 1921) ............................................................16

*Bridges v. Sheldon,* 7 F. 17 (C.C.D. Vt. 1880) ........................................................16

*City and County of San Francisco v. Trump*, 897 F.3d 1225 (9th Cir. 2018) .........11

*In Re Johnson*, 167 U.S. 120 (1897) ................................................................26, 27

*Larned v. Griffin*, 12 F. 590 (C.C.D. Mass. 1882) ...................................................21

*Long v. Ansell*, 293 U.S. 76 (1934) ........................................................................14

*Moreno v. Napolitano*, 213 F. Supp. 3d 999 (N.D. Ill. 2016) .................................11

*New York v. U.S. Immigration & Customs Enf't,* No. 19-CV-8876(JSR),
    2019 WL 6906274 (S.D.N.Y. Dec. 19, 2019) ....................... 13-14, 15, 17, 23

*Page Co. v. MacDonald,* 261 U.S. 446 (1923) ........................................................22

*Parker v. Hotchkiss,* 18 F. Cas. 1137 (C.C.E.D. Pa. 1849)
    (No. 10,739) ...........................................................................................17, 22

*Ryan v. U.S. Immigration & Customs Enf't*, 382 F. Supp. 3d 142
    (D. Mass. 2019) ..........................................................................13, 23, 24, 27

*Stewart v. Ramsay,* 242 U.S. 128 (1916) ...............................................17, 22, 25, 27

*Washington v. U.S. Dep't of Homeland Sec.,* No. C19-2043 TSZ,
    2020 WL 1819837 (W.D. Wash. Apr. 10, 2020) ..........................................23

*Williamson v. United States,* 207 U.S. 425 (1908) ...........................................14, 21

## State Cases

*Halsey v. Stewart,* 4 N.J.L. 366 (1817).........................................................17, 22, 27

*Lunn v. Commonwealth,* 477 Mass. 517, 78 N.E.3d 1143 (2017)......................9, 11

*Parker v. Marco,* 136 N.Y. 585, 32 N.E. 989 (1893)..............................................16

*State v. Buck,* 62 N.H. 670 (1883) ..........................................................................22

*Thompson's Case,* 122 Mass. 428 (1877)................................................................22

## Foreign Cases

*Cole v. Hawkins,* (1738) 95 Eng. Rep. 396............................................................. 17

*Ex Parte Jackson*, (1808) 33 Eng. Rep. 699 ..........................................................20

*Lightfoot v. Cameron*, (1776) 96 Eng. Rep. 658 ....................................................20

*Meekins v. Smith*, (1791) 126 Eng. Rep. 363.............................................20, 22, 26

*Orchard's Case*, (1828) 38 Eng. Rep. 987..........................................................15-16

*Spence v. Stuart*, (1802) 102 Eng. Rep. 530.....................................................20, 22

*Walpole v. Alexander*, (1782) 99 Eng. Rep. 530 ...............................................21, 22

## Statutes

### Federal Statutes

8 U.S.C. §§ 1103(a)(10) (1994 & Supp. II 1997).....................................................9

8 U.S.C. § 1357 (1994 & Supp. II 1997)..................................................................9

8 U.S.C. § 1252c (1994 & Supp. II 1997) ...............................................................9

Anti-Drug Abuse Act of 1988, Pub. L. No. 100-690, § 7344,
    102 Stat. 4181, 4470-4471 (1988)..................................................................7

Pub. L. No. 104-208, § 133, 110 Stat. 3009, 3009-563 (1996) .................................9

**State Statutes**

2019 Cal. Stat. Ch. 787 ..........................................................................19

Colo. Rev. Stat. § 13-1-401 to § 13-1-404.............................................19

2020 Wash. Sess. Laws Ch. 37 ..............................................................19

## Constitutional Provisions

Mass. Const. of 1780, pt. I, art. XXIX...................................................27

## Other Authorities

6 Matthew Bacon, A NEW ABRIDGMENT OF THE LAW (7th ed. 1832) .....................15

Letter from Thomas A. Balmer, Chief Justice, Or. Supreme Court, to Jeff
 Sessions, Att'y Gen., & John F. Kelly, Sec'y, Dep't of Homeland Sec.
 (Apr. 6, 2017) ...............................................................................18, 23, 24

3 William Blackstone, COMMENTARIES ON THE LAWS OF ENGLAND
 (3rd ed.1768)...................................................................................15, 16, 20

Letter from Tani G. Cantil-Sakauye, Chief Justice, Cal. Supreme Court, to
 Jeff Sessions, U.S. Att'y Gen. (Mar. 16, 2017)...........................................17

Jennifer M. Chacón, *Unsecured Borders: Immigration Restrictions, Crime
 Control, and National Security*, 39 CONN. L. REV. 1827 (2007) .................10

Alina Das, *Inclusive Immigrant Justice: Racial Animus and the Origins of
 Crime-Based Deportation,* 52 U.C. DAVIS L. REV. 171 (2018).....................10

Exec. Order No. 13,768, 82 Fed. Reg. 8799 (Jan. 25, 2017)...................................11

Letter from Mary E. Fairhurst, Chief Justice, Wash. Supreme Court, to John
 F. Kelly, Sec'y, Dep't of Homeland Sec. (Mar. 22, 2017)...............18, 24, 25

Letter from Supreme Judicial Court Chief Justice Ralph Gants and Trial Court Chief Justice Paula Carey to Acting Field Office Director Todd M. Lyons (DHS/ICE/ERO) (Feb. 20, 2020)........................................ 4, 12-13

Pratheepan Gulasekaram et al., *Anti-Sanctuary and Immigration Localism*, 119 COLUM. L. REV. 837 (2019).................................................11

Letter from Michael Hancock, Mayor of Denver, to Jeffrey D. Lynch, Acting Field Office Dir., U.S. Immigration and Customs Enf't (April 6, 2017) ..............................................................................25

César Cuauhtémoc García Hernández, *Creating Crimmigration*, 2013 BYU L. REV. 1457 (2013) ....................................................10

Samuel Howe, PRACTICE IN CIVIL ACTIONS AND PROCEEDINGS AT LAW IN MASSACHUSETTS (1834) ..............................................................14

Christopher N. Lasch, *A Common-Law Privilege to Protect State and Local Courts During the Crimmigration Crisis*, 127 YALE L.J. F. 410 (2017)........................................12, 14, 15, 27

