No. 19-1838
_____

UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT
_____

MARIAN RYAN, in her official capacity as Middlesex County District Attorney;
RACHAEL ROLLINS, in her official capacity as Suffolk County District
Attorney; COMMITTEE FOR PUBLIC COUNSEL SERVICES; CHELSEA
COLLABORATIVE, INC.,
*Plaintiffs-Appellees,*


v.


U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; MATTHEW T.
ALBENCE, in his official capacity as the Acting Deputy Director of U.S.
Immigration and Customs Enforcement and Senior Official Performing the Duties
of the Director; TODD M. LYONS, in his official capacity as Acting Field Office
Director of U.S. Immigration and Customs Enforcement, Enforcement and
Removal Operations; U.S. DEPARTMENT OF HOMELAND SECURITY;
CHAD WOLF, in his official capacity as Acting Secretary of United States
Department of Homeland Security,
*Defendants-Appellants.*
_____


ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

Case No. 19-cv-11003; The Hon. Indira Talwani
_____

**AMICUS BRIEF OF THE MASSACHUSETTS ASSOCIATION
OF CRIMINAL DEFENSE LAWYERS SUPPORTING THE PLAINTIFF
APPELLEES AND URGING AFFIRMANCE OF THE PRELIMINARY
INJUNCTION ISSUED BELOW**
_____

(Counsel listed on inside cover)

MASSACHUSETTS ASSOCIATION OF
CRIMINAL DEFENSE LAWYERS,

By their attorneys,


/s/ Maria T. Davis_____
Howard M. Cooper (First Circuit # 42972)
hcooper@toddweld.com
Maria T. Davis (First Circuit # 1164841)
mdavis@toddweld.com
Todd & Weld, LLP
One Federal Street, 27th Floor
Boston, MA 02110
(617) 720-2626

Date: June 8, 2020

## CORPORATE DISCLOSURE STATEMENT

Amicus curiae, the Massachusetts Association of Criminal Defense Lawyers, is a nonprofit corporation. It does not have any parent corporation and no publicly owned corporation owns 10% or more of its stock.

# TABLE OF CONTENTS

CORPORTE DISCLOSURE STATEMENT ........................................................3

TABLE OF CONTENTS.............................................................................4

TABLE OF AUTHORITIES ......................................................................5

    i.      Introduction ...............................................................................8

    ii.     Interest of the Amicus Curiae...................................................9

    iii.    Statement of Amicus Under Rule 29(A)(4)(E) .....................10

    iv.    Factual and Statutory Background .........................................11

    v.     Argument ................................................................................13

           I.     Ice's Arrest of Individual in the Courthouse Violates
                   the Sixth Amendment Right of Criminal Defendants
                   to a Fair Trial...............................................................13

           II.    The Massachusetts Declaration of Rights Further Guarantees
                   the Right to a Fair Trial...............................................22

    vi.    Conclusion ...........................................................................27

CERTIFICATE OF COMPLIANCE....................................................28

CERTIFICATE OF SERVICE ............................................................29

# TABLE OF AUTHORITIES

## Cases

*Attorney Gen. v. Colleton,*
    387 Mass. 790 (1982) ...............................................................................23

*Bado v. United States,*
    186 A.3d 1243 (D.C. 2018) ......................................................................16

*Blanton v. City of North Las Vegas,*
    489 U.S. 538 (1989) .................................................................................17

*Codispoti v. Pennsylvania,*
    418 U.S. 506 (1974) .................................................................................15

*Com. v. Aponte,*
    391 Mass. 494 (1984) ...............................................................................23

*Com. v. Bergstrom,*
    402 Mass. 534 (1988) ...............................................................................22

*Com. v. Sylvain,*
    466 Mass. 422 (2013) ............................................................................... 22

*Com. v. Mavredakis,*
    430 Mass. 848 (2000) ...............................................................................23

*D.C. v. Clawans,*
    300 U.S. 617 (1937) .................................................................................16

*Diamond v. Earle,*
    217 Mass. 499 (1914) ...............................................................................25

*Diaz v. United States,*
    223 U.S. 442 (1912) .................................................................................14

*Duncan v. Louisiana,*
    391 U.S. 145 (1968) .............................................................................13, 16

*Ex parte McNeil,*
  6 Mass. 245 (1810) ............................................................................................25

