No. 19-1838

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIRST CIRCUIT
_____

MARIAN RYAN, in her official capacity as Middlesex County District Attorney; RACHAEL ROLLINS, in her official capacity as Suffolk County District Attorney; COMMITTEE FOR PUBLIC COUNSEL SERVICES; CHELSEA COLLABORATIVE, INC.,

*Plaintiffs-Appellees,*

v.

U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; MATTEW T. ALBENCE, in his official capacity as Acting Deputy Director of U.S. Immigration and Customs Enforcement and Senior Official Performing the Duties of the Director; TODD M. LYONS, in his official capacity as Acting Field Office Director of U.S. Immigration and Customs Enforcement, Enforcement and Removal Operations; U.S. DEPARTMENT OF HOMELAND SECURITY; CHAD WOLF, in his official capacity as Acting Secretary of United States Department of Homeland Security,

*Defendants-Appellants.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

No. 19-cv-11003

The Hon. Indira Talwani

**Brief of Amici Curiae
27 Domestic and Sexual Violence Advocacy Organizations
in Support of Plaintiffs-Appellees and Affirmance**

(*Counsel listed on inside cover*)

Joel A. Fleming (Bar No. 1158979)
Lauren Godles Milgroom (Bar No. 1183519)
Amanda R. Crawford
Block & Leviton LLP
260 Franklin St., Suite 1860
Boston, MA 02110
Tel: (617) 398-5600
Joel@blockesq.com
Lauren@blockesq.com
Amanda@blockesq.com

*Counsel for Amici Curiae*

**FEDERAL RULE OF APPELLATE PROCEDURE 29 STATEMENTS**

Pursuant to Fed. R. App. P. 29(a)(2), undersigned counsel for amici curiae states that all parties have consented to the filing of this brief.

Pursuant to Fed. R. App. P. 29(a)(4)(E), undersigned counsel states that no counsel for the parties authored this brief in whole or in part, and no party, party's counsel, or person or entity other than amici and their counsel contributed money that was intended to fund the preparation or submission of this brief.

**CORPORATE DISCLOSURE STATEMENT**

Undersigned counsel for amici curiae certifies pursuant to Fed. R. App. P. 29(a)(4)(A) that all amici are non-profit organizations or government agencies that do not have any parent corporations or issue stock, so there is no publicly held corporation owning 10% or more of their stock.

Dated: May 22, 2020                    /s/ *Lauren Godles Milgroom*
                                       Lauren Godles Milgroom
                                       Attorney for Amici Curiae

# TABLE OF CONTENTS

FEDERAL RULE OF APPELLATE PROCEDURE 29 STATEMENTS ............... i

CORPORATE DISCLOSURE STATEMENT ......................................................... i

Table of Authorities ................................................................................................. iii

Interests of Amici Curiae .........................................................................................1

Argument..................................................................................................................4

    A.  ICE's Civil Courthouse Arrests Stopped Immigrant Victims of Domestic and Sexual Violence From Reporting Crimes and Participating in the Criminal Justice System ...................................................................................6

    B.  The Stories of Amici's Clients Show the Dangerous Effects of ICE's Civil Courthouse Arrests in Massachusetts..............................................................9

    C.  The Preliminary Injunction Has Reopened the Courthouse Doors to Amici's Clients and Increased Their Participation in the Justice System...................13

Conclusion ..............................................................................................................18

Certificate of Compliance .......................................................................................19

Certificate of Service ..............................................................................................20

# TABLE OF AUTHORITIES

**Cases**

*Diamond v. Earle*, 217 Mass. 499 (1914)...................................................................3

*Ryan v. U.S. Immigration & Customs Enf't*, 382 F. Supp. 3d 142 (D. Mass. 2019).4

*Stewart v. Ramsay*, 242 U.S. 128 (1916)...................................................................3

*Valley Bank & Trust Co. v. Marrewa*, 354 Mass. 403 (1968)...................................3

**Statutes**

8 U.S.C. § 1101(a)(15)(T)(i)(III)(aa)..........................................................................6

8 U.S.C. § 1101(a)(15)(T)-(U)....................................................................................6

**Other Authorities**

Amicus Letter of Massachusetts Legal Aid Organizations, SJ-2018-0119, Petition
for Writ of Protection Pursuant to Mass. Gen. L. c. 211, § 3 (Mass. Mar. 23, 2018)
....................................................................................................................................10

*Data Brief: Rape and Sexual Assault in Massachusetts, 2016-2017*, MA. DEP'T OF
PUB. HEALTH (Feb. 2018) ...........................................................................................6

Decker, M., Raj, A. and Silverman, J., *Sexual Violence Against Adolescent Girls:
Influences of Immigration and Acculturation*, 13 Violence Against Women 498
(2007) .........................................................................................................................6

*Denied, Disappeared, and Deported*, IMMIGR. DEF. PROJECT (Jan. 2020)...............8

*Freezing Out Justice: How immigration arrests at courthouses are undermining
the justice system*, ACLU (May 3, 2018)...................................................................8

*FY2017 ERO Administrative Arrests*, ICE (2017).....................................................8

*Key Terms and Phrases*, RAPE, ABUSE, & INCEST NATIONAL NETWORK .................2

Maria Cramer, *ICE courthouse arrests worry attorneys, prosecutors*, BOSTON GLOBE (June 16, 2017)..........................................................................................8, 9

*See Immigrant Victims of Sexual Assault*, NATIONAL SEXUAL VIOLENCE RESOURCE CENTER .............................................................................................................6

Shannon Dooling, *Amid Drop in Total ICE Arrests, ICE Wants to Keep Arresting People at Courthouses*, WBUR (Dec. 16, 2019) ........................................................9

Steph Solis, *'Chilling effect:' ICE made more than 100 arrests at Massachusetts courthouses in the past year*, MASSLIVE (Mar. 29, 2019)........................................9

*Violence Against Women Act STOP Grant Program FF2017-2020 Implementation Plan*, COMM. OF MA. EXEC. OFFICE OF PUBLIC SAFETY & SEC. (Feb. 15, 2018).......6

**Regulations**

8 C.F.R. § 204.11(a).................................................................................................6

## INTERESTS OF AMICI CURIAE

The twenty-seven amici are:

- Asian Task Force Against Domestic Violence

- ASISTA

- Boston Area Rape Crisis Center

- Boston University School of Law Immigrants' Rights & Human Trafficking Program

- Catholic Charities of Boston

- Children's Law Center of Massachusetts

- De Novo

- Domestic & Sexual Violence Council

- Domestic Violence Ended (DOVE), Inc.