Christopher N. Lasch et al., *Understanding "Sanctuary Cities,"* 59 B.C. L. REV. 1703 (2018) ............................................................6

Nathan Levy, Jr., *Mesne Process in Personal Actions at Common Law and the Power Doctrine,* 78 YALE L.J. 52 (1968)................................26

Teresa A. Miller, *Citizenship & Severity: Recent Immigration Reforms and the New Penology*, 17 GEO. IMMIGR. L.J. 611 (2003) ....................7

Mai M. Ngai, IMPOSSIBLE SUBJECTS: ILLEGAL ALIENS AND THE MAKING OF MODERN AMERICA (2004)..............................................................10

Huyen Pham & Pham Hoang Van, *Subfederal Immigration Regulation and the Trump Effect*, 94 N.Y.U. L. REV. 125 (2019)..............................9

Memorandum from James A. Puleo, Acting Associate Commissioner of the Office of Operations, U. S. Immigration & Naturalization Service to District Directors and Chief Patrol Agents, U. S. Immigration and Naturalization Service (May 17, 1993) ......................................7-8

Letter from Stuart Rabner, Chief Justice, N. J. Supreme Court, to John F. Kelly, Sec'y, Dep't of Homeland Sec. (Apr. 19, 2017) ....................18, 24, 25

Sarah Rogerson, *Sovereign Resistance to Federal Immigration Enforcement in State Courthouses*, 32 GEO. IMMIGR. L.J. 275 (2018)...........................7, 8

Ilya Somin, *Making Federalism Great Again: How the Trump Administration's Attack on Sanctuary Cities Unintentionally Strengthened Judicial Protection for State Autonomy*, 97 TEX. L. REV. 1247 (2019) ................................................................ 11-12

1 Joseph Story, COMMENTARIES ON THE CONSTITUTION OF THE UNITED STATES (4th Ed. 1873) ...........................................................................14, 21

Juliet Stumpf, *The Crimmigration Crisis: Immigrants, Crime, and Sovereign Power*, 56 AM. U. L. REV. 367 (2006) ...........................................................7

James Tomberlin, *"Don't Elect Me": Sheriffs and the Need for Reform in County Law Enforcement,* 104 VA. L. REV. 113 (2018) ..............................26

Yolanda Vázquez, *Constructing Crimmigration: Latino Subordination in a "Post-Racial" World*, 76 OHIO ST. L.J. 599 (2015)......................................10

U.S. Immigr. & Customs Enf't, Directive Number 11072.1: Civil Immigration Enforcement Actions Inside Courthouses (Jan. 10, 2018) ..............................................................................................12

Michael J. Wishnie, *State and Local Police Enforcement of Immigration Laws*, 6 U. PA. J. CONST. L. 1084 (2004)......................................................10

## IDENTITIES AND INTEREST OF THE *AMICI CURIAE*

The **Massachusetts Bar Association** ("MBA"), a non-profit organization founded in 1910, is a state-wide bar association. Its House of Delegates also has representative seats for every county bar association and many other statewide legal associations focused on specific practice areas, along with all major diversity bar associations in the Commonwealth.

The **Boston Bar Association** ("BBA") is the nation's oldest bar association, the direct successor to the earliest bar association in Boston, founded by John Adams in 1761. The BBA works to advance the highest standards of excellence for the legal profession, to serve the community at large, and to advocate for access to justice, including the right of all persons to equality under law.

The **Massachusetts Academy of Trial Attorneys** ("Academy") is a voluntary, non-profit, state-wide professional association of lawyers whose purpose is to uphold and defend the Constitutions of the United States and the Commonwealth of Massachusetts; to promote the administration of justice; and to advance the cause of those who seek redress for injury to person or property.

The **Women's Bar Association of Massachusetts** ("WBA") is a statewide non-profit organization whose mission is to support the advancement of women in the legal profession and in a just society. For more than four decades, the WBA has

submitted, filed, and joined many *amicus curiae* briefs in state and federal courts on legal issues that have a unique impact on women, as in this case.

The **South Asian Bar Association of Greater Boston** ("SABAGB") was founded in 2004 and is part of a network of local chapters under the umbrella of the South Asian Bar Association of North America. SABAGB serves as a resource for lawyers of South Asian descent and the South Asian community at large, many of whom are either immigrants or children of recent immigrants.

## Interest

The interest of the *amici* is to advocate for the rights of their members, and their members' clients, to access to the courts of the Commonwealth, and to the full and fair administration of justice in those courts. As bar associations whose members engage in diverse practice areas in courthouses around the Commonwealth, *amici* can attest that the courthouse arrests at the heart of this case disrupt the delivery of justice, not only in criminal cases but in many civil matters as well, and generally chill the pursuit of legal rights and remedies and impede the search for truth at trials. *Amici* have observed that ICE's current civil arrest policy adversely impacts proceedings throughout the Trial Court system: District Courts, including small claims matters, Housing Courts, including summary process claims for evictions and counterclaims for building and health code violations; Probate and Family Law Courts, including domestic relations and domestic violence,

spousal support, and termination of parental rights; and the Superior Court, with jurisdiction over a vast range of civil cases including, torts, contracts, equitable proceedings, numerous statutory claims, and many types of unfair and deceptive acts and practices.

This case thus impacts the ability of the Massachusetts Judiciary to function effectively and deliver justice to litigants, witnesses, and others enmeshed in or impacted by civil and criminal court proceedings, a matter of grave concern to all members of the Massachusetts Bar. The *amici* have sought leave to file under Rule 29 (a) (3). Accordingly, as friends of the court, and in support of the plaintiffs-appellees, the *amici* submit this brief discussing in depth the history and importance of the common-law privilege against civil arrests from the perspective of practicing attorneys. *Amici* urge this Court to affirm the District Court's grant of a preliminary injunction prohibiting federal executive branch officials from "civilly arresting parties, witnesses, and others attending Massachusetts Courthouses on official business while they are going to, attending, or leaving the courthouse." A030-31.

## STATEMENT OF *AMICI* UNDER RULE 29 (A) (4) (E)

No party's counsel authored this *amicus* brief in whole or in part and no party's counsel, party, or other person—other than the *amici curiae*, their members, or their counsel—contributed money that was intended to fund preparing or submitting this brief.