*Fong Haw Tan v. Phelan,*
  333 U.S. 6 (1948) ...............................................................................................17

*Hopt v. Utah,*
  110 U.S. 574 (1884) ...........................................................................................14

*In re Murchison,*
  349 U.S. 133 (1955) ...........................................................................................14

*In re Thompson,*
  122 Mass. 428 (1877) .........................................................................................24

*Illinois v. Allen,*
  397 U.S. 337 (1970) ...........................................................................................14

*Lamb v. Schmitt,*
  285 U.S. 222 (1932) ...........................................................................................26

*Lewis v. United States,*
  518 U.S. 322 (1996) ...........................................................................................16

*Meekins v. Smith,*
  126 Eng. Rep. 363, 364 (1791) ..........................................................................24

*Nebraska Press Ass'n v. Stuart,*
  427 U.S. 539 (1976) .....................................................................................14, 16

*Padilla v. Kentucky,*
  559 U.S. 356 (2010) ...........................................................................................17

*Page Co. v. MacDonald,*
  Massachusetts Superior Court. 261 US 446 (1923) ...........................................25

*People v. Suazo,*
  32 N.Y.3d 491 (2018) ..............................................................................16, 17, 18

*Ramos v. Louisiana,*
   140 S. Ct. 1390 (2020) ................................................................13, 14

*Robinson v. United States,*
   No. 5:05-CR-322 (NAM), 2015 WL 13843361
   (N.D.N.Y. Jan. 12, 2015) .......................................................20, 21

*Sessions v. Dimaya,*
   138 S. Ct. 1204 (2018) .......................................................................17

*Stewart v. Ramsay,*
   242 U.S. 128 (1916) ....................................................................25, 26

*Taylor v. Louisiana,*
   419 U.S. 522 (1975) ............................................................................15

*U.S. v. Encarnacion,*
   239 F.3d 395 (1st Cir. 2001) ...........................................................27

*United States v. Hernandez,*
   894 F.3d 1104 (9th Cir. 2018) .....................................................20, 21

*United States v. Jackson,*
   390 U.S. 570 (1968) ...................................................................19, 21

*United States v. Valenzuela-Bernal,*
   458 U.S. 858 (1982) ...........................................................................15

*Wood v. Neale,*
   71 Mass. 538 (1855).....................................................................24, 25

*Waller v. Georgia*
   467 U.S. 39 (1984)..............................................................................20

*Walpole v. Alexander,*
   99 Eng.Rep. 530 (K.B. 1782) ...........................................................26

# i. __Introduction__

The Government's choice to leverage the vast resources of the United States Immigration and Customs Enforcement ("ICE") to stand as sentinels at the courthouses of the Commonwealth of Massachusetts, awaiting any opportunity to arrest and deport noncitizen immigrants, forces criminal defendants to choose whether they wish to risk their home, livelihood, and family in order to obtain a trial. Of course, the decision of whether to face trial and with it the threat of deportation is no decision at all: no reasonable person will exercise his or her right to a speedy, public, impartial jury trial under the specter of being ejected from his or her home. Through this policy, the Government has thus deprived every criminal defendant who is also a noncitizen immigrant of their Sixth Amendment right to a jury trial.

The right to a truly fair trial that the Sixth Amendment guarantees comprises the bedrock of the criminal justice system of our country. Without the promise of a genuine opportunity to defend oneself in a jury trial before the public, criminal defendants face the risk of prosecutors unconstrained by the watch of the people within a justice system unburdened by the need to prove to a criminal defendants' peers that he or she is truly guilty beyond a reasonable doubt. Thus, any government policy that threatens the sanctity of a criminal defendant's Sixth

Amendment rights threatens the very character of the criminal justice system. And that is precisely what the policy of ICE at issue here does.

The Massachusetts Association of Criminal Defense Lawyers ("MACDL") respectfully submits this amicus brief to focus the Court's attention on the Sixth Amendment rights that the Government has laid at the altar of seeking every deportation they can. If this Court reverses the decision below, it will ensure that every noncitizen immigrant facing criminal prosecution will also face the need of sacrificing their Sixth Amendment rights just to ensure they can hope to remain in their adopted home country.

This Court should affirm.