- Foley Hoag Domestic Violence and Sexual Assault Prevention Project

- Greater Boston Legal Services

- Harbor Communities Overcoming Violence (HarborCOV)

- Harvard Legal Aid Bureau

- Healing Abuse Working for Change

- Immigration Legal Assistance Program at Ascentria Care Alliance

- Jane Doe Inc.

- Justice Center of Southeast Massachusetts

- Legal Services Center of Harvard Law School

- Massachusetts Law Reform Institute

- Mental Health Legal Advisors Committee

- MetroWest Legal Services

- Northeast Justice Center

- PAIR Project

- REACH Beyond Domestic Violence

- The Second Step

- Victim Rights Law Center

- Voices Against Violence

Amici are non-profit organizations, councils, and other entities that address the needs of immigrant survivors[1] of domestic and sexual violence and human trafficking in Massachusetts. Many provide direct legal representation to immigrant survivors, helping them obtain abuse prevention orders or immigration benefits, including through the U-Visa and T-Visa processes for victims of crimes. Other

---

[1] The terms "survivor" and "victim" are both applicable to people who have experienced domestic and sexual violence. In general, this brief uses "victim" when referring to a specific crime or aspect of the criminal justice system and otherwise defaults to "survivor." For more information on terminology, *see, e.g.*, *Key Terms and Phrases*, RAPE, ABUSE, & INCEST NATIONAL NETWORK, https://www.rainn.org/articles/key-terms-and-phrases.

amici conduct policy advocacy in the areas of immigration or domestic and sexual violence or support organizations providing direct services to immigrant survivors.

To do their work, amici must be able to reassure survivors that pursuing justice will not expose them to further harm or the risk of deportation. The presence of U.S. Immigration and Customs Enforcement ("ICE") in Massachusetts courthouses has frustrated amici's efforts to empower immigrant survivors to access the legal system and obtain protection from their abusers or secure immigration benefits through programs requiring cooperation with law enforcement.

## ARGUMENT

The "well settled" common-law privilege against civil arrest[2] is meant to protect people like amici's clients.[3] This brief tells their stories. Survivors need Massachusetts courts and law enforcement to protect them from their abusers. In turn, Massachusetts police, prosecutors, and courts need survivors to report abuse and testify against their abusers. ICE's unprecedented policy of making civil arrests in Massachusetts courthouses threatens this cooperative relationship, endangers immigrant survivors, and makes it harder for the Commonwealth and its courts to enforce state law.

Like other states, Massachusetts has long recognized a common-law privilege against civil arrest.[4] "The rule is an ancient one," grounded in the principle "that justice requires the attendance of witnesses cognizant of material facts."[5] ICE's civil-arrest policy flouted that ancient rule and created an "unreasonable obstacle[] . . . thrown in the way of [survivors] freely coming into court to give oral testimony."[6]

---

[2] *Stewart v. Ramsay*, 242 U.S. 128, 129-130 (1916).

[3] The term "client" is used broadly here to refer to the survivors whom amici support, whether through direct services or policy advocacy.

[4] *Valley Bank & Trust Co. v. Marrewa*, 354 Mass. 403, 406-07 (1968) (quoting *In re Thompson*, 122 Mass. 428, 429 (1877)).

[5] *Diamond v. Earle*, 217 Mass. 499, 501 (1914).

[6] *Id.*

While ICE's policy was in effect, many survivors were more afraid of seeking legal help than continuing to endure abuse. Consistent with the experience of amici and their clients, the district court correctly found that ICE's policy has caused "witnesses and victims [to] refuse to participate in proceedings"—resulting in greater public harm than good.[7] In halting ICE's illegal and ill-advised policy, the preliminary injunction restored victims' access to the courts. Amici's clients are now more likely to report crimes of sexual violence and to work with law enforcement to prosecute those crimes.

This brief explains how ICE's courthouse arrests deter victims of domestic and sexual violence from reporting crimes and participating in the criminal justice system. It then presents stories from amici's clients that illustrate the harms of ICE's policy and the benefits of the district court's injunction. First, it shows how ICE's civil-arrest policy often led immigrant survivors of domestic and sexual violence to endure severe abuse in silence rather than risk appearing in court to challenge their abusers. Next, it shows how the district court's injunction has empowered amici's clients to go to court to ensure their safety. Amici urge this Court to affirm.

---

[7] *Ryan v. U.S. Immigration & Customs Enf't*, 382 F. Supp. 3d 142, 161 (D. Mass. 2019).

A. *ICE's Civil Courthouse Arrests Stopped Immigrant Victims of Domestic and Sexual Violence From Reporting Crimes and Participating in the Criminal Justice System*

In Massachusetts, sexual assault is "a serious social and public health problem."[8] As is true in other states, immigrants[9] in Massachusetts are particularly vulnerable to domestic and sexual violence.[10] Immigrants in Massachusetts are twice as likely to be victims of intimate partner homicide as their non-immigrant peers.[11] Immigrants may also under-report sexual violence because of a "lack of a relationship between law enforcement and local communities, language barrier[s], fear[s] of deportation, and experiences with law enforcement in their native countries."[12]

---

[8] *Data Brief: Rape and Sexual Assault in Massachusetts, 2016-2017*, MA. DEP'T OF PUB. HEALTH (Feb. 2018), https://bit.ly/2WAfyhf.