## SUMMARY OF ARGUMENT

I.  The *amici curiae* bar associations first offer historical context situating the civil immigration arrest practice at issue here in the context of an evolving immigration enforcement system that in the past three decades has been characterized by ever-increasing federal attempts to harness state justice systems in the service of immigration enforcement.  Responding to one such instance, two of the top judicial officials in Massachusetts recently lamented as an "affront to justice" federal immigration officials' deportation of a defendant (following an arrest in a Massachusetts courthouse) who was awaiting trial in state court. Letter from Supreme Judicial Court Chief Justice Ralph Gants and Trial Court Chief Justice Paula Carey to Acting Field Office Director Todd M. Lyons (DHS/ICE/ERO) (Feb. 20, 2020), *available at* https://www.bostonherald.com/2020/02/20/massachusetts-judges-blast-ice-for-deporting-local-defendants/. Recent increases in the use of civil arrests at courthouses by the federal Executive threaten the ability of Massachusetts Courts to administer justice.

II.  Second, the *amici curiae* offer a detailed explanation of the common-law privilege from civil arrest that the District Court properly relied upon in determining that immigration courthouse arrests are not authorized under the Immigration and Nationality Act.  This common-law privilege from civil arrest, entrenched over centuries of English and American law, has two distinct strands. The first prohibits any civil arrest of any person at the *place* of a courthouse or its environs.  This strand of the privilege is rooted in concerns for the dignity, decorum, and authority of courts—concerns which continue to be pertinent today. The second strand of the privilege prohibits the civil arrest of any *person* while attending, coming to, or returning from court business.  This strand of the privilege prevents the threat of civil arrest from deterring parties and witnesses from attending court. This rationale also persists today as it has over the centuries. The common-law privilege from civil arrest while attending court has continuing vitality and fully supports the District Court's ruling. Thus, *amici curiae* urge this Court to affirm the preliminary injunction.

# ARGUMENT

## I. ICE'S INCREASED USE OF COURTHOUSE ARRESTS CONTINUES A RECENT PUSH BY THE EXECUTIVE BRANCH TO INVOLVE STATE AND LOCAL JUSTICE SYSTEMS IN IMMIGRATION ENFORCEMENT AND THREATENS THE FAIR ADMINISTRATION OF JUSTICE IN STATE COURTS.

Thirty years of ever-increasing efforts by the federal government to harness state and local justice systems in the service of immigration enforcement set the stage for the conflict between the parties in this case. After years of federal Executive attempts to enlist state governments in civil immigration enforcement, the current Administration has focused its gaze on state courthouses as a place to leverage state systems in carrying out immigration enforcement. The common-law privilege relied upon by the District Court in granting the preliminary injunction enforces sound legal doctrine and underlying policy rationales that have been unbroken for centuries and should not be cast aside.

For more than a century, the Supreme Court clearly demarcated separate spheres of responsibility over state and local crime control and federal immigration control. *See generally* Christopher N. Lasch et al., *Understanding "Sanctuary Cities,"* 59 B.C. L. REV. 1703, 1719-23 (2018) (describing recent entanglement of these systems). During the 1980s and 1990s, this clear demarcation began to blur. Congress amended the Immigration and Nationality Act to increase the number and types of crimes that would subject a noncitizen to deportation. In 1988, for

example, Congress created a category of "aggravated felonies," which expanded the list of removable offenses. See Anti-Drug Abuse Act of 1988, Pub. L. No. 100-690, § 7344, 102 Stat. 4181, 4470-4471 (1988). Almost every immigration statute enacted since then has continued to expand the list of crimes resulting in deportation or exclusion from the United States. *See* Teresa A. Miller, *Citizenship & Severity: Recent Immigration Reforms and the New Penology*, 17 GEO. IMMIGR. L.J. 611, 633-34 (2003); Juliet P. Stumpf, *The Crimmigration Crisis: Immigrants, Crime, and Sovereign Power*, 56 AM. U. L. REV. 367, 383 (2006).

As the federal government expanded its enforcement efforts, intrusion on vital local functions became more and more likely. After a series of enforcement actions in churches and one school, the former Immigration and Naturalization Service (INS) created a policy in 1993 that prohibited immigration enforcement actions in "sensitive locations." Sarah Rogerson, *Sovereign Resistance to Federal Immigration Enforcement in State Courthouses*, 32 GEO. IMMIGR. L.J. 275, 283-84 (2018). The INS identified churches, hospitals, and schools as "sensitive locations" where immigration enforcement would unnecessarily alarm or harm communities. The "sensitive locations" policy required the INS to "attempt to avoid apprehension of persons and to tightly control investigative operations on [those] premises." Memorandum from James A. Puleo, Acting Associate Commissioner of the Office of Operations, U. S. Immigration & Naturalization Service to District

Directors and Chief Patrol Agents, U. S. Immigration and Naturalization Service (May 17, 1993), *available at* https://bit.ly/2Ccdrqe. Enforcement activities in these "sensitive locations" required advance written approval from a District Director, who would consider whether alternative measures were available that would minimize the impact on these institutions and communities. *See* Rogerson, *Sovereign Resistance*, 32 GEO. IMMIGR. L.J. at 283. The state judicial function was not addressed by the 1993 policy memo; it did not need to identify courthouses as "sensitive locations" since longstanding common-law doctrine already prohibited civil arrests at these locations. *See* Section II, *infra.*

The government recognized in its "sensitive locations" policy—implicitly if not explicitly—that the public interest in protecting vulnerable populations and privileged activities may outweigh the public interest in apprehending noncitizens on civil charges sooner rather than later. *See id.* at 285-87. Law enforcement may do more harm than good by making an arrest inside a school or hospital, or at a church, wedding, or funeral, because such arrests may corrode the relationship between law enforcement and affected communities and jeopardize the functioning of valued local institutions. And the risk of error inherent in all human activity, including law enforcement, may require particular certainty and supervisory approval before disrupting people who are exercising important rights. *See id.*

While the "sensitive locations" memo recognized a public interest in balancing civil apprehension against unwarranted intrusions on local institutions like schools and hospitals, it by no means signaled a retreat from enforcement efforts. To the contrary, in 1996, Congress sought to multiply personnel involved in enforcement activities by enacting a bill that invited state and local law enforcement agencies to help enforce immigration law. *See* Pub. L. No. 104-208, § 133, 110 Stat. 3009, 3009-563 (1996) (amending 8 U.S.C. § 1357 (1994 & Supp. II 1997) to allow agreements authorizing state and local officers to carry out the "function of an immigration officer"); Huyen Pham & Pham Hoang Van, *Subfederal Immigration Regulation and the Trump Effect*, 94 N.Y.U. L. Rev. 125 (2019). Congress also specified narrow circumstances in which state and local officers can effect civil immigration arrests outside such agreements. *See* 8 U.S.C. §§ 1103(a)(10), 1252c (1994 & Supp. II 1997).