## ii. Interest of the Amicus Curiae

MACDL is an incorporated, non-profit association representing more than 1,000 experienced trial and appellate lawyers who devote a substantial part of their practices to criminal defense. MACDL is the single largest organization of criminal defense lawyers in the Commonwealth. Literally every day, MACDL members are in the trial courts of the Commonwealth representing the accused. MACDL's mission is to preserve the adversary system of justice, including the critical independence of the judiciary, to maintain and foster independent and able criminal defense lawyers and to ensure justice and due process for all persons

accused of crimes, whether they are citizens or immigrants, and regardless of their immigration status.

MACDL is dedicated to protecting the rights of all individuals accused of crimes in the Commonwealth guaranteed by the United States Constitution and the Massachusetts Declaration of Rights. MACDL seeks to improve the criminal justice system by supporting policies and procedures to ensure fairness and justice in criminal matters. MACDL devotes much of its energy to identifying, attempting to avoid and remedying problems in the criminal justice system. It files amicus curiae briefs in cases raising questions of importance to the administration of justice.

MACDL respectfully submits this amicus brief because ICE's implementation of a courthouse-arrest policy threatens individuals' fundamental constitutional rights, including the right to a jury trial under the Sixth Amendment of the United States Constitution and the Massachusetts Declaration of Rights.

### iii.  <u>Statement of Amicus Under Rule 29(A)(4)(E)</u>

No party's counsel authored this amicus brief in whole or in part, no party's counsel or party contributed money that was intended to fund preparing or submitting this brief, and no person—other than the amicus curiae, its members, or its counsel—contributed money that was intended to fund preparing or submitting the brief.

#### iv.  **Factual and Statutory Background**

The Immigration and Nationality Act (the "INA"), enacted in 1952,

generally grants officers of the Immigration and Naturalization Service ("INS")

authority to conduct arrests of individuals suspected of being undocumented, with

or without warrants. See INA § 242(a), codified at 8 U.S.C. § 1226(a); Complaint

¶33. The INA provides authority to arrest such individuals where "[an ICE officer]

has reason to believe that the alien so arrested is in the United States in violation of

any such law or regulation and is likely to escape before a warrant can be obtained

for his arrest." Id. § 287(a)(2).2. Such arrests are considered civil arrests as

opposed to criminal arrests. Complaint ¶33. At the time the INA was enacted, a

common law privilege existed protecting parties and witnesses attending court

proceedings from subjecting themselves to civil arrest. Complaint ¶22. Nothing in

the INA provides any indication that the authority granted by the INA was

intended to or in fact overrode this already longstanding common law in any way.

Id. ¶35.

In 2017, sixty-five years after Congress passed the INA, President Trump

issued Executive Order 13,768, entitled "Enhancing Public Safety in the Interior of

the United States". Id. ¶36. In that Order, President Trump explicitly called for the

deportation of anyone potentially removable from the United States. See id.

Shortly after issuance of that Executive Order, ICE officials began the practice of

conducting courthouse surveillance and arrest raids at state courthouses; these practices have only increased as time has passed. Id. ¶37. ICE has used this practice to monitor and arrest criminal defendants, witnesses, and victims. Id. ¶39. ICE formalized its policy relating to courthouse arrests in January 2018, when it put into effect Directive No. 11072.1 entitled "Civil Immigration Actions Inside Courthouses" (the "Directive"). Id. ¶41. This Directive affords ICE agents discretion to make civil arrests in courthouses any time those agents, in their discretion, believe that such an arrest is necessary. Id. ¶¶42-44.

At this point in time, ICE officers are routinely present in courts throughout the Commonwealth and regularly arrest individuals attending various types of court proceedings. Id. ¶¶47-49. At times, ICE has arrested noncitizens they suspected of being undocumented when in fact those individuals were in the United States legally. Id. ¶59. ICE's arrests of individuals in and around courthouses have been disruptive and at times violent and, as a result, highly visible to others in the courthouse. Id. ¶51. ICE's policy of arresting individuals in courthouses has resulted in many parties and witnesses, including criminal defendants, not wanting to appear in court. Id. ¶77.