[9] This brief focuses mainly on undocumented immigrants, but documented immigrants, including those with visas or green cards, are also frequently uninformed or misinformed about their legal rights. *See Immigrant Victims of Sexual Assault*, NATIONAL SEXUAL VIOLENCE RESOURCE CENTER, https://www.nsvrc.org/sarts/toolkit/6-12.

[10] *See* Decker, M., Raj, A. and Silverman, J., *Sexual Violence Against Adolescent Girls: Influences of Immigration and Acculturation*, 13 Violence Against Women 498, 506-07 (2007) ("[B]eing an immigrant confers significant additional vulnerability to recurring sexual assault.").

[11] *Violence Against Women Act STOP Grant Program FF2017-2020 Implementation Plan*, COMM. OF MA. EXEC. OFFICE OF PUBLIC SAFETY & SEC., at 12 (Feb. 15, 2018), https://bit.ly/3cdOBGP.

[12] *Id.* at 14.

Recognizing immigrants' particular vulnerability, Congress created the U- and T-Visa programs, which provide pathways to legal status for victims of abuse and trafficking.[13] To obtain a U- or T-Visa, a victim must cooperate with law enforcement.[14] In the case of a U-Visa, a police officer, prosecutor, or judge must formally certify that cooperation.[15] In the case of a T-Visa, such a certification "shall be considered" as part of a petitioner's "relevant credible evidence."[16]

ICE's in-court arrests have undermined these programs by allowing abusers to plausibly threaten victims that the cooperation that Congress sought to encourage could lead to detention and deportation.[17] Since 2017, ICE has increased its civil

---

[13] *See* 8 U.S.C. § 1101(a)(15)(T)-(U). The U- and T-visa programs were first enacted as part of the Victims of Trafficking and Violence Protection Act of 2000, Pub. L. No. 106-386, 114 Stat. 1464 (2000), and amended most recently by the Violence Against Women Reauthorization Act of 2013, Pub. L. No. 113-4, 127 Stat. 54 (2013).

[14] 8 U.S.C. § 1101(a)(15)(T)(i)(III)(aa); *id.* § 1101(a)(15)(U)(i)(III).

[15] *Id.* § 1184(p)(1).

[16] *Id.* § 1184(o)(6); *Victims of Human Trafficking: T Nonimmigrant Status*, U.S. CITIZENSHIP & IMMIGR. SERVS. (May 10, 2018), https://bit.ly/3dDfG6m.

[17] Another relevant federal program not highlighted in the client stories shared by amici is Special Immigrant Juvenile Status ("SIJS"), which provides a pathway to legal status for young people who have faced abuse, neglect, or abandonment by their parents. Like U- and T- visa petitioners, SIJS petitioners must engage with the legal system to obtain the requisite finding from a juvenile court that "family reunification is no longer a viable option." 8 C.F.R. § 204.11(a).

arrests in courthouses by as much as 1700%.[18] In 2018, the ACLU, in partnership with the National Immigrant Women's Advocacy Project, published a study showing that "the fear of deportation—magnified by immigration arrests in courthouses since President Trump took office—[was] stopping immigrants from reporting crimes and participating in court proceedings."[19] In that study, which was based on hundreds of interviews nationwide, "law enforcement officials reported that many crimes ha[d] become more difficult to investigate: **69 percent said domestic violence was harder to investigate, 64 percent said this applied to human trafficking, and 59 percent said this was true about sexual assault**."[20]

These troubling national trends were also seen in Massachusetts. ICE's courthouse arrests in the Commonwealth have increased dramatically since 2017.[21] In April 2017 alone, ICE arrested more than 40 people in Massachusetts courthouses, out of 102 total non-criminal arrests.[22] The trend continued. Lawyers for Civil Rights

---

[18] *See, e.g.*, *Denied, Disappeared, and Deported*, IMMIGR. DEF. PROJECT at 2 (Jan. 2020), https://bit.ly/3doVPYD.

[19] *Freezing Out Justice: How immigration arrests at courthouses are undermining the justice system*, ACLU at 1 (May 3, 2018), https://bit.ly/2YHJP0h.

[20] *Id.* (emphasis added).

[21] *See* Maria Cramer, *ICE courthouse arrests worry attorneys, prosecutors*, BOSTON GLOBE (June 16, 2017), https://bit.ly/2SJSco6.

[22] *Id.*; *FY2017 ERO Administrative Arrests*, ICE (2017), https://bit.ly/2zmfp9q.

tracked at least 100 ICE arrests in Massachusetts courthouses in 2018.[23] Recent data suggests that ICE also conducted dozens of courthouse arrests per month in 2019. From October 2018 through May 2019, ICE averaged 229 total monthly arrests in Massachusetts.[24] After the district court's injunction, however, the monthly average dropped to only 159 for the remainder of the fiscal year.[25]

    B.  *The Stories of Amici's Clients Show the Dangerous Effects of ICE's Civil Courthouse Arrests in Massachusetts*

After ICE began its courthouse raids in 2017, amici consistently heard from undocumented survivors who were too afraid to get help. In their community outreach efforts, amici also had trouble reaching survivors who were too afraid to even speak with a lawyer. Survivors who were afraid of ICE declined to pursue restraining orders, testify in criminal proceedings, apply to the federal programs described above, or even report incidents of domestic or sexual violence.[26] In short, ICE put amici's clients' lives at risk by making them afraid to go to court.

---

[23] Steph Solis, *'Chilling effect:' ICE made more than 100 arrests at Massachusetts courthouses in the past year*, MASSLIVE (Mar. 29, 2019), https://bit.ly/2WF5VxK .

[24] Shannon Dooling, *Amid Drop in Total ICE Arrests, ICE Wants to Keep Arresting People at Courthouses*, WBUR (Dec. 16, 2019), https://wbur.fm/3b6GgU0 (citing *ERO Administrative Arrests by Field Office (Area of Responsibility) and Month*, ICE (Dec. 11, 2019), https://bit.ly/2yqKrNf).