In each of these instances, the statutes authorized, but did not require, state and local officers to enforce civil immigration law. *See Lunn v. Commonwealth,* 477 Mass. 517, 527, 532-37, 78 N.E.3d 1143, 1152-53, 1156-60 (2017) (concluding that Congress did not—and could not—*require* Massachusetts officials to enforce federal immigration law, and instead simply *authorized* them to

exercise immigration enforcement powers, but only in enumerated circumstances and only if authorized under Massachusetts law).[1]

In 2002, the Office of Legal Counsel (OLC) took the position that state and local law enforcement officers did not need authorization such as that contained in the 1996 legislation, and opined instead that state and local officers had the "inherent authority" to enforce immigration laws. *See* Michael J. Wishnie, *State and Local Police Enforcement of Immigration Laws*, 6 U. PA. J. CONST. L. 1084, 1084-88 (2004). The Supreme Court ultimately discredited the OLC's "inherent authority" argument in *Arizona v. United States*, 567 U.S. 387 (2012), noting the "limited circumstances" in which Congress had authorized immigration arrests by state and local officers and holding that Arizona's attempt to authorize such arrests beyond the "system Congress created" was preempted. *Id.* at 408-10.

---

[1] After the terrorist attacks on September 11, 2001, the federal Executive aggressively pushed for state and local law enforcement to take an active role in immigration enforcement. Scholars have documented the evolution of Executive reliance on state and local crime control systems as connected to the racialized portrayal of immigrants as criminal and national-security threats. *See generally* Mai M. Ngai, IMPOSSIBLE SUBJECTS: ILLEGAL ALIENS AND THE MAKING OF MODERN AMERICA (2004); César Cuauhtémoc García Hernández, *Creating Crimmigration*, 2013 BYU L. REV. 1457 (2013); Jennifer M. Chacón, *Unsecured Borders: Immigration Restrictions, Crime Control, and National Security*, 39 CONN. L. REV. 1827 (2007); Yolanda Vázquez, *Constructing Crimmigration: Latino Subordination in a "Post-Racial" World*, 76 OHIO ST. L.J. 599 (2015); Alina Das, *Inclusive Immigrant Justice: Racial Animus and the Origins of Crime-Based Deportation,* 52 U.C. DAVIS L. REV. 171 (2018).

Other federal Executive efforts to enlist state and local officers in the immigration enterprise have included requests for state and local officials to detain suspected immigration violators, *see Lunn,* 477 Mass. 517, 78 N.E.3d 1143 (concluding Massachusetts officers lacked state-law authority for such detentions); *see also Moreno v. Napolitano*, 213 F. Supp. 3d 999 (N.D. Ill. 2016) (holding that federal officials routinely exceeded their authority in requesting detention without complying with the INA's requirements for civil immigration arrests). The federal government has pressured local governments to enforce civil immigration law in other ways as well. *See* Pratheepan Gulasekaram et al., *Anti-Sanctuary and Immigration Localism*, 119 COLUM. L. REV. 837, 844-47 (2019) (describing shift from "encouragement" to a "more direct and punitive approach").

In 2017, the President issued an Executive Order that threatened to withhold federal funding from any jurisdiction that the Secretary of Homeland Security, "in his discretion," designated as a "sanctuary jurisdiction." Exec. Order No. 13,768, 82 Fed. Reg. 8799, 8801 (Jan. 25, 2017). The Ninth Circuit observed "that the Administration intends to cripple jurisdictions that do not assist in enforcing federal immigration policy." *City and County of San Francisco v. Trump*, 897 F.3d 1225, 1243 (9th Cir. 2018); *see also* Ilya Somin, *Making Federalism Great Again: How the Trump Administration's Attack on Sanctuary Cities Unintentionally*

*Strengthened Judicial Protection for State Autonomy*, 97 TEX. L. REV. 1247, 1254-84 (2019) (detailing court rulings concerning withholding of federal funding).

In the wake of this extensive history of ongoing and increasing efforts to conscript the States into enforcing civil immigration law, jurisdictions that sought to disentangle their local institutions from immigration enforcement found themselves subjected by the federal executive to increasing arrests in state courthouses. *See* Christopher N. Lasch, *A Common-Law Privilege to Protect State and Local Courts During the Crimmigration Crisis*, 127 YALE L.J. F. 410, 421-22 & nn. 64-67 (2017). In January 2018, the Department of Homeland Security issued the courthouse-arrest directive that is the subject of this action. U.S. Immigr. & Customs Enf't, Directive Number 11072.1: Civil Immigration Enforcement Actions Inside Courthouses (Jan. 10, 2018), *available at* https://www.ice.gov/sites/default/files/documents/Document/2018/ciEnforcement ActionsCourthouses.pdf. This executive policy shift took unprecedented action to enforce immigration law by making civil arrests in a setting the law has regarded as deserving of special protection for hundreds of years. Two of the top judicial officials in Massachusetts recently lamented as an "affront to justice" federal immigration officials' deportation of a defendant (following an arrest in a Massachusetts courthouse) who was awaiting trial in state court. Letter from Supreme Judicial Court Chief Justice Ralph Gants and Trial Court Chief Justice

Paula Carey to Acting Field Office Director Todd M. Lyons (DHS/ICE/ERO) (Feb. 20, 2020), *available at* https://www.bostonherald.com/2020/02/20/ massachusetts-judges-blast-ice-for-deporting-local-defendants/.

There is no need to address broader constitutional issues in this case because the "system Congress created" never sought to abrogate the common-law privilege against civil arrest of people attending state or federal courts on official business. *Ryan v. U.S. Immigration & Customs Enf't*, 382 F. Supp. 3d 142, 157-58 (D. Mass. 2019). This time-honored privilege from civil arrest while going to, attending, or leaving courthouses on official business preserves the ability of state and federal courts to administer fundamental justice, and amply supports the injunction issued below.