**v. <u>Argument</u>**

**I.     ICE's Arrests of Noncitizen Individuals in Courthouses Violates Criminal Defendants' Right to a Fair Trial Under the Sixth <u>Amendment</u>.**

ICE's actions impose an impossible choice upon immigrant criminal defendants: to forego their right to a fair trial or to risk civil arrest just by entering the courthouse. Moreover, when noncitizens make the decision to attend their court appearances and are in fact arrested following those appearances, the noncitizens are prevented from attending further court proceedings and lose their right to a fair trial. The law is clear that the Sixth Amendment guarantees the right of individuals – including noncitizens – the right to a fair trial, a right that is fundamental to ensuring full access to the courts. <u>See</u> U.S. Const. amend. VI. Thus, the Government's effort to leverage the state courts to pursue civil immigration arrests violates the Sixth Amendment by chilling beyond repair immigrants' ability to exercise their Sixth Amendment right to seek full justice in the courts.

The Sixth Amendment provides that in criminal prosecutions, a defendant is entitled to "a speedy and public trial, by an impartial jury . . . and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the assistance of counsel for his defense." U.S. Const. amend. VI. The Supreme Court has been explicit that the right to a fair trial is "'fundamental to the

13

American scheme of justice[.]'" <u>Ramos v. Louisiana</u>, 140 S. Ct. 1390, 1397 (2020) (quoting <u>Duncan v. Louisiana</u>, 391 U.S. 145, 148-150 (1968), which determined that rights granted by the Sixth Amendment are, among other things, "among those fundamental principles of liberty and justice which lie at the base of all our civil and political institutions"). Accordingly, the Supreme Court has acknowledged that "'[a] fair trial in a fair tribunal is a basic requirement of due process.'" <u>Nebraska Press Ass'n v. Stuart</u>, 427 U.S. 539, 551 (1976) (quoting <u>In re Murchison</u>, 349 U.S. 133, 136 (1955).

Indeed, the protections set forth in the Sixth Amendment are undisputedly vital to the criminal justice system. Regarding the right to be present at trial, the Supreme Court held, over 130 years ago, that it was "essential to the protection of one whose life or liberty is involved in a prosecution for felony that he shall be personally present at the trial; that is at every stage of the trial when his substantial rights may be affected by the proceedings against him[,]" and that "[i]f he be deprived of his life or liberty without being so present, such deprivation would be without that due process of law required by the Constitution." <u>Hopt v. Utah</u>, 110 U.S. 574, 579 (1884). To the extent that a defendant is prevented from attending his trial at some point after the trial begins, he faces a very real risk of being found to have voluntarily waived his right to be present at trial, resulting in significant detriment. <u>See</u> <u>Illinois v. Allen</u>, 397 U.S. 337 (1970); <u>Diaz v. United States</u>, 223

U.S. 442 (1912); *cf.* Fed. R. Crim. P. 43(c)(1) (defendant initially present at trial, or who had pleaded guilty or nolo contendere, waives right to present if defendant is voluntarily absent after trial has begun).

ICE's practices also infringe upon a criminal defendant's right to call noncitizen witnesses on his behalf. Given that ICE does not limit its surveillance and arrest procedures to criminal defendants, but instead to any individuals in or around the courthouse, noncitizen witnesses have little incentive to put their own freedom at risk to testify at trial. As a result, where a criminal defendant is unable to offer beneficial testimony through a helpful witness, the defendant will suffer a violation of his right to compulsory process. See United States v. Valenzuela-Bernal, 458 U.S. 858, 867 (1982).

Moreover, while all Sixth Amendment rights are indispensable, courts addressing Sixth Amendment rights have often focused on the significance of a criminal defendant's right to a jury trial. In doing so, the Supreme Court has repeatedly held that "[t]he Sixth Amendment represents a deep commitment of the Nation to the right of jury trial in serious criminal cases as a defense against arbitrary law enforcement[.]" Codispoti v. Pennsylvania, 418 U.S. 506, 515-16 (1974) (internal quotation omitted); Taylor v. Louisiana, 419 U.S. 522, 540-41 (1975) (holding that "[b]ecause we believe that trial by jury in criminal cases is fundamental to the American scheme of justice, we hold that the Fourteenth

Amendment guarantees a right of jury trial in all criminal cases[,]" and therefore that Sixth Amendment rights were protected from state action). This guarantee ensures that "only the jury can strip a man of his liberty or his life." Nebraska Press Ass'n v. Stuart, 427 U.S. 539, 551 (1976)