[25] *Id.*

[26] *See, e.g.*, Cramer, *ICE courthouse arrests worry attorneys, prosecutors*; Amicus Letter of Massachusetts Legal Aid Organizations, SJ-2018-0119, Petition for Writ

Lucia Vasquez[27] is a client of amicus DOVE. Lucia endured five years of physical abuse, stalking, and isolation from her family at the hands of Julio, with whom she had two young children. Julio constantly threatened Lucia—telling her if she went to court, he would obtain sole custody of the children because he was documented and she was not. Lucia knew her children would be in danger in Julio's custody. When Lucia finally worked up the courage to flee with her children, Julio leveraged his documented status and called the police on Lucia, falsely claiming it was Lucia who was abusing the children. Thankfully, the police quickly realized that Lucia was keeping the children safe from Julio. Lucia's family encouraged her to seek custody of her children and a restraining order, but Lucia had heard rumors that ICE was patrolling the courthouses. So, Lucia decided she would be safer *not* going to court. DOVE is still in touch with Lucia, who is fortunately now in a more secure situation. But she told her attorney that if the injunction had been in place when she felt in fear of Julio, she "one-hundred percent" would have sought protection from the court. But for ICE's policy, Lucia could have assisted in Julio's prosecution and possibly qualified for a U-Visa.

Before the injunction, even survivors who initially cooperated with law

---

of Protection Pursuant to Mass. Gen. L. c. 211, § 3 at 10-12 (Mass. Mar. 23, 2018) (attached as Exhibit A).

[27] All survivor and abuser names are pseudonyms and identifying facts have been removed to protect survivors' safety and privacy.

enforcement might abruptly drop their cases. Survivors were painfully aware that each step of cooperation with law enforcement led them closer to court and to ICE. For example, an advocate at amicus De Novo recounted the story of Diana Martinez, a Colombian client in her twenties whose abuser assaulted her, choked her, pointed a gun at her, and threatened to kill her. After landing in the emergency room and eventually an emergency shelter, Diana met with the Suffolk County District Attorney's office and worked up the courage to testify against her abuser in court. Immediately after Diana testified, however, her abuser told her that if she came to court again, he would have ICE arrest her. She had not yet completed her role in cooperating with the prosecutor, but Diana was so afraid of returning to the courthouse that she stopped speaking with law enforcement entirely.

Some survivors who did seek legal protection before the injunction waited to do so until the abuse had escalated to near-fatal levels, because they were so afraid of encountering ICE in the courthouse. Ana Valdez, a client at amicus HarborCOV, is an illustrative example. Ana met James when they were both teenagers in their home country. They had a child together and moved to the United States about a decade ago. Ana gave birth to another child after they arrived. James was sexually, physically, and emotionally abusive. One night, James raped Ana while their infant child slept in a crib next to the bed. Distraught, Ana told James to leave—but James would not stay away for long. In the following years, James repeatedly called Ana,

followed her when she ran errands, and waited outside her apartment. On several occasions, James threatened to kill Ana or one of the children if she did not take him back. But Ana was too terrified to seek a restraining order. Ana had heard that immigration officers often patrolled the courthouse, and she could not risk being deported with her children to the violent community she had escaped years ago. Several years after they broke up, James attacked Ana in public because she was talking to another man. Still, Ana was too afraid to go to court. Months later, James got violent again. He forced his way inside her apartment and choked Ana until she could barely breathe. James then punched her several times and threatened her with further abuse. For weeks following this incident, Ana was still too afraid to go to court. Only after she realized that the next time James might kill her—which would leave her children without a safe guardian—did Ana finally seek and secure a restraining order against James. Now, James has a related criminal case pending against him. Had Ana felt safe to seek a restraining order in the first place, however, she could have avoided years of abuse, and James could have been prosecuted sooner.

ICE's escalation of civil arrests harmed not only amici's clients, but also amici themselves. Amici who provide direct services try to involve clients in their cases as much as possible and have clients handle the parts that do not require a lawyer. Clients' roles can vary from picking up filings from the clerks' office, to meeting

with a victim witness advocate in a district attorney's office, to appearing *pro se* in straightforward cases. By having clients take ownership over their cases, clients learn to advocate for themselves, and amici have more resources to help more clients. With ICE's increased presence in the courthouses, however, sending immigrant clients to court alone became excessively risky. For example, in July 2018, an attorney at amicus Catholic Charities of Boston sent one of her undocumented clients to pick up a docket sheet at court. When he did so, ICE confronted him in the courthouse and took him aside for questioning. After that incident, Catholic Charities had to stop sending undocumented clients to court alone. Similarly, amicus Greater Boston Legal Services ("GBLS") had to accompany all undocumented clients to court and devote time and effort to creating safety plans with each client for what to do if ICE were to approach them. Amicus REACH Beyond Domestic Violence ("REACH") often sent an advocate into court ahead of their clients to see if ICE was there before advising the clients to enter.

> ### C. The Preliminary Injunction Has Reopened the Courthouse Doors to Amici's Clients and Increased Their Participation in the Justice System

In June 2019, the district court restored the common law privilege and reopened the courthouse doors for immigrant survivors in Massachusetts. Amici attest that the preliminary injunction has helped their clients trust that they can safely seek protection from their abusers. An advocate at amicus De Novo reports seeing a "noticeable increase" in the number of survivors now willing to report instances of

domestic or sexual violence. Other amici have seen similar increases. Amici also report that survivors are less likely to abandon their cases for fear of being deported. Many amici now carry copies of the injunction with them when accompanying undocumented survivors to court—sometimes giving copies to clients as well. The following illustrative stories show the injunction's powerful effects.