## II. THE COMMON-LAW PRIVILEGE AGAINST CIVIL ARREST WHILE ATTENDING COURT PRESERVES THE SANCTITY, AUTHORITY, AND EFFECTIVENESS OF THE JUDICIAL BRANCH OF GOVERNMENT, PROTECTS INDIVIDUAL ACCESS TO JUSTICE, AND PRESERVES INDIVIDUAL RIGHTS.

At common law, a plaintiff commenced a civil action against a defendant by procuring his arrest, as the District Court recognized. *See Ryan*, 382 F. Supp. 3d at 155-56 (citing authorities). The common law rule against civil arrests in and around courthouses and while persons travel to and from court proceedings developed in England, where the civil arrest practice began and was commonplace. *See New York v. U.S. Immigration & Customs Enf't,* No. 19-CV-8876(JSR), 2019

WL 6906274, at *8 (S.D.N.Y. Dec. 19, 2019) ("[I]t is patently clear that English common law provided a privilege against any civil arrests in and around courthouses, and also against civil arrests of witnesses and parties necessarily traveling to and from the courthouse") (citing, *inter alia,* Lasch, *Common-Law Privilege*, 127 YALE L.J. F. at 432-39). The rule later became part of the law of the United States. *See New York,* 2019 WL 6906274, at *8 (noting "no real dispute between the parties here that this privilege was adopted into American common-law after independence").

The Supreme Court cited established treatises that acknowledged the firmly entrenched privilege from civil arrest as a matter of both federal and Massachusetts law. 1 Joseph Story, COMMENTARIES ON THE CONSTITUTION OF THE UNITED STATES § 859, at 608 (4th Ed. 1873) (describing the privilege as "conceded by law to the humblest suitor and witness in a court of justice") (quoted in *Williamson v. United States,* 207 U.S. 425, 443 (1908)); Samuel Howe, PRACTICE IN CIVIL ACTIONS AND PROCEEDINGS AT LAW IN MASSACHUSETTS 143-44 (1834) ("[A]ll persons connected with a cause, which calls for their attendance in court, and who attend *bona fide,*— are protected from arrest, *eundo, morando, et redeundo*") (cited in *Long v. Ansell*, 293 U.S. 76, 83 (1934)).

The common-law privilege against civil arrest has two strands, one protecting against civil arrests "in and around courthouses" and one protecting

against civil arrests "of witnesses and parties necessarily traveling to and from the courthouse." *New York,* 2019 WL 6906274, at *8 (citing, *inter alia,* 3 William Blackstone, COMMENTARIES ON THE LAWS OF ENGLAND 289 (3rd ed.1768) and Lasch, *Common-Law Privilege*, 127 YALE L.J. F. at 432-39). Each strand is rooted in policy rationales which continue to be of vital significance today.

A.   **The Common-Law Privilege Prohibits Civil Arrests in and Around Courthouses, Protecting The Sanctity of the Courts as a Branch of Government and Signaling Equal Access for All Who Come Seeking Justice.**

The common-law privilege from civil arrest as it pertains to the *place* of courthouses and their environs was largely concerned with the dignity, decorum, and authority of courts, and the need for courts as an institution of government to be surrounded with an aura of sanctity and equality.

As Blackstone put it, no civil arrest could be made "in any place where the King's justices are actually sitting." Blackstone, 3 COMMENTARIES at 289. The privilege as to the courthouse and its environs was absolute and included even those persons with no business before the Court. *See* Lasch, *Common-Law Privilege*, 127 YALE L.J. F. at 428 & n.101 (describing privilege as to the courthouse and its environs as applying to "all persons whatsoever") (quoting 6 Matthew Bacon, A NEW ABRIDGMENT OF THE LAW 530 (7th ed. 1832)).

In *Orchard's Case*, for example, an attorney was arrested either inside the court or "in the space between the outer and the inner doors" of the court. (1828) 38

Eng. Rep. 987, 987. Though an attorney, Orchard was admittedly "not in court for the purpose of professional attendance, or of discharging any professional duty." *Id.* But it was argued that Orchard could not be arrested because no arrest may be made "in any place where the King's justices are actually sitting." *Id.* (quoting Blackstone, *supra*). "To permit arrest to be made in the Court would give occasion to perpetual tumults, and was altogether inconsistent with the decorum which ought to prevail in a high tribunal." *Id.* The Court discharged Orchard from custody and "admonished the officer to beware of again acting in a similar manner." *Id.* at 988.

American courts likewise recognized that the privilege was partly rooted in the authority and dignity of courts. *See Bramwell v. Owen,* 276 F. 36, 40 (D. Or. 1921) (citation omitted) (stating that the "rule is even buttressed upon a broader principle, namely, that it is a privilege of the court as affecting its dignity and authority, and is founded upon sound public policy."); *Bridges v. Sheldon,* 7 F. 17, 44 (C.C.D. Vt. 1880) ("The privilege arises out of the authority and dignity of the court where the cause is pending"); *Parker v. Marco,* 136 N.Y. 585, 32 N.E. 989 (1893) (describing the privilege as "the privilege of the court, and … necessary for the maintenance of its authority and dignity…").

Indeed, the need to uphold the dignity and decorum of courts was sufficiently strong that English and American decisions made clear that not only arrest but also the mere service of process was prohibited at or near courthouses.

16

*E.g., Cole v. Hawkins,* (1738) 95 Eng. Rep. 396, 396 (addressing service made on courthouse steps, and noting "service of a process in the sight of the Court is a great contempt"); *Blight v. Fisher,* 3 F. Cas. 704, 704–05 (C.C.D.N.J. 1809) (No. 1542) (holding service in the "actual or constructive presence of the court" is a contempt); *New York,* 2019 WL 6906274, at *9. Service of process at the courthouse might "embarrass" the administration of justice even if actual interference did not ensue. *See Stewart v. Ramsay,* 242 U.S. 128, 130 (1916) (noting that "the judicial administration … would be *often embarrassed, and sometimes interrupted*" by service of process upon suitors or witnesses) (quoting *Parker v. Hotchkiss,* 18 F. Cas. 1137, 1138 (C.C.E.D. Pa. 1849) (No. 10,739)) (emphasis added); *see also Halsey v. Stewart,* 4 N.J.L. 366, 368 (1817) (rejecting argument that service of process is only invalid when it creates "noise, disturbance, or confusion" and extending privilege from service to encompass one returning from court).