The reach of the Sixth Amendment right to a jury is not absolute, but instead, it extends to those situations in which an offense is "serious", as opposed to "petty". See Lewis v. United States, 518 U.S. 322, 325 (1996). While courts formerly made this determination based on whether an offense was entitled to a jury at common law, the test is now based on the maximum penalty attached to the offense. See id. at 325-26. Specifically, an offense is considered petty if it carries with it a maximum penalty of six months or less, "unless the legislature has authorized additional statutory penalties so severe as to indicate that the legislature considered the offense serious." Id. at 326. The severity of ramifications is significant, as "'[t]he penalty authorized by the law of the locality may be taken 'as a gauge of its social and ethical judgments[.]'" People v. Suazo, 32 N.Y.3d 491, 496 (2018) (quoting Duncan v. State of La., 391 U.S. 145, 160 (1968), quoting D.C. v. Clawans, 300 U.S. 617, 628 (1937)).

Penalties need not be criminal in nature to trigger the right to a fair trial, and among the penalties that are considered "serious" is the threat of deportation. See Bado v. United States, 186 A.3d 1243, 1251 (D.C. 2018). Although considered a

civil offense, "[t]he Supreme Court has 'long recognized that deportation is a particularly severe 'penalty,'' equating it to 'banishment.'" Bado, 186 A.3d at 1251 (quoting Padilla v. Kentucky, 559 U.S. 356, 365 and 373 (2010), other quotations omitted); see also Sessions v. Dimaya, 138 S. Ct. 1204, 1213 (2018) (holding that removal is "a particularly severe penalty, which may be of greater concern to a convicted alien than any potential jail sentence." (internal quotations omitted); Fong Haw Tan v. Phelan, 333 U.S. 6, 10 (1948) (holding that "deportation is a drastic measure and at times the equivalent of banishment or exile."). Indeed, "[r]emoval that results from conviction erects a bar to entry into the United States, with all the grave consequences that preclusion entails: loss of our country's constitutional protections, the ability to engage with its social institutions, and access to educational and economic opportunities." Bado, 186 A.3d at 1251. Give the tremendous loss that results from removal, as the D.C. Circuit has recognized,

> The loss of liberty, akin to incarceration, that results from removal as well as the Court's repeated statements about its severity, lead us to conclude, under a *Blanton* analysis, that deportation is so "onerous" a penalty for conviction that it presents the "rare situation" that should ensure the availability of a jury trial in a criminal proceeding even though the penalty of incarceration does not "puncture the six-month incarceration line."

Bado, 186 A.3d at 1251-52 (quoting Blanton v. City of North Las Vegas, 489 U.S. 538, 543 (1989). Similarly, the Court of Appeals of New York has recognized that

"deportation or removal is a penalty of the utmost severity[,]" and that "[a]

noncitizen who is adjudicated deportable may first face additional detention,

followed by the often-greater toll of separation from friends, family, home, and

livelihood by actual forced removal from the country and return to a land to which

that person may have no significant ties. People v. Suazo, 32 N.Y.3d 491, 499-500

(2018).

The Sixth Amendment right to a fair trial extends to all individuals,

including those without documentation. See Bado, 186 A.3d at 1252. Indeed, such

individuals routinely face the severe threat of deportation if convicted of a crime

and therefore must be able to rely on fundamental Sixth Amendment rights as

much if not more than other criminal defendants. See id. (holding that Sixth

Amendment guarantees apply where the appellant had been in the process of

seeking asylum but that those proceedings were terminated pending resolution of

his trial, as a conviction would result in deportation); see also People v. Suazo, 32

N.Y.3d 491, 493 (2018) (holding that "a noncitizen defendant who demonstrates

that a charged crime carries the potential penalty of deportation – i.e. removal from

the country – is entitled to a jury trial under the Sixth Amendment").