Alex Prado's journey to safety offers perhaps the clearest proof that the injunction increases access to justice for immigrant survivors. Alex, a mother of three from Brazil, had been in a relationship with Carlos for fifteen years. Their relationship began in Brazil and continued after they relocated their family to the United States. For much of their relationship, Carlos controlled all aspects of Alex's daily life, and she suffered extreme physical and verbal abuse. After several years in the United States, Alex managed to escape to another state. But, devastatingly for Alex, Carlos obtained custody of their children.

Missing her children and wanting to ensure they were safe, Alex eventually returned to Carlos. Shortly after her return, the abuse escalated to an almost-fatal climax. Carlos threw a pot of boiling water at Alex, intending to scald her. When the water missed Alex, Carlos grabbed a knife, held it to her throat, and threatened to kill her. Thankfully, Alex escaped and called the police to report the attack. Carlos was arrested and prosecuted. Although Alex wanted to testify in court against Carlos, she faced a heart-wrenching decision: (1) tell her story to ensure that Carlos never

hurt her again but risk being detained by ICE and losing her children; or (2) hide from both Carlos and ICE, and hope Carlos never tried to kill her again. Alex could not decide which was worse.

Alex's situation vastly improved when the district court granted the preliminary injunction a few days before Carlos' next court date. After Alex's attorney at amicus DOVE explained the scope of the preliminary injunction, Alex's decision became easier. Carrying a copy of the preliminary injunction, Alex attended the hearing and gave in-person testimony about the years of abuse she had suffered. The preliminary injunction allowed Alex to take her life back into her own hands.

Shortly after the injunction took effect, amicus GBLS represented Ashley Salas, a 20-year-old woman from South America, who was seeking a restraining order against her abuser. Ashley had heard that ICE targeted courthouses as a place to find and trap immigrants and was terrified that even a brief hearing would expose her to ICE. Ashley's attorney explained the preliminary injunction and advised Ashley that ICE was prohibited from arresting her at the courthouse. Largely because of her attorney's reassurances, Ashley decided to go forward with the hearing. On the day of the hearing, however, Ashley's fear became overwhelming, and she almost changed her mind. Ashley's attorney met her in the courthouse parking lot, took out a copy of the preliminary injunction, and went over it in detail with Ashley—reassuring Ashley that ICE would not arrest her in court. With her

attorney holding a copy of the injunction, Ashley finally stepped through the courthouse doors and pursued her restraining order. The judge granted the order, which protects Ashley to this day.

Stephanie Vela, a client of amici Boston Area Rape Crisis Center, sought a restraining order in late summer 2019. Earlier, Stephanie had contacted the District Attorney's Office and reported that her young teenage daughter, Laura, had been sexually assaulted. The victim witness advocate at the D.A.'s office advised her to seek a restraining order on Laura's behalf, but Stephanie did not think it was safe for her family to go to court. She was terrified that they would be detained, separated, and deported. Stephanie's attorney assuaged Stephanie's fears by reviewing the preliminary injunction with her and Laura. After multiple discussions, Stephanie decided to pursue the restraining order and ultimately prevailed in court. Stephanie and Laura also plan to help prosecutors in a criminal proceeding against Laura's abuser. Today, the restraining order continues to protect Laura, and Stephanie's family remains safely together.

No matter the rules of the courthouse, nearly all immigrant survivors are anxious about interacting with authorities. For Maria Balbuena, an undocumented survivor, it took endless back-and-forth with advocates at REACH to convince her to meet with a police officer. She agreed only after the officer offered to meet her in plainclothes with her advocate. During the meeting, Maria would interrupt every few

minutes to ask the officer: "Wait, are you going to deport me?" and to ask her advocate "Is he going to deport me?" Fears like Maria's will not evaporate overnight, but the common law privilege against courthouse arrests and the injunction that restored that privilege have allowed law enforcement to strengthen its relationship with immigrant survivors. Since the injunction has been in place, law enforcement has made tremendous strides in overcoming barriers to reporting.

In the fall of 2019, Massachusetts officials, prosecutors, and law enforcement began organizing community meetings with immigrant survivors to inform them about the preliminary injunction and their rights as crime victims. In conjunction with REACH, GBLS, and the Latinas Know Your Rights program, word of these community meetings spread informally from advocates and attorneys to current and former clients. Dozens of community members attended each meeting. The meetings were hugely successful in fostering cooperation between crime victims and law enforcement and helping to restore victims' trust in the Massachusetts courts. Survivors felt comforted to hear law enforcement officials describe efforts to promote their safety. Some attendees were also surprised that the officers had been so responsive to their concerns, given negative experiences with law enforcement in their home countries.

Nonetheless, trust between immigrant survivors and state law enforcement remains fragile. Survivors and advocates know that the preliminary injunction is

temporary and can only hope that the courthouse will remain a safe space. The possibility that ICE could return to courthouses threatens to undo the efforts of amici, state officials and prosecutors, and the police to encourage survivors to seek help. Preserving the common law privilege against civil courthouse arrests will protect the integrity of the judicial system and encourage vulnerable immigrant survivors to participate in the system without fear of being detained by ICE.

## CONCLUSION

The Court should affirm the district court's preliminary injunction.

Date: May 22, 2020

/s/ *Lauren Godles Milgroom*
Joel A. Fleming (Bar No. 1158979)
Lauren Godles Milgroom (Bar No. 1183519)
Amanda R. Crawford
Block & Leviton LLP
260 Franklin St., Suite 1860
Boston, MA 02110
Tel: (617) 398-5600
Joel@blockesq.com
Lauren@blockesq.com
Amanda@blockesq.com

*Counsel for Amici Curiae*

## CERTIFICATE OF COMPLIANCE

The undersigned counsel certifies compliance of the foregoing amicus brief with the following requirements of the Federal Rules of Appellate Procedure and the Local Rules of this Court:

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7) and 29(a)(5), because this brief contains 3,824 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word for Mac in Times New Roman 14-point font.