Affirming the dignity and authority of courts is of no less moment today. In requesting that immigration officials cease making courthouse arrests, the chief justices of the highest courts of California, Washington, Oregon and New Jersey invoked this policy rationale. Letter from Tani G. Cantil-Sakauye, Chief Justice, Cal. Supreme Court, to Jeff Sessions, U.S. Att'y Gen. (Mar. 16, 2017), [hereinafter "Cantil-Sakauye Letter"], available at http://perma.cc/6YXM-PLRT (expressing

"concern[] about the impact on public trust and confidence in our state court system if the public feels that our state institutions are being used to facilitate other goals and objectives, no matter how expedient they may be"); Letter from Mary E. Fairhurst, Chief Justice, Wash. Supreme Court, to John F. Kelly, Sec'y, Dep't of Homeland Sec. (Mar. 22, 2017) [hereinafter "Fairhurst Letter"], available at http://perma.cc/2Y7Q-BP9E (stating that immigration arrests erode community trust in Washington courts as "a trusted public forum where they will be treated with dignity, respect, and fairness"); Letter from Thomas A. Balmer, Chief Justice, Or. Supreme Court, to Jeff Sessions, Att'y Gen., & John F. Kelly, Sec'y, Dep't of Homeland Sec. (Apr. 6, 2017) [hereinafter Balmer Letter], available at http://perma.cc/7EE6-JTB2 (noting that detention or arrest of undocumented residents seriously impedes the Oregon courts "daily work to ensure the rule of law for all Oregon residents"); Letter from Stuart Rabner, Chief Justice, N. J. Supreme Court, to John F. Kelly, Sec'y, Dep't of Homeland Sec. (Apr. 19, 2017) [hereinafter Rabner Letter] available at https://www.njcourts.gov/pressrel/2017/ Kelly.ICE.ltr.041917.pdf (noting that "[a] true system of justice must have the public's confidence").

California, in enacting legislation to prohibit civil arrests in courthouses, acknowledged the critical role of courts as "essential to a republican form of government," and found that courthouse arrests are "a threat to the proper

functioning of [state] government." 2019 Cal. Stat. Ch. 787 (A.B. No. 668). Colorado and Washington have likewise enacted legislation based on these foundational principles. *See* Colo. Rev. Stat. § 13-1-401 to § 13-1-404 (recognizing the common-law privilege as codified in Colorado law, and noting in a legislative declaration the privilege's role in protecting access to courts, "a cornerstone of Colorado's republican form of government"); *see also* 2020 Wash. Sess. Laws Ch. 37 at Sec. 1(1) (finding that "civil arrests in and around Washington's court facilities impede the fundamental mission of Washington's courts"); *Id.* at Sec. 1(2) (finding that such arrests "have created a climate of fear that is deterring and preventing Washington residents from safely interacting with the justice system").

*Amici* bar organizations urge the Court to acknowledge the ongoing vitality of the privilege from civil arrest in order to preserve the fair administration of justice and uphold the authority, dignity, independence, and impartiality of Massachusetts courts.

**B.     The Common-Law Privilege Prohibits Civil Arrests of Those on Their Way to, or Returning from, Court Proceedings, thus Protecting Individual Access to the Courts and Preserving Individual Rights.**

While the common-law privilege from arrest at the *place* of the courthouse was focused broadly on preserving the dignity and decorum of courts, the privilege from arrest for *people* with business before the courts was rooted in deeply practical concerns for the administration of justice in particular matters. The

privilege was deemed essential for procuring the attendance of witnesses and preserving litigants' ability to present their cases.

Reported English and American decisions demonstrate the breadth of the privilege described by Blackstone: "Suitors, witnesses, and other persons, necessarily attending any courts of record upon business, are not to be arrested during their actual attendance, which includes their necessary coming and returning." Blackstone, 3 COMMENTARIES at 289. In *Meekins v. Smith*, the Court restated the general rule "that all persons who had relation to a suit which called for their attendance, whether they were compelled to attend by process or not, (in which number bail were included) were intitled to privilege from arrest eundo et redeundo [going and returning], provided they came bonâ fide." (1791) 126 Eng. Rep. 363, 363. In *Spence v. Stuart*, a defendant was privileged against arrest when he appeared for examination under oath before an arbitrator. (1802) 102 Eng. Rep. 530, 530-31. In *Lightfoot v. Cameron*, a party was privileged from arrest while dining with his attorney after attending court proceeding during the day. (1776) 96 Eng. Rep. 658, 658. In *Ex Parte Jackson*, the Court stated that "[t]here is no doubt, that the privilege extends to a Plaintiff, or a Defendant, attending his own cause." (1808) 33 Eng. Rep. 699, 700. As the Court explained, "a party may give useful information, as the cause proceeds." *Id.*

English cases also made clear that the privilege from civil arrest was not tied to residency. In a 1782 case, a defendant from France was arrested in England after he appeared to testify as a witness in connection with another case. *Walpole v. Alexander*, (1782) 99 Eng. Rep. 530, 530. Lord Mansfield stated that "[t]his is the first case of a witness coming from abroad who has required the protection of the Court" (*id*. at 531), meaning that in all prior cases in which the Court had applied the rule against civil arrest, the arrestee was a domestic resident. The Court held the "protection is extended to witnesses coming from abroad, as well as to those who are resident in this country." *Id.*

American decisions affirmed the privilege's existence and breadth. In *Larned v. Griffin*, the Court stated that "[i]t has long been settled that parties and witnesses attending in good faith any legal tribunal, with or without a writ of protection, are privileged from arrest on civil process during their attendance, and for a reasonable time in going and returning." 12 F. 590, 590 (C.C.D. Mass. 1882) (citing cases). The United States Supreme Court, while addressing the related legislative privilege, noted that the privilege from arrest "is conceded by law to the humblest suitor and witness in a court of justice." *Williamson,* 207 U.S. at 443 (quoting Story, COMMENTARIES § 859). Similarly, the Massachusetts Supreme Judicial Court acknowledged the privilege from arrest while addressing the related legislative privilege:

Parties and witnesses, attending in good faith any legal tribunal, whether a court of record or not, having power to pass upon the rights of the persons attending, are privileged from arrest on civil process during their attendance, and for a reasonable time in going and returning, whether they are residents of this state or come from abroad, whether they attend on summons or voluntarily, and whether they have or have not obtained a writ of protection.