ICE's practice of surveilling and arresting individuals attending state court

proceedings has significantly impacted the ability of noncitizen criminal

defendants to appear in court and thus to benefit from rights conferred by the Sixth

Amendment. There can be little doubt that the concrete threat of being deported from one's adopted home impinges upon the willingness of a criminal defendant to exercise his or her right to a fair trial under the Sixth Amendment. Such a chilling effect is nothing less than a violation of the Sixth Amendment's fundamental guarantees of a jury trial that is public, speedy, and impartial. Federal courts, including the Supreme Court, have recognized that any time the Government threatens—through coercion or otherwise—any of those essential aspects of a fair trial it violates the Sixth Amendment. Indeed, courts have jealously guarded that essential right under conditions far less severe than those here, where criminal defendants face the very real risk of deportation if they dare to avail themselves of their rights under the Sixth Amendment.

Perhaps most poignantly, the Supreme Court has recognized as unconstitutional any sentencing scheme that presents a criminal defendant with a Hobson's choice of (i) forfeiting his or her right to a trial or (ii) proceeding with trial at the risk of incurring a radically more severe sentence. Thus, in <u>United States v. Jackson</u>, the Supreme Court struck down as violative of the Sixth Amendment the Federal Kidnaping Act's sentencing scheme where a "defendant who abandons the right to contest his guilt before a jury is assured that he cannot be executed; the defendant ingenuous enough to seek a jury acquittal stands forewarned that, if the jury finds him guilty and does not wish to spare his life, he

will die." 390 U.S. 570, 581 (1968). The Court explained that it is "inevitable" that such a provision deters the exercise of a criminal defendant's Sixth Amendment right to demand a jury trial and therefore struck it down. Id. Similarly, in United States v. Hernandez, the Ninth Circuit explained that sentencing enhancements for proceeding to trial violates the Sixth Amendment where it chills the a defendant's willingness try his or her case before a jury: "imposing a penalty for asserting a constitutional right heightens the risk that future defendants will plead guilty not to accept responsibility, but to escape the sentencing court's wrath." 894 F.3d 1104, 1112 (9th Cir. 2018).

Indeed, the Supreme Court has taken pains to ensure that the Government does not tread upon even what might superficially appear to be tertiary aspects of the Sixth Amendment's guarantees. For example, in Waller v. Georgia, the Supreme Court held it was a violation of a criminal defendant's Sixth Amendment rights for the Government to close to the public a pre-trial hearing regarding a suppression hearing. 467 U.S. 39, 48–49 (1984). The Supreme Court found the wholesale closure of the pre-trial hearing violated a criminal defendant's Sixth Amendment rights where the laudable aims of a public trial—discouraging perjury and ensuring that the prosecutor deals fairly with the defendant, among others— apply to a hearing to suppress evidence as well. Id. at 46. Similarly, the U.S. District Court for the Northern District of New York ordered a hearing on a motion

to set aside a sentence, including based upon a violation of Sixth Amendment rights, where a photo identification requirement at the criminal defendant's trial may have "chilled" the attendance of spectators. <u>Robinson v. United States</u>, No. 5:05-CR-322 (NAM), 2015 WL 13843361, at *11 (N.D.N.Y. Jan. 12, 2015).

Just as the guarantee of avoiding the death penalty "inevitabl[y]" deprives a criminal defendant of his jury trial by forcing him to choose his life or his constitutional right, the threat of deportation "inevitabl[y]" forces a criminal defendant to choose his home, livelihood, and family over his Sixth Amendment right to trial. <u>Jackson</u>, 390 U.S. at 581. By standing watch in courthouses for non-citizen immigrants appearing for criminal trials, ICE agents "impos[ing] a penalty for asserting a constitutional right heighten[] the risk that future defendants will plead guilty not to accept responsibility, but to escape the sentencing court's wrath." <u>Hernandez</u>, 894 F.3d at 1112 (9th Cir. 2018). At bottom, in their zest to aggressively deport non-citizens the Government radically undercuts the Sixth Amendment rights of any noncitizen criminal defendant by confronting him or her with the grave risk of deportation without a trial if he or she seeks a fair, constitutional, trial by jury.

## II. The Massachusetts Declaration of Rights Further Guarantees the Right to a Fair Trial.

Article 12 of the Massachusetts Declaration of Rights makes clear that individuals in the Commonwealth are entitled to a fair trial. Specifically, Article 12 states that:

> No subject shall be held to answer for any crimes or offence, until the same is fully and plainly, substantially and formally, described to him; or be compelled to accuse, or furnish evidence against himself. And every subject shall have a right to produce all proofs, that may be favorable to him; to meet the witnesses against him face to face, and to be fully heard in his defense by himself, or his council at his election. And no subject shall be arrested, imprisoned, despoiled, or deprived of his property, immunities, or privileges, put out of the protection of the law, exiled, or deprived of his life, liberty, or estate, but by the judgment of his peers, or the law of the land.