Dated: May 22, 2020                          Respectfully submitted,

                                             */s/ Lauren Godles Milgroom*
                                             Lauren Godles Milgroom
                                             Counsel for Amici Curiae

## CERTIFICATE OF SERVICE

I hereby certify that on May 22, 2020, I, Lauren Godles Milgroom, electronically filed the foregoing document with the Clerk of the United States Court of Appeals for the First Circuit using the CM/ECF system. Counsel in the case are registered CM/ECF users and such services will be accomplished by the CM/ECF system.

Dated: May 22, 2020                          Respectfully submitted,

                                             */s/ Lauren Godles Milgroom*
                                             Lauren Godles Milgroom
                                             Counsel for Amici Curiae

# Exhibit A



MASSACHUSETTS
**LAW REFORM**
INSTITUTE

40 COURT STREET
SUITE 800
BOSTON, MA 02108

617-357-0700 PHONE
617-357-0777 FAX
WWW.MLRI.ORG

March 23, 2018

Maura S. Doyle, Clerk
Supreme Judicial Court for Suffolk County
John Adams Courthouse
One Pemberton Square, Suite 1300
Boston, MA 02108-1707

Re:  SJ-2018-0119, Petition for Writ of Protection
     Pursuant to G.L. c. 211, § 3

Dear Ms. Doyle:

Enclosed, please find this Amicus Letter filed on
behalf of the named organizations in support of SJ-
2018-0119, Petition for Writ of Protection Pursuant to
G.L. c. 211, § 3.

          Thank you for your assistance.


          Sincerely,


          Georgia Katsoulomitis
               (BBO# 560473)
          *Executive Director*
     Massachusetts Law Reform Institute (MLRI)
               40 Court Street
                    Suite 800
               Boston, MA 02108
               (617)357-0700 (x 316)
          GKatsoulomitis@mlri.org

cc Jonathan Miller, Office of the Attorney General
   Robert L. Quinan, Jr., Office of the Attorney General
   The Honorable Paula M. Carey, Chief Justice of the
   Trial Court
   Jonathan S. Williams, Court Administrator

March 23, 2018

The Honorable Elspeth B. Cypher
Associate Justice of the Supreme Judicial Court
John Adams Courthouse
One Pemberton Square
Boston, MA 02108-1707

RE:   SJ-2018-0119, Petition for Writ of Protection
      Pursuant to G.L. c. 211, § 3

Amicus Letter of Massachusetts Legal Aid Organizations

Dear Justice Cypher:

    We write as representatives of the civil legal
aid community of Massachusetts in support of the
Petition for Writ of Protection filed pursuant to G.L.
c. 211 § 3 in the above-referenced matter. As legal
services organizations, we represent and advocate for
thousands of low-income people in a wide array of
legal matters, including landlord-tenant, divorce and
custody, abuse prevention orders, child welfare,
termination of parental rights, guardianship, civil
commitment, domestic violence, consumer fraud,
employment, unemployment benefits, public benefits,
and civil rights, as well as appellate and impact
litigation in these and other matters affecting the
legal rights of immigrants, the homeless, welfare
recipients, limited English-proficient persons, people
with disabilities, racial and ethnic minorities, and

1

other low-income individuals and families across the
Commonwealth.

Massachusetts has a richly diverse population,
with many Latino, Black diasporic and Asian families
in our communities across the Commonwealth. Residents
of Massachusetts originate from dozens of countries
across the world, including El Salvador, Honduras,
Guatemala, Brazil, Haiti, Cape Verde, Ghana, China,
Vietnam, India, South Korea, and many others. See
e.g., Sacchetti, The Changing Face of Citizenship,
Boston Globe (March 25, 2014); Burge, Mass. Cities,
Towns Change as Latino Populations Grow, Boston Globe
(July 28, 2013); Boston.com, Massachusetts' Ethnic
Mosaic (December 26, 2010); Migration Policy
Institute, State Immigration Data Profiles:
Massachusetts, (2016). Over a million Commonwealth
residents are foreign-born, according to Census
figures. See United States Census Bureau, QuickFacts:
Massachusetts,
https://www.census.gov/quickfacts/fact/table/MA/AGE295
216 (last visited March 20, 2018); Migration Policy
Institute, State Immigration Data Profiles:
Massachusetts, (2016).

This population includes a significant number of "mixed status" families – that is, those in which one or more U.S. citizens, often children, reside with parents, siblings, and other family members who may be undocumented, possess one of dozens of federally defined immigration statuses, or reside here "under color of law." Several reliable sources indicate that Massachusetts has at least 38,000 U.S. citizen children of unauthorized immigrants. See Migration Policy Institute, A Profile of U.S. Children with Unauthorized Immigrant Parents (Jan. 2016). The historically undercounted undocumented population is currently estimated at 210,000. See Pew Research Center, U.S. Unauthorized Immigration Population Estimates (Nov. 2016). This is a figure which may grow by more than 20,000 by 2019 as a result of federal de-documentation policies which threaten to strip humanitarian legal status from approximately 10,000 Haitians and Central Americans who've held "TPS" for many years and from almost as many young DREAMERs with "DACA" status. Temporary Protected Status, or TPS, is a form of humanitarian immigration relief which has been announced as terminated (effective 2019) for both Salvadorans and Haitians, who total approximately

10,793 in Massachusetts. See Massachusetts Immigrant
and Refugee Advocacy Coalition, Temporary Protected
Status (TPS): An Overview (Feb. 2018). Additionally,
an estimated 7,900 youth in Massachusetts have
acquired Deferred Action for Childhood Arrivals (DACA)
status and thousands more undocumented youth who would
be eligible for this program but for its recent
elimination are long-time residents of the
Commonwealth who have grown up here, graduated from
local high schools, and contribute every day to their
communities. See U.S. Citizenship and Immigration
Services, Number of Form I-821D, Fiscal Year 2012-2017
https://www.uscis.gov/sites/default/files/USCIS/Resour
ces/Reports%20and%20Studies/Immigration%20Forms%20Data
/All%20Form%20Types/DACA/daca_performancedata_fy2017_q
tr2.pdf (March 2017); Migration Policy Institute,
Deferred Action for Childhood Arrivals (DACA) Data
Tools (Jan. 2018) (estimating total number of
Massachusetts residents who would be eligible for, but
do not receive, DACA).