*Thompson's Case,* 122 Mass. 428, 429 (1877) (Gray, C.J.) (citing, *inter alia,*

*Walpole, Meekins,* and *Spence, supra*).

American decisions also affirmed the policy rationale underlying the privilege. *E.g., State v. Buck,* 62 N.H. 670, 670 (1883) ("Without the free and unrestricted attendance of parties and witnesses, justice cannot be administered."); *Halsey,* 4 N.J.L. at 368 (noting that parties and witnesses would be as deterred by service of process as they would by the prospect of arrest and concluding that "[w]hether a [person] wishes to attend the court as a party or witness, he should be able to do it under its protection"). The United States Supreme Court has observed that the privilege serves to prevent the deterrence of witnesses from attendance at court and of parties from asserting claims or defenses. *Stewart,* 242 U.S. at 130–31 (quoting *Parker,* 18 F. Cas. at 1138; *Page Co. v. MacDonald,* 261 U.S. 446, 448 (1923) (the privilege exists so that neither suitors "nor their witnesses [are] subject to be embarrassed or vexed while attending, the one "for the protection of his rights", the others "while attending to testify") (quoting *Stewart,* 242 U.S. at 130).

"Such an 'absolutely indispensable' privilege, so fundamental to the functioning of both federal and state judiciary, cannot be assumed to have

disappeared simply with the passage of time." *Ryan,* 382 F. Supp. 3d at 156 (citation omitted). Indeed, the policy rationales for the privilege apply with full force today and demonstrate the continuing importance and vitality of this strand of the privilege. *See New York,* 2019 WL 6906274, at \*10 (stating that "the policy objectives cited for hundreds of years by English and American courts to justify the common law privilege against civil courthouse arrests apply equally to modern-day immigration arrests"); *see also Washington v. U.S. Dep't of Homeland Sec.,* No. C19-2043 TSZ, 2020 WL 1819837, at \*10 (W.D. Wash. Apr. 10, 2020) (denying motion to dismiss, finding "the State has adequately alleged that state and/or federal common-law privileges against 'courthouse arrest' existed at the time the INA was enacted, that Congress did not abrogate the privilege or privileges when it passed the INA, and that, in issuing their 'courthouse arrest' policy, defendants exceeded the authority delegated to them in the INA") (footnote omitted).

The state court chief justices who recently asked that immigration officials cease these courthouse arrest practices cited the very same policy rationales that had been articulated over the centuries. They noted the deterrent effect that courthouse arrests have on parties and witnesses. *See, e.g.,* Balmer Letter, *supra,* at 2 (noting trial court reports that parties or witnesses failed to attend court proceedings, and observing that the "chilling effect" of courthouse arrests extends

not only to the undocumented, but to "those who are uncertain about the implications of their immigration or residency status or are close family, friends, or neighbors of undocumented residents"); Fairhurst letter, *supra* (observing that those needing access to a "trusted public forum" include "victims in need of protection from domestic violence, criminal defendants being held accountable for their actions, witnesses summoned to testify, and families who may be in crises," and noting that "fear of apprehension by immigration officials deters individuals from accessing our courthouses"); Rabner letter, *supra,* at 1 ("Witnesses to violent crimes may decide to stay away from court and remain silent. Victims of domestic violence and other offenses may choose not to testify against their attackers. Children and families in need of court assistance may likewise avoid the courthouse. And defendants in state criminal matters may simply not appear.").

The District Court found that "being unable to reliably secure the attendance of defendants, victims, and witnesses hinders the ability of the DAs to prosecute crimes and Chelsea Collaborative's members to secure their rights under state law…." *Ryan,* 382 F. Supp. 3d at 153. Consonant with this finding, the chief justices noted that access to justice, and the individual rights that are protected by access, are threatened by such courthouse arrests. *E.g.,* Balmer Letter, *supra,* at 2 ("The safety of individuals and families, the protection of economic and other rights, and the integrity of the criminal justice system all depend on individuals

being willing and able to attend court proceedings …"); Fairhurst letter, *supra,* at 1 (stating that courthouse arrests impede the "fundamental mission of our courts … to provide due process and access to justice for everyone, regardless of their immigration status"); Rabner letter, *supra,* at 1 (stating immigration courthouse arrests "effectively deny access to the courts"). Myriad individual rights are implicated, but most obviously the ability to present claims and defenses, *see Stewart,* 242 U.S. at 130-31, and the ability to secure the presence of witnesses. *See* Letter from Michael Hancock, Mayor of Denver, to Jeffrey D. Lynch, Acting Field Office Dir., U.S. Immigration and Customs Enf't (April 6, 2017), available at http://perma.cc/WB2C-FT2V (noting refusal of domestic violence victims to come to court). As bar associations whose members engage in diverse practice areas in courthouses around the Commonwealth, *amici* can attest that the courthouse arrests at the heart of this case disrupt the delivery of justice not only in criminal cases, but in many civil matters, and generally chill the pursuit of legal rights and remedies in every one of the Massachusetts Trial Courts.

### C. There Is No Merit to the Government's Arguments Against the Existence and Application of the Common-Law Privilege Against Civil Arrest.

There is no merit to the government's argument that this privilege "applied in *private* suits, not enforcement or arrest actions brought by the federal government," which misunderstands the nature of the civil arrest procedure to

which the privilege was originally directed. Appellant's Opening Br. 29. First, the arrests that were prohibited by the privilege, although marking the institution of a private suit, were carried out by the central government, through the sheriffs or their officers. *See, e.g., Meekins*, 126 Eng. Rep. at 363 (describing arrest "by an officer of the sheriff of Middlesex"). *See* Nathan Levy, Jr., *Mesne Process in Personal Actions at Common Law and the Power Doctrine,* 78 YALE L.J. 52, 60-63 (1968) (describing evolution of process, from one in which sheriffs would only execute judicial writs of arrest after an initial failure of the defendant to respond to summons, to one in which civil actions were initiated by the sheriff's arrest pursuant to a writ of *capias ad respondendum* or writ of *latitat*). The sheriff was an agent of the Crown—a "conspicuous instrument of royal will." James Tomberlin, *"Don't Elect Me": Sheriffs and the Need for Reform in County Law Enforcement,* 104 VA. L. REV. 113, 118 (2018) (citation omitted); *see also id.* at 120 (describing the sheriff in the American colonies as "a royal officer … sworn 'to serve the King well and truly … [and] to serve and return the King's writs honestly …'") (citation omitted). Thus, the privilege was most certainly a constraint on "arrest actions brought" by officers of the Crown.