Massachusetts Declaration of Rights, Art. XII. Drafted in 1780, Article 12 is one of the bedrock principles of the Declaration of Rights, which has its roots in the Magna Carta and the first legal code established by colonists in New England in 1641, the Body of Liberties. <u>See</u> Magna Carta, Clause 39; Body of Liberties, Art. I. The Massachusetts Supreme Judicial Court has explicitly held that the rights afforded by Article 12 apply equally to citizens and non-citizens alike. <u>See Com. v. Sylvain</u>, 466 Mass. 422, 423-24 (2013); <u>see also Com. v. Bergstrom</u>, 402 Mass. 534, 546 (1988) (holding that "Article 12 does not discriminate against classes of defendants nor distinguish among categories of crimes.").

Moreover, the Supreme Judicial Court has noted that, generally, it has "interpreted sections of our Declaration of Rights so as to provide broader protection to criminal defendants than is available under corresponding provisions in the United States Constitution." Com. v. Aponte, 391 Mass. 494, 506 (1984) (addressing jury selection); see also Attorney Gen. v. Colleton, 387 Mass. 790, 795-96 (1982) (stating that "[t]his court has expressly observed that, when interpreting the Massachusetts Constitution, we are not bound by Federal decisions which are less restrictive in some aspects than our Declaration of Rights[,]" and that "[i]n fact, on occasion we have exercised our prerogative to interpret our Constitution more broadly."). In doing so, the Supreme Judicial Court has recognized that "Article 12 and other similar State constitutional provisions evolved from a sense of disapproval of the inquisitorial methods of the Star Chamber and ecclesiastical courts in England[,]" and that "[o]ur precedents have often interpreted art. 12 expansively." Com. v. Mavredakis, 430 Mass. 848, 859 (2000), abrogated on other grounds by Com. v. Smith, 471 Mass. 161 (2015).

ICE's campaign of civil arrests of persons seeking to access the courts and exercise of their Article 12 right to a fair trial threatens this protection for immigrants. This is no small matter given the importance of this long-held right. Indeed, the Commonwealth's recognition of the right to access its courts – and by extension a criminal defendant's right to secure a fair trial – was not unprecedented

when created, and dates back centuries to the early English common law privilege
from arrest on civil process. See Christopher N. Lasch, "A Common-Law Privilege
to Protect State and Local Courts During the Immigration Crisis," 127 Yale L.J.
Forum 410, 423 (2017). By the 18th century, courts commonly recognized what
was by then a well-engrained principle that individuals appearing before court
were protected from civil arrest while attending court proceedings and for a
reasonable period of time while going to and leaving those proceedings. See, e.g.,
Meekins v. Smith, 126 Eng. Rep. 363, 364 (1791)  (holding "that all persons who
had relation to a suit which called for their attendance, whether they were
compelled to attend by process or not, . . . were intitled to privilege from arrest
eundo et redeundo [going and returning], provided they came bonâ fide").

    Unsurprisingly, courts in the United States adopted this concept shortly
afterwards and it has remained in effect since that time. See, e.g., In re Thompson,
122 Mass. 428, 429 (1877) (holding that "[p]arties and witnesses, attending in
good faith any legal tribunal, whether a court of record or not, having power to
pass upon the rights of the persons attending, are privileged from arrest on civil
process during their attendance, and for a reasonable time in going and returning,
whether they are residents of this state or come from abroad, whether they attend
on summons or voluntarily, and whether they have or have not obtained a writ of
protection"); Wood v. Neale, 71 Mass. 538, 538 (1855) (extending protection from

civil arrest to "all legal tribunals of a judicial character," and discharging a prisoner who had been arrested in violation of the privilege); Ex parte McNeil, 6 Mass. 245, 246 (1810) (applying the privilege when a party was arrested in Court while appearing at a hearing at which his presence was not necessary); Diamond v. Earle, 217 Mass. 499, 500 (1914) (same).