Equal access to the courts is important for every
one of these individuals and the U.S. citizen members
of the families in which they live. The recent ICE

4

presence in the courthouses of the Commonwealth, which
has been widely publicized in mainstream and ethnic
media, has already chilled access to civil legal
remedies by legal services clients and is likely to
imperil the participation of litigants and witnesses
in key areas of our practice, including the following:

## Housing

If an immigrant family faces an eviction in
court, the fear that ICE may learn about the eviction
may prevent that family from going to court to contest
the eviction and defend their rights. ICE can learn
about an eviction from landlords seeking to harass
vulnerable immigrant families out of their homes with
little or no court process so that landlords can raise
rents or sell their properties in housing markets that
are quickly gentrifying. ICE can also track a family
on the Trial Court's publicly available online
database, similar to how they are scanning criminal
dockets. Immigrant families hear that ICE comes to
criminal sessions to arrest families, and fear they
will do the same with eviction cases which are often
heard in the same courts. The fear of being arrested
in a court may stop immigrant families from defending

themselves against an eviction – an eviction that
could be illegal or even prevented. This fear can
impact both undocumented tenants and households where
some members have legal immigrant status. Under the
new legislation to ensure that statewide all in
Massachusetts have access to the resources and
expertise of a Housing Court, such fear would
compromise the ability of immigrant homeowners and
tenants to appear in court. G. L. c. 185C, §§ 1, 4,
and 8; G.L. c. 211B, §§ 1 and 2, as amended by St.
2017, c. 47, § § 78-82 and 153. They would effectively
be denied the same due process, resources, and access
that other homeowners and tenants are afforded in a
specialized forum on housing. Delivering on the
promise of this forward-looking legislation will be
difficult if not impossible if immigrants and their
citizen family members are afraid to use the courts
because of the threat of ICE's presence. In the end,
immigrants – both documented and undocumented – are
left with the impossible choice of going to court and
risk being deported or not going to court and being
swiftly and harshly defaulted and forced from their
home.

## Child Welfare

Fear of ICE presence at Courthouses may deter immigrant parents from accessing our juvenile courts and negatively impact the U.S. citizen and immigrant children of the Commonwealth. Parents in need of additional support with a stubborn, truant, or runaway child may be too fearful to file a Child Requiring Assistance petition. We know families who have expressed this fear and been unwilling to avail themselves of the Juvenile Court's support. Although parental involvement is critical in juvenile justice proceedings, parents may become fearful of accompanying and supporting their child facing charges of delinquency. This fear is especially real for parents in counties where the Juvenile Court is located in the same building as the District Court, such as the Fenton Judicial Center in Lawrence or the J Michael Ruane Judicial Center in Salem. The Juvenile Court's mission is to protect children from abuse and neglect, to strengthen families, to rehabilitate juveniles, and to protect the public from delinquent and criminal behavior. This important mission is

undermined when families are too fearful to attend and participate in the Court's process.

Additionally, when the state goes to Court to seek to remove a child/ren from his or her parents and place them into foster care based on allegations that the parents are unfit, parents' Constitutional right to counsel and the due process right to hearings and a trial to ensure that their family is not being needlessly torn apart disintegrate if the family is too intimidated to enter the courthouse to defend themselves for fear that they may be arrested, deported, and/or separated from their children by ICE regardless of whether they have abused or neglected their children. If their children are already in the state's custody, parents may be unable to access the courts to prove fitness, to show that they are participating in services required to reunify with their children, or to present witnesses on their behalf (because either they or their witnesses may be fearful of ICE). Thus, fear of encountering ICE in court could result in parents losing custody of their children to the state or children remaining in the custody of the state and in the overburdened foster care system, even though these children should be at

8

home with fit and loving parents. Unnecessarily
separating children from their parents because their
parents are deterred by ICE from presenting their case
in court traumatizes children causing long term harm,
and can cause avoidable poor life outcomes for
children wrongly trapped the child welfare system.

## Family Law

Legal services advocates are already reporting
cases where immigrant family law clients are too
afraid to file a case in Probate & Family Court.
Immigrant family law clients are foregoing
opportunities to seek divorce, child support, custody
and other family-related legal rights for fear of
being arrested, detained and deported. This chilling
effect on Probate & Family Court access is negatively
impacting the children of immigrants in Massachusetts
and forcing immigrants into unfair and terrible
choices: staying in unwanted, even abusive, marriages
to avoid filing for divorce; sacrificing financial
stability to avoid seeking child support; giving up on
time with children to avoid pursuing custody or
visitation; allowing children to remain in problematic
or even unsafe custody and parenting time situations

(e.g. substance abuse issues, child abuse or other safety concerns). It is also well-known that immigration status is used by many domestic abusers to control their victims and is part of the pattern of abuse in abusive relationships. Abusers threaten victims with reports to ICE should they file for divorce or custody. ICE presence at courthouses amplifies this dynamic, especially as many Probate and Family Courts are located in the same buildings as District Court raising the fears of families who have read of the arrests in District Court.

The mission of the Massachusetts Probate & Family Court is profoundly undermined when the presence of ICE interferes with the Probate & Family Court's ability to "deliver timely justice to the public by providing equal access to a fair, equitable and equal forum."

### Domestic Abuse and Harassment Protection

Advocates have reported immigrant clients who need to obtain or extend 209A Abuse Prevention Orders, but are so afraid of encountering ICE that they choose to let an order expire, or forego seeking a 209A order entirely. There have also been cases in which the defendant has failed to pay rent or child support

ordered as part of a restraining order.  The client
has been fearful of seeking enforcement of the orders,
thus placing them in situations in which they may be
evicted and where they may feel they need to return to
their abuser for economic reasons.