Further, the government mistakenly rests its argument on criminal cases, for example citing *In Re Johnson*, 167 U.S. 120 (1897), for the proposition that "in criminal cases the interests of the public override that which is, after all, a mere

privilege from arrest." *Id.* at 126 (quoted at Appellant's Opening Br. 30). But the District Court explicitly enjoined only civil arrests, placing the injunction squarely within the common-law privilege. *Ryan,* 382 F. Supp. 3d at 161 (enjoining defendants from "civilly arresting parties, witnesses, and others attending Massachusetts courthouses on official business while they are going to, attending, or leaving the courthouse"); *see also* Lasch, 127 Yale L.J. F. at 432 (and authorities cited therein) (arguing that the "legal categorization of immigration arrests and proceedings as civil supports application of the common-law privilege").

## CONCLUSION

Since 1780, the Massachusetts Constitution, Part I, art. XXIX, has proclaimed that "It is essential to the preservation of the rights of every individual, his life, liberty, property, and character, that there be an impartial interpretation of the laws, and administration of justice." *Amici curiae* urge the Court to acknowledge the ongoing vitality of the privilege against civil arrest in order to ensure that parties and witnesses are not deterred from pursuing their business in the courts of Massachusetts. "Courts of justice ought everywhere to be open, accessible, free from interruption, and to cast a perfect protection around every man who necessarily approaches them." *Stewart,* 242 U.S. at 129 (quoting *Halsey,* 4 N.J.L. at 367). For the foregoing reasons, *amici* urge this Court to affirm the

District Court's grant of a preliminary injunction prohibiting federal executive branch officials from "civilly arresting parties, witnesses, and others attending Massachusetts Courthouses on official business while they are going to, attending, or leaving the courthouse." A030-31.

Respectfully submitted,

*Counsel for Amici Curiae*

/s/ *Thomas J. Carey, Jr.*

Thomas J. Carey, Jr.
First Circuit Bar #1101849
1131 Main Street
Hingham, MA  02043
(781) 740-1234
thomas.carey.1@bc.edu


/s/ *Martin W. Healy*

Martin W. Healy
First Circuit Bar #19151
Chief Operating Officer and General Counsel,
Massachusetts Bar Association
20 West Street
Boston, MA  02111
(617) 338-0500
MHealy@massbar.org

*On the Brief*:

Christopher N. Lasch
Professor of Law
Co-director, Immigration Law and Policy Clinic
University of Denver Sturm College of Law
2255 East Evans Avenue
Denver, CO 80208
(303) 871-6368
clasch@law.du.edu

Dated: May 20, 2020

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(a)(5) (A), (6), and First Circuit Local Rule 32, I certify that the *Amicus Brief* of Massachusetts Bar Association, Boston Bar Association, Massachusetts Academy of Trial Attorneys, Women's Bar Association of Massachusetts, and South Asian Bar Association of Greater Boston in Support of Plaintiffs-Appellees complies with the 6500 word Type-Volume limit of Fed. R. App. P. 29 (a) (5) because it contains not more than 6,393 words, exclusive of the cover, corporate disclosure statement, table of contents, table of authorities, signature block, certificates of counsel, and certificate of service. The Brief complies with typeface and typesize requirements because it has been prepared in a proportionately spaced typeface, using 14-point Times New Roman type.

/s/ Thomas J. Carey, Jr.
Thomas J. Carey, Jr.
First Circuit Bar #1101849
1131 Main Street
Hingham, MA 02043
(781) 740-1234
thomas.carey.1@bc.edu

Dated: May 20, 2020

**CERTIFICATE OF SERVICE**

I hereby certify that on this twentieth day of May 2020, I caused the foregoing brief to be electronically filed with the United States Court of Appeals for the First Circuit via its CM/ECF system. The brief is served electronically on all parties' counsel, who are registered CM/ECF users and will receive notice via the CM/ECF system.

Katherine M. Fahey
Christopher J.C. Herbert
Alicia Rubio
Daryl L. Wiesen
David Zimmer
Goodwin Procter LLP
100 Northern Avenue
Boston, MA 02210
Direct: 617-570-1000

Wendy S. Wayne
Committee for Public Counsel Services
21 McGrath Highway, 2nd Floor
Somerville, MA 02143
Direct: 617-623-0591

Oren Nimni
Lawyers' Committee for Civil Rights
61 Batterymarch Street, 5th Floor
Boston, MA 02110
Direct: 617-988-0606

Rayford A. Farquhar
Donald Campbell Lockhart
Eve A. Piemonte
Michael P. Sady
U.S. Attorney's Office
1 Courthouse Way, Suite 9200
Boston, MA 02210
Direct: 617-748-3100
Fax: 617-748-3971

Francesca Genova
Julian Kurz
U.S. Dept. of Justice
Civil Division, Office of Immigration Litigation
PO Box 868
Washington, DC 20044
Direct: 202-305-1062
Fax: 202-305-7000

Erez R. Reuveni
U.S. Dept. of Justice
450 5th Street, N.W.
Washington, DC 20530
Direct: 202-307-4293

Bradly Paul Bennion
Law Office of Brad P. Bennion
PO Box 890118
Weymouth, MA 02189
Direct: 617-943-6164

Ralph L. Casale
Christopher J. Hajec
Michael Meriwether Hethmon
Immigration Reform Law Institute
25 Massachusetts Avenue, N.W., Suite 335
Washington, DC 20001
Direct: 202-232-5590

/s/ *Thomas J. Carey, Jr.*

Thomas J. Carey, Jr.
First Circuit Bar #1101849
1131 Main Street
Hingham, MA  02043
(781) 740-1234
thomas.carey.1@bc.edu