Further, the United States Supreme Court has recognized that a federal court may not recognize service made upon a party or witness while that individual is in state court, regardless of the courts' separate jurisdiction. Specifically, in Page Co. v. MacDonald, the plaintiff in a federal lawsuit attempted to serve the defendant in that lawsuit as the defendant appeared before a special master appointed by the Massachusetts Superior Court. 261 US 446, 447 (1923). The federal plaintiff held that such service was proper since the Massachusetts Superior Court amounted to a "different sovereignty" than the federal District Court. See id. The Supreme Court disagreed, holding that "[a] federal court in a state is not foreign and antagonistic to a court of the state within the principle[,]" and therefore that "'[s]uitors as well as witnesses, coming from another state or jurisdiction, are exempt from the service of civil process while in attendance upon court, and during a reasonable time in coming and going.'" Id. at 448 (quoting Stewart v. Ramsay, 242 U.S. 128, 129 (1916)).

Courts have steadfastly adhered to this common law principal, both at its inception and today, based on their recognition that without such protection, individuals would not in fact be able to assert their constitutional rights in court. See, e.g., Walpole v. Alexander, 99 Eng.Rep. 530, 531 (K.B. 1782) (holding that "in order to encourage witnesses to come forward voluntarily they are privileged from arrest", and recognizing the protection for both residents and non-residents); Lamb v. Schmitt, 285 U.S. 222, 225 (1932) (recognizing that "the due administration of justice requires that a court shall not permit interference with the progress of a cause pending before it, by the service of process in other suits, which would prevent, or the fear of which might tend to discourage, the voluntary attendance of those whose presence is necessary or convenient to the judicial administration in the pending litigation"). Moreover, as the Supreme Court has acknowledged, the privilege is necessary to ensure the proper functioning of the courts themselves. Stewart, 242 U.S. at 130 (stating that the privilege "is founded in the necessities of the judicial administration, which would be often embarrassed, and sometimes interrupted, if the suitor might be vexed with process while attending upon the court for the protection of his rights, or the witness while attending to testify").

Here, ICE's arrests of noncitizen individuals, including criminal defendants attempting to exercise rights guaranteed by Article 12 – arrests which are

26

indisputably civil in nature, <u>see</u> <u>U.S. v. Encarnacion</u>, 239 F.3d 395, 398 (1st Cir. 2001) – blatantly violate the long-standing protection of individuals attending court proceedings. In turn, these arrests have effectively precluded an entire group of society from exercising their Article 12 right to a fair trial, to the detriment of both those individuals and the court system as a whole.

## vi. __Conclusion__

For all of the reasons set forth above, MACDL respectfully requests that this Court affirm the district court's decision.

Respectfully Submitted,

MASSACHUSETTS ASSOCIATION
OF CRIMINAL DEFENSE
LAWYERS,

By their attorneys,

/s/ Maria T. Davis
Howard M. Cooper (BBO# 543842)
hcooper@toddweld.com
Maria T. Davis (BBO# 675447)
mdavis@toddweld.com
Todd & Weld, LLP
One Federal Street, 27th Floor
Boston, MA 02110
(617) 720-2626

Date: June 8, 2020

## CERTIFICATE OF COMPLIANCE

The undersigned counsel certifies compliance of the foregoing amicus brief with the following requirements of the Federal Rules of Appellate Procedure and the Local Rules of this Court.

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) and 29(a)(5), because this brief contains 4,624 words, including footnotes, but excluding the cover page, corporate disclosure statement, table of contents, table of authorities, signature block, certificate of compliance, and certificate of service.

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface in Times New Roman 14-point font.

/s/ Maria T. Davis
Howard M. Cooper (First Circuit # 42972)
hcooper@toddweld.com
Maria T. Davis (First Circuit # 1164841)
mdavis@toddweld.com
Todd & Weld, LLP
One Federal Street, 27th Floor
Boston, MA 02110
(617) 720-2626

## CERTIFICATE OF SERVICE

I Maria T. Davis, hereby certify that I filed with the Clerk of the U.S. Court of Appeals for the First Circuit the foregoing Amicus Brief and hereby certify that I served a true copy of the above document upon all parties with an interest in this matter by electronically filing through this Court's CM/ECF filing system this 8th day of June 2020.

/s/ Maria T. Davis
Maria T. Davis