In some cases, a victim of domestic abuse is
afraid to seek the protection of the courts, not
because she or he does not have legal status, but
because the abusive person does not have legal status.
While they need the protection of the courts, these
victims may not wish the defendant to be detained and
deported for a number of reasons: the need for
support, concerns that their child will lose a parent
with whom the child has a good relationship,
regardless of the parents' situation, fear of
retribution from the defendant's family members here
or in the country of origin, and, despite everything,
does not wish the harms that might occur in the
country of origin to be visited upon someone they once
loved.

Similarly, fear of accessing the courts may
dissuade victims of harassment, including stalking (a
high risk factor for lethality) and sexual harassment,
from seeking harassment prevention orders under M.G.L.

c258E. Victims and others may be in harm's way but
fear of ICE prevents them from accessing the
protection to which they are entitled from the courts.

Finally, it is important to note that while
abuse prevention orders and harassment protections
orders may be sought in many different court
departments, the vast majority are issued by the
District and Boston Municipal Courts - the very courts
identified in the media as the places in which ICE
arrests are most often made.

### Employment Rights

ICE activity in Massachusetts courthouses is
having a chilling effect on immigrant workers' access
to just wages and other conditions of employment.
These workers, already more vulnerable to being denied
their agreed-upon, or even minimum, wages, are far
less likely to come forward and hold their employers
to account when doing so renders them acutely
vulnerable to immigration enforcement. Even when
employers don't explicitly threaten retaliation
against immigrant workers who dare to enforce their
rights, news of ICE arrests in courthouses has created
a perilous atmosphere where workers are choosing to

cut their losses and stay silent, even in the face of egregious violations of state and federal employment laws. We have seen a marked decrease in the number of immigrant workers seeking our services, including at the Massachusetts Attorney General's monthly wage theft clinic, which cannot meet its intended purpose if our state's most vulnerable workers consider it more a site of danger than of hope. In the dwindling instances when we do interface with undocumented clients and potential clients, the question of risk associated with attending court is inevitably a topic of paralyzing concern. This uncertainty has also introduced new evaluations of risk into the most routine parts of our practice, for example causing us to avoid filing affidavits of indigency in cases where the process of getting court fees waived requires a court appearance for a vulnerable client who fears exposure to ICE. The protection of our employment laws extends to all Massachusetts residents, regardless of immigration status. For undocumented workers and their families, that protection is meaningless so long as the courthouse is a trap.

### Access to Justice

The Massachusetts Judiciary has a longstanding
commitment to ensuring equal access to the court
system for all members of the public, and "Access to
Justice is a core value of the Massachusetts Judicial
Branch." Executive Office of the Trial Court, Access
to Justice Initiative https://www.mass.gov/service-
details/access-to-justice-initiative (last visited
March 20, 2018); see also Carey & Spencer, Strategic
Plan 2.0, Massachusetts Trial Court 20 (Oct. 2016)
("The Trial Court is committed to providing fair and
impartial administration of justice, protection of
constitutional and statutory rights and liberties,
equal access to  justice for all in a safe and
dignified environment ..."). In June 2009, the Chief
Justices of the Supreme Judicial Court and the Trial
Court established the Access to Justice Initiative,
with a mission that includes  "broaden[ing] access to
civil justice for all litigants" Executive Office of
the Trial Court, Access to Justice Initiative
https://www.mass.gov/service-details/access-to-
justice-initiative (last visited March 20, 2018). To
honor this vital commitment to access to justice
values and to provide meaningful access for all
Commonwealth's residents, it is important that the

judiciary avoid giving the imprimatur of legality to ICE's presence in the courthouses.

For all of the foregoing reasons, we respectfully request that the Petition be referred to the full bench of this Court for consideration of issuing a ruling that the writ of protection from civil arrest applies to civil immigration arrests in order to protect access to the courts of the Commonwealth of Massachusetts.

Respectfully Submitted,

Georgia Katsoulomitis
(BBO# 560473)
*Executive Director*
Massachusetts Law Reform Institute (MLRI)
40 Court Street
Suite 800
Boston, MA 02108
(617)357-0700 (x 316)
GKatsoulomitis@mlri.org
On behalf of:

Elizabeth A. Soulé
(BBO#551967)
*Executive Director*
MetroWest Legal Services
63 Fountain Street, Suite 304

Framingham, MA 01702
508-620-1830

Jay McManus
(BBO#338720)
*Executive Director*
Children's Law Center of Massachusetts
298 Union St.
Lynn, MA 01903
781-581-1977

Mojdeh Rohani
*Executive Director*
Community Legal Services and Counseling Center
(CLSACC)
47 Thorndike Street
Suite SB-LL-1
Cambridge, MA 02141
(617) 661-1010

Denise Ghartey
*President*
Esme Caramello
(BBO# 600896)
*Faculty Director*
Harvard Legal Aid Bureau
23 Everett Street, First Floor
Cambridge, MA 02138
(617) 495-4408

Phillip Kassel
(BBO#555845)
*Executive Director*
Mental Health Legal Advisors Committee
24 School Street, Suite 804
Boston, MA 02108
617-338-2345

Sue Chandler
*Executive Director*
DOVE (DOmestic Violence Ended), Inc.
P.O. Box 690267
Quincy, MA 02269
617-770-4065

Carol Rose
(BBO#634406)
*Executive Director*
ACLU of Massachusetts
211 Congress Street
Boston, MA 02110
(617) 482-3170

Brian O'Connor
(BBO# 636175)
*Program Manager*
Justice Center of Southeast Massachusetts
231 Main Street, Suite 201
Brockton, MA 02301-4342
(774) 488-5961

Ethan Horowitz
(BBO# 674669)
*Managing Director*
Northeast Justice Center
50 Island Street
Suite 203B
Lawrence, Massachusetts 01840
978-888-0624

Leticia Medina-Richman
(BBO# 637620)
*Managing Attorney*
Central West Justice Center
405 Main Street 3rd Floor
Worcester, Massachusetts 